# TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT is dated as of June 13, 1999, and is entered into by and among, on the one hand, COMEDY CLUB, INC., a Louisiana corporation, ("CCI"), having its principal executive office at 1405 Airline Drive, Metairie, Louisiana, and AL COPELAND INVESTMENTS, INC., a Louisiana corporation, ("ACII"), having its principal executive office at 1405 Airline Drive, Metairie, Louisiana, jointly and severally (CCI and ACII are hereinafter, jointly and severally, referred to as "Licensee"); and, on the other hand, IMPROV WEST ASSOCIATES, a California limited partnership ("Licensor"), having its principal executive office at 8162 Melrose Avenue, Los Angeles, California.

WHEREAS, Licensor owns and operates a restaurant, bar and nightclub at 8162 Melrose Avenue, Los Angeles, California known as the "IMPROV" (the "Melrose Improv") and controls the rights to use and license the trademarks "IMPROV" and "IMPROVISATION" (such trademarks, together with the related trade dress and related trade secrets, are hereinafter referred to as the "Trademarks") at such location; and

WHEREAS, Licensor, except as otherwise herein set forth or disclosed, owns the Trademarks and controls the rights to use the Trademarks at all locations other than at the Melrose Improv and also is engaged in the business of licensing others to use the Trademarks in connection with restaurants, bars and nightclubs; and

WHEREAS, Licensor and Licensee are entering into a Asset Purchase and Sale Agreement (the "Asset Purchase Agreement") concurrently with this Agreement, pursuant to which Licensor agrees to sell, assign and transfer and Licensee agrees to purchase certain assets of the Melrose Improv; and

WHEREAS, Licensor wishes to grant to Licensee and Licensee wishes to acquire an exclusive license to use the trademarks "IMPROV" and "IMPROVISATION" (the "Trademarks') in connection with the business that Licensee plans to operate at the premises now used by the Melrose Improv; and

WHEREAS, Licensor wishes to grant to Licensee and Licensee wishes to acquire from Licensor a license to use the Trademarks in connection with other restaurant/bar/nightclub facilities that Licensor may own or open at other locations and the right to grant to third parties a sub-license to use the Trademarks in connection with other restaurant/bar/nightclub facilities that such third parties may own or open at other locations;

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 26

NOW THEREFORE, in consideration of the premises and the mutual covenants and conditions contained herein, and intending to be legally bound hereby, the parties agree as follows:

1.   DEFINITIONS

"Adjusted Gross Sales" means, for any Club, all gross receipts at such Club, less credit card chargebacks not ultimately collected, less complimentary food, beverages and admissions (not exceeding the level of complimentary food, beverages and admissions as the Melrose Improv has customarily afforded to its business guests and entertainment industry performers, executives, managers, lawyers and agents), less any receipts for food and beverages consumed in any area of the Club (the "Non-Improv Area") which is both physically separate and apart (which may mean a separate building, but may also mean a separate dining room) from that portion of the Club in respect of which the Trademarks are used and not used for the presentation of live entertainment, plus, if and to the extent any discounts are allowed to Club patrons for food, beverages or Club admission by reason of their patronage of the Non-Improv Area or as a means of marketing or promoting the Non-Improv Area, a deemed admission equal to the discount.

"Affiliate" means, as to any natural person, or any corporation, partnership, joint venture, limited liability company, business association, trust, governmental agency or other entity (each, a "Person"), any other Person controlled by, under common control with, or which controls, directly (or indirectly through one or more intermediaries), the Person in question. The term "Control" for these purposes means the ability, whether by direct or indirect ownership of shares or other equity interest, by contract or otherwise, to elect a majority of the directors of a corporation, to select the managing partner or member of a partnership or limited liability company, or otherwise to select, or have the power to remove and then select, a majority of those persons exercising governing authority over an entity, and, in the case of a limited partnership or limited liability company, shall mean the sole general partner thereof, all of the general partners thereof, to the extent each has equal management control or authority, or the managing general partner or member or managing general partners or members thereof, as appropriate (and in any event shall mean the ownership and control [that is, the right to vote] of fifty percent (50%) or more of the residual equity interest in an entity). The term "Affiliate" shall also mean and include: (i) a trust of which the Person, or a direct or indirect shareholder of such Person, is a trustee, or which has as its principal income or residuary beneficiaries such Person, or any direct or indirect shareholder of such Person, or members of the immediate family of such Person, or direct or indirect shareholder; and (ii) any members of such Person's immediate family, or the member of the immediate family of any direct or indirect shareholder of such Person. For purposes hereof, shares or other ownership interests held by a trust shall be deemed to be owned pro rata by the income and residuary beneficiaries of such trust. Further, the members of the immediate family of any Person shall include all collateral

Trademark License Agreement
Revised 6/9/99

EXHIBIT ℬ   PAGE 21

3

relatives of such Person having a common linear ancestor with such Person, and the spouse or any former spouse of such Person or any of such collateral relatives of such spouse.

"Club" means any bar, restaurant, nightclub or other facility in respect of which any of the Trademarks is in any way used or displayed and any restaurant, nightclub or other facility adjacent to or within 50 yards of such facility which is owned or operated by an Affiliate of the owner or operator of such bar, restaurant, nightclub or other facility.

"Operator" means any Person, including Licensee or any Affiliate of Licensee or any Third Party, which owns or operates a Club licensed or sub-licensed pursuant to this Agreement, whether for its own account or as manager or agent for any other person duly licensed or sub-licensed to own or operate a Club.

"Term" means, in the case of the License (hereinafter defined), the duration of the License pursuant to Section 3 of this Agreement, and, in the case of the Melrose Improv License (hereinafter defined), the duration of the Melrose Improv License pursuant to Section 3 of this Agreement.

"Third Party" means any Person other than Licensor, an Affiliate of Licensor, Licensee or an Affiliate of Licensee.

2.    GRANT OF LICENSES

a.    Subject to the terms and conditions of this Agreement, and except as herein otherwise provided, Licensor hereby grants to Licensee, for the Term and the Territory (as hereinafter defined), the exclusive right, power and license (the "License") to use the Trademarks in connection with one or more Clubs (other than the Melrose Improv, which is covered by Section 2.b. below), each containing a restaurant, bar and nightclub which presents, in a showroom with a minimum of 150 seats, at least three nights each week (including Friday and Saturday), entertainment consisting exclusively of live, stand-up or sketch comedy performances and live improvisational comedy performances substantially as presented at the Melrose Improv during the period January 1, 1998 through the date of this Agreement and the right, power and license to sub-license Third Parties to do so. Licensee's License is expressly conditioned upon Licensee and its Affiliates and all sub-licensees complying with any and all applicable local, state and federal laws, rules or regulations, including but not limited to securities laws, franchising laws and alcoholic beverage licensing laws. Any sub-license granted by Licensee: (i) shall be subject to this Agreement; (ii) shall not grant rights which are broader in any way than the license granted hereunder; (iii) shall not grant any television rights nor any merchandising rights, other than the right to sell merchandise as herein contemplated; (iv) shall provide that the sub-licensee shall not have the right to grant further sub-licenses; (v) shall contain every provision required or

4

implied by this Agreement (as when this Agreement states that "Licensee shall cause all Operators [to undertake certain actions or to observe certain requirements]"); and (vi) shall be subject to Licensor's prior written approval, which approval shall not be unreasonably withheld provided the proposed sub-licensee and each of its Affiliates is financially capable and responsible and is not an Affiliate of any Person who has been convicted of a felony or a crime involving moral turpitude in any jurisdiction.

b.      Subject to the terms and conditions of this Agreement, and except as herein otherwise provided, Licensor hereby grants to Licensee, for the Melrose Improv License Term (as hereinafter defined), an exclusive license (the "Melrose Improv License") to use the Trademarks at 8156 Melrose Avenue and 8162 Melrose Avenue, Los Angeles, California (the "Premises") in connection with a restaurant, bar and nightclub which presents, at least three nights each week (including Friday and Saturday), entertainment consisting exclusively of live, stand-up or sketch comedy performances and live improvisational comedy performance in substantially the same manner as such entertainment has been presented by Licensor at the Melrose Improv since January 1, 1998.

3.      TERM

a.      The License shall commence on the date of this Agreement and continue until May 31, 2019, unless terminated sooner in accordance with the terms of this Agreement. Upon termination of this Agreement, the License and the rights granted hereunder and the obligations imposed hereunder shall cease, except that Licensee and any sub-licensee shall remain liable for any obligations remaining hereunder including obligations accrued as of the date of such termination and except as otherwise expressly set forth herein. On condition that Licensee fully performs all of its obligations under this Trademark License Agreement and is not in default, then Licensee shall have the option, exercisable by written notice given to Licensor after June 1, 2018 and before December 1, 2018, to extend the License until May 31, 2029.

b.      The Melrose Improv License shall commence on the date of this Agreement and continue until May 31, 2019, unless terminated sooner in accordance with the terms of this Agreement.  Upon termination of this Agreement, the Melrose Improv License and the rights granted hereunder and the obligations imposed hereunder shall cease, except that Licensee shall remain liable for any obligations remaining hereunder including obligations accrued as of the date of such termination and except as otherwise expressly set forth herein.  On condition that Licensee fully performs all of its obligations under this Trademark License Agreement and is not in default, then Licensee shall have the option, exercisable by written notice given to Licensor after June 1, 2018 and before December 1, 2018, to extend the Melrose Improv License until May 31, 2029.

Trademark License Agreement
Revised 6/9/99

5

c.     Any sub-license granted during the Term may be for an initial term of twenty (20) years and may give the sub-licensee the option to extend the term of the sub-license for an additional ten (10) years all on condition that at all times the sub-licensee fully perform all of its obligations under the sub-license, including such obligations as shall be required by this Agreement.

d.     Licensor, for itself and its Affiliates, hereby expressly reserves all of its rights and interests under and with respect to: (i) all agreements listed on Schedule 3-1 attached hereto (relating to rights of Third Parties to use the Trademarks in connection with Clubs), all amendments, extensions and renewals of such agreements, and all fees or other amounts required to be paid thereunder; (ii) any direct or indirect ownership or other interest in any Club now or at any time hereafter operated at any location covered by the agreements listed on Schedule 3-1 (such interests to include, without limitation, a profit participation or royalty interest in such Club, any direct ownership of such Club, or the ownership of stock, partnership or joint venture interests, interests in limited liability companies and the like, in entities owning or controlling any such Clubs); and (iii) all other rights of Licensor provided for herein or otherwise; and (iv) any and all other rights of any nature in respect of or in connection with the Trademarks, including but not limited to television (except as otherwise herein provided), radio, motion picture, merchandising (except as otherwise herein provided), sound recording, publishing, computer game, internet, on-line computer network, live performance rights (regardless of where live performances are presented) and the right to use the Trademarks on cruise ships (regardless of the point of origination or termination of the cruise).

4.     TERRITORY

The territory within which Licensee may exercise the rights herein granted (the "Territory") shall mean the 48 contiguous continental states of the United States with the following exceptions:

a.     Certain pre-existing agreements to which Licensor and/or its Affiliates are parties contain covenants restricting the right of Licensor and/or its Affiliates and licensees, to own or operate a restaurant, bar, or nightclub or otherwise use the Trademarks as provided in such agreements (the "Restrictive Agreements"). The Restrictive Agreements are listed on Schedule 4-1 attached hereto. Licensee hereby acknowledges that it has received and read copies of certain portions of the Restrictive Agreements which create restrictions on Licensor. Before opening any Club and before entering into any sub-license that might reasonably be expected to violate or cause Licensor or it Affiliates to be in violation of any of the Restrictive Agreements, Licensee agrees that it shall provide written notice of its intention to do so and the details thereof to Licensor. Licensor shall, within 30 days following receipt of any such notice, advise Licensee whether or not the proposed Club or sub-license might violate any of the Restrictive Agreements listed on Schedule 4-1. If Licensor

determines and advises Licensee that the proposed Club or sub-license might result in a violation of a Restrictive Agreement, Licensee agrees that it shall not open such Club and/or grant the sub-license until after expiration (if applicable) of the Restrictive Agreement in question, and then only in accordance with the provisions of this Agreement.  If Licensee disagrees with Licensor's determination, and the parties are unable to negotiate a resolution, then they shall submit the issue to arbitration in the same manner as provided in section 22 of this Agreement.

b.      Licensee may not open and may not grant sub-licenses in respect of any Club in the State of Nevada or in or within a 25 mile radius of Tunica, Mississippi. Subject to the preceding sentence and the other provisions of this Agreement, Licensor and Licensee may each own or operate (but Licensee may not sub-license) a Club in any other area or in any other venue (such as riverboats) in which gambling is legal provided that the other party has not first opened a Club in such area, or provided, in the case of Licensee, that Licensor is not otherwise using the Trademarks in such area (e.g. as by presenting shows or other entertainment).

5.      MANNER IN WHICH THE TRADEMARKS SHALL BE USED

~~Licensee shall observe and conform, and shall cause its Affiliates and sub-~~ licensees and their Affiliates, to observe and conform to the following requirements and requirements with respect to the use of the Trademarks, each of which requirements are of the essence of this Agreement:

a.      Unless Licensor in each instance otherwise specifically and in writing agrees, the Trademarks shall be used in substantially the same manner as the Trademarks are now used at the Melrose Improv, and the typeface and format of all such uses, including but not limited to exterior signs, shall be substantially identical to that used for the Trademarks at present in corresponding ways and places at the Melrose Improv.

b.      If any of the Trademarks is used at any Club at which there is a Non-Improv Area at which another name or trademark (such as a restaurant name) is used to identify the business carried on there, the Trademarks shall be given signage at least equal in size and prominence to the signage of the name and trademarks such other business to the extent applicable zoning laws and regulations allow, unless otherwise agreed on a case by case basis.  No tradename other than "the Improv" or "the Improvisation" shall be used at 8162 Melrose Avenue, Los Angeles, California.

c.      Admission shall be charged for any live performance at any Club.  The amount of such admission shall be comparable to the charges at present imposed at the Melrose Improv and other Clubs covered by the agreements listed on Schedule 3-1 or as may in the future be imposed by any of the Clubs covered by the agreements listed on Schedule 3-1.  In addition to the admission charge, there shall be a two drink

7

minimum (or equivalent minimum food service minimum).  Liquor, beer, wine and food service shall be available at all times in the room in which entertainment is presented.

     d.    Such further conditions and requirements as may be set forth on any Schedule 5-1 attached hereto.

     6.    LICENSE FEES AND ROYALTIES

     a.    Upon execution of this Agreement, Licensee will pay Licensor an initial, non-refundable license fee of $25,000 for the Melrose Improv License.  Such initial, non-refundable license fee shall not be applicable to any other fees or royalties payable under this Agreement.

     b.    Two weeks before the opening of any Club, which is owned or operated by Licensee or by an Affiliate of Licensee, Licensee shall pay Licensor an initial, non-refundable license fee in respect of such Club, of $25,000.  Against and in reduction of the fees payable pursuant to this Section 6.b., Licensee shall pay Licensor a non-refundable advance of $50,000 upon execution of this Agreement,  and a further non-refundable advance of $50,000 on June 1, 2000.

     c.    In addition to the initial license fee payable pursuant to Section 6.a. above, Licensee will pay Licensor for the Melrose Improv License a royalty of 3 1/2% of the Adjusted Gross Sales at the Melrose Improv and all business owned or licensed by Licensee at the Premises (i.e., including but not limited to the business of any Club operated there).  Such royalty shall be accounted for weekly, and paid in the week following the week for which accounting is made, except that if Second City or a similar business opens at 8156 Melrose Avenue, then, upon the opening of such business, the amount due in respect of such business located at 8156 Melrose Avenue shall be $500 per month, payable on the first of each month, regardless of the Adjusted Gross Receipts or lack thereof of such business.

     d.    In addition to the initial license fee payable pursuant to Section 6.b. above, Licensee will pay Licensor a royalty equal to the percentage set forth on the following table of the Adjusted Gross Sales of each Club, other than the Melrose Improv, which is opened, owned and operated by Licensee or an Affiliate of Licensee:



8

| Club | Royalty Rate |
|------|--------------|
| First 15 Clubs | 4% |
| Each Club after 15th Club, up to 25th Club | 3.5% |
| Each Club after 25th Club | 3% |

For purposes of determining the applicable royalty rate under the preceding table, the Melrose Improv shall not count towards the number of Clubs. The applicable royalty shall be paid weekly, in respect of the preceding week. Notwithstanding the foregoing provisions of this Section 6.d., royalties for a Club shall not be payable for a period of three months following the opening of such Club on condition that Licensee uses the royalties otherwise payable, in addition to at least an equivalent amount provided by the Operator of such Club, to promote and advertise such Club and accounts to Licensor for the amounts so paid for promotion and advertising.

e.     In the case of Clubs which are owned and operated by Operators other than Licensee or its Affiliates:

(i)     Licensee shall cause such Operators to pay a royalty based upon the Adjusted Gross Sales of each such Club. Such royalty shall be divided equally between Licensor and Licensee, except that Licensor shall be entitled to a royalty rate of at least 2 ½%.

*For example:* If an Operator other than Licensee or its Affiliates pays a royalty rate of 5%, Licensor shall receive a royalty rate of 2 ½%. If an Operator other than Licensee or its Affiliates pays a royalty rate of 6%, Licensor shall receive a royalty rate of 3%. If an Operator other than Licensee or its Affiliates pays a royalty rate of 4%, Licensor shall receive a royalty rate of 2 ½%.

(ii)     Licensee shall pay Licensor an amount equal to the greater of (A) fifty percent (50%) of any other amounts paid by such Operators to Licensee or its Affiliates, as and when paid, after Licensee recoups from 100% of such other amounts an amount equal to all training and opening expenses incurred by Licensee in connection with the Improv area of such Club or (B) $12,500 upon the opening of such Club.

All sub-licenses shall contain provisions with respect to accounting, payment and default substantially equivalent to the provisions of this Agreement and shall name Licensor as a third party beneficiary of such sub-licenses. Unless Licensee itself pays

Trademark License Agreement
Revised 6/9/99

EXHIBIT B  PAGE 33

Licensor the full amount of royalties due pursuant to this Agreement, Licensee shall cause such Operators to account for and pay directly to Licensor Licensor's share of such royalties and other amounts.

### 7. MERCHANDISING

Licensee shall have the following merchandising rights with respect to the Trademarks and no others.

Licensee shall have the right to create, subject to Licensor's approval, which approval shall not be unreasonably withheld, merchandising items in the categories set forth on Schedule 7-1 (the "Items") for sale only at Clubs or in restaurants owned, operated or sub-licensed by Licensee or its Affiliates. Licensee shall offer approved merchandising items for sale, as aforesaid, in a manner similar to the way that merchandising items have been offered and sold at the Melrose Improv from January 1, 1998 to the date of this Agreement, in the Improv area of all Clubs owned or operated by Licensee or any Affiliate of Licensee. Licensee shall require as a condition of every sub-license that the sub-licensee offer approved merchandising items for sale to the public, in such similar manner, and shall manufacture and sell approved merchandising items at an appropriate and reasonable wholesale price to all Operators for such purpose. Licensee shall permit Licensor to purchase any quantity of the Items, for its own use or for resale, at Licensee's cost. Licensee shall itself account, and shall cause all Operators to account, to Licensor and pay Licensor, on a monthly basis, a royalty equal to three and one half percent (3-1/2%) of the gross retail sales price of each merchandising item sold in any Club during the preceding month and a royalty equal to ten percent (10%) of the gross retail sales price of each merchandising item sold outside of a Club during the preceding month. The sales price for each Item as to which Licensor receives a royalty shall not be included in Adjusted Gross Sales.

### 8. TELEVISION

a. If, in connection with any television, radio, or internet program or series of programs that Licensor produces, it wishes to use as a location the Melrose Improv or any other Club operated by Licensee or an Affiliate of Licensee, Licensor shall have the right to do so on such rental terms as are reasonable and customary for the use of such a facility and as shall be negotiated in good faith.

b. Licensor agrees that if it wishes to produce any television program or series of programs for initial exhibition on broadcast television in the United States using the Trademarks or any radio or internet program or series of programs using the Trademarks, it shall afford Licensee the right of first refusal to finance such program or series of programs. Such right of first refusal shall mean that if Licensor is interested in such program or series, it shall by notice to Licensee offer Licensee the opportunity to finance such program or series and, if Licensee notifies Licensor within one week of

10

the receipt of such notice that it is interested in financing such program or series, Licensor shall negotiate with Licensee the terms and conditions upon which Licensee would make such financing commitment. If a mutually satisfactory agreement is not reached within three weeks of the date Licensor first sends notice, then Licensor shall be free to enter into any agreement for the financing of such program or series. In the event of a "hot offer", the foregoing time periods, respectively, shall be shortened to three days and one week. If Licensee at any time develops a concept or program idea by its own efforts or because Licensee opens a Club in a new city and/or a local entity approaches Licensee to do a show, then Licensee may do so subject to complying with procedures outlined in section 8.c. If, however, a national network or cable service or national program producer asks Licensee to do a show at any Club located in Los Angeles, or if any one approaches Licensee to do a show by reason of the fact that Licensee is operating a Club in Los Angeles, then this paragraph shall not apply.

c.     The following shall apply beginning three years after the Closing Date: If Licensee wishes to produce any television program or series of programs for initial exhibition on broadcast television in the United States or any radio or internet program or series of programs, it may do so beginning three years after the Closing Date, provided it shall offer Licensor the opportunity to function as the production company, on terms and conditions appropriate to the program, in keeping with customary industry standards, and as shall be negotiated in good faith. If Licensor chooses not to be the production company, then Licensee shall instead pay Licensor a "packaging fee" in connection with such program or series of programs in the same manner as the "packaging fees" customarily paid to the William Morris Agency on the formula known as "10, 5 and 5", meaning Licensor shall receive ten percent (10%) of the license fee, payable out of the budget of the program, five percent (5%) of all syndication sales and five percent (5%) of the net profits. Beginning three years after the Closing Date, if Licensor finances and produces a television program or series of programs for initial exhibition on broadcast television in the United States using the Trademarks or any radio or internet program or series of programs using the Trademarks, it will pay Licensee a similar "packaging fee".

9.     LICENSEE'S COVENANTS

a.  Licensee shall submit to Licensor as soon as available but not later than ninety (90) days after Licensee's fiscal year, complete financial statements for such year for Licensee and for each Affiliate of Licensee which owns or operates one or more Clubs.  Licensee shall certify them to be true and correct and to have been prepared in accordance with generally accepted accounting principles consistently applied, and any materially false or inaccurate certification shall be a breach of this Agreement.  Licensor may also request, from time to time, information with respect to gross operating profits percentages and certain operating statistics for each such Club, and Licensee shall provide such information within a reasonable time after any such request.  Licensor shall cause each Operator which is a Third Party to submit to

. 11

Licensor as soon as available but not later than ninety (90) days after such Operator's fiscal year, complete financial statements for such year for such Operator.   The respective Operator shall certify them to be true and correct and to have been prepared in accordance with generally accepted accounting principles consistently applied, and any materially false or inaccurate certification shall be a breach of such Operator's sub-license and a breach by Licensee of this Agreement.   Licensor may also request, from time to time, that Licensee cause each Operator which is a Third Party to provide information with respect to gross operating profits percentages and certain operating statistics for each Club, and Licensee shall cause such information to be provided within a reasonable time after any such request.

b.   Licensee acknowledges that the Licensor is the sole and exclusive owner of the Trademarks and that nothing contained in this Agreement shall be construed to convey any rights or proprietary interest in the Trademarks to Licensee other than the specific licenses granted hereunder.   Licensee shall cause each Operator to make a similar acknowledgment.   Licensee covenants that it shall not at any time challenge or contest the validity, ownership, title or registration of Licensor in and to the Trademarks or the validity of the licenses granted under this Agreement. Licensee shall cause each Operator to make a similar covenant.

c.   Licensee covenants promptly to notify Licensor, and to cause each Operator promptly to notify Licensor, of any suspected infringement of, or challenge to the validity of ownership of or the right of Licensor to use the Trademarks licensed hereunder.   Licensee acknowledges, and will cause each Operator to acknowledge, Licensor's right to control any administrative proceeding or litigation involving the Trademarks.   Licensor is not obligated by this Agreement or otherwise to protect any rights granted to the Licensee to use the Trademarks, or to protect the Licensee against claims of infringement or unfair competition, provided however, that if Licensor elects not to act, and if action is reasonably necessary to protect Licensee's rights in the Trademarks, Licensee may, upon notice to Licensor, act in Licensor's place, and may recoup the cost of doing so from any royalties thereafter payable hereunder.   In the event Licensor undertakes the defense or prosecution of any litigation relating to the Trademarks, Licensee agrees, on behalf of itself and its Affiliates, and Licensee shall cause each Operator to agree, on behalf of itself and its Affiliates, to execute any and all documents and to do such acts and things as may in the opinion of Licensor be necessary to carry out such defense or prosecution.

d.   Licensee agrees that Licensor may enter any Club at any time during regular business hours for purposes of reviewing Licensee's operation in general, to assure compliance with the standard of quality established by Licensor for goods sold and services provided under in connection with the Trademarks.   Licensor shall cause all Operators to afford Licensee such right of entry.

12

All royalties due pursuant to this Agreement shall be paid weekly in respect of the preceding week. Unless Licensee itself pays Licensor the full amount of royalties due pursuant to this Agreement, Licensee shall cause all Operators to pay directly to Licensor any royalties due to Licensor on a weekly basis in respect of the preceding week. Once each month, Licensee shall submit to Licensor a report (the "Monthly Report") setting forth, in reasonable detail, and with respect to each separate Club (including Clubs owned and operated by Third Parties): (i) the amount of gross receipts received by each such Club, broken down by type of income (such as restaurant receipts, bar receipts, showroom admissions, etc.); (ii) the amount of permissible deductions from such gross receipts to reach Adjusted Gross Sales pursuant to this Agreement; (iii) a calculation of the royalties payable; and (iv) a reconciliation of the royalties payable with the amounts theretofore paid weekly. A separate Monthly Report shall be prepared and submitted to Licensor for the Melrose Improv. Licensee will cause each Operator to prepare and supply the foregoing information for each Club that such Operator owns or operates. Each Monthly Report submitted to Licensor in accordance with the provisions of this Section shall be certified on behalf of Licensee by its Chief Financial Officer as being true and correct in all material respects. All information supplied by an Operator which is a Third Party shall be certified on behalf of such Third Party by its Chief Financial Officer as being true and correct in all material respects. Each Monthly Report shall be accompanied by the payment shown thereon to be due to Licensor.

f.     Licensee shall maintain, and shall cause each Operator to maintain, accurate books and records sufficient, for all purposes, for the preparation of the Monthly Reports, and to verify the information contained therein, and otherwise to calculate the royalties required to be paid pursuant to this Agreement. Licensee shall grant to Licensor and each of its agents, accountants, employees and other authorized representatives full and complete access to all books and records of Licensee relating to this Agreement, and shall cause each Operator to do so with respect to the Clubs that they respectively own or operate. To the extent such information is contained in electronic storage media, Licensee agrees to provide, and to cause each Operator to provide, upon request of Licensor, hard copies of all such data. Any investigation or audit conducted by Licensor, or their respective employees or agents shall be upon reasonable prior written notice and during normal business hours and shall be conducted in a manner so as to minimize disruption of the operations of Licensee or the Operator being audited. If, as a result of any such investigation or audit, Licensor shall determine that the amount of royalties theretofore paid to Licensor pursuant hereto is less than the amount required to have been paid, Licensee or the Operator responsible for the underpayment, as the case may be, shall promptly remit the deficiency to together with a late payment fee of 10% of the amount of the underpayment. Licensor shall cause all Operators to agree to payment of such a late payment fee in the case of any underpayment. In addition, if any such investigation or audit discloses an underpayment to Licensor for any monthly period of five percent (5%) or more, Licensee or the Operator responsible for the underpayment, as the case may be, shall

13

promptly reimburse Licensor for all reasonable costs and expenses incurred by Licensor in conducting such investigation or audit for all periods then being investigated or audited. Licensor shall cause all Operators to agree to such reimbursement in such event.

g.    Licensor will maintain, and will cause all Operators to maintain, insurance customary to the operation of businesses such as the Clubs, including general liability insurance, and will add the persons listed on Schedule 8-3 of the Asset Purchase Agreement as additional insureds.

h.    Licensor will provide Budd Friedman and his assistant with office space at the Premises or other location to which the "Improv Flagship" (as defined in section 9.1.) may be moved as provided by section 9.1., comparable in size, furnishing and amenities to the office which Budd Friedman has at the Melrose Improv as of the date of this Agreement, for the entire duration of the time which Licensee or any of its Affiliates occupies the Premises, free of any charge. Such office shall include light, heat, air conditioning, local telephone service and the continued use of all office equipment used by Budd Friedman in his office as of the date of this Agreement, all without charge.

i.    Licensee shall allow Mark Lonow to use the main showroom or other facilities at the Melrose Improv or other location to which the "Improv Flagship" (as defined in section 9.1.) may be moved as provided by section 9.1., on up to three mutually agreed dates each year, for the entire duration of the time which Licensee or any of its Affiliates occupies the Premises, for purposes of "graduation" ceremonies and celebrations for his acting students, all without charge. Licensee shall allow Mark Lonow to showcase acts at the Melrose Improv as he has in the past.

j.    Licensee shall not own or operate, and Licensee shall ensure that none of its Affiliates shall own or operate any bar, restaurant, nightclub or other facility which presents live stand-up or sketch comedy performances or live improvisational performances, other than the Melrose Improv or a Club, or Second City.

k.    Licensee will fulfill the schedule set forth in section 12.a. of this Agreement, and pay the advances set forth in section 12.b. of this Agreement

l.    For the duration of the Melrose Improv License, Licensee will operate a restaurant, bar and nightclub under the name "the Improv", or "the Improvisation", at 8162 Melrose Avenue, Los Angeles, California which presents, at least three nights each week (including Friday and Saturday), entertainment consisting exclusively of live, stand-up or sketch comedy performances and live improvisational comedy performance in substantially the same manner as such entertainment has been presented by Licensor at the Melrose Improv since January 1, 1998, provided however, that Licensee may move such business (the "Improv Flagship") to another location within

14

the entity for Los Angeles with Licensor's consent, which consent shall not be unreasonably withheld. If Licensee determines that the "Improv Flagship" (regardless of its location) is not financially viable, then it may sublease the location (it being understood that the business of the "Improv Flagship" may not be sublicensed or assigned) provided that Licensee first by notice offers to assign to Licensor all its rights to the "Improv Flagship" and to sublease the Premises (or other location to which the "Improv Flagship" may be moved) to Licensor for no cost other than the cost of inventory on hand. Licensee shall cause the Lessor of the Premises (or other location to which the "Improv Flagship" may be moved) to insert into the lease for the Premises (or other location, as the case may be) a clause stating that if Licensee elects to sublease to Licensor, the Lessor will approve such sublease.

10.    REPRESENTATION AND WARRANTIES OF LICENSOR

Licensor represents and warrants to Licensee that as of the date of this Agreement it is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has full corporate power and authority to enter into this agreement and to carry out the transactions contemplated hereby. The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Licensor have been duly and validly authorized by all necessary corporate action of Licensor.

11.    REPRESENTATIONS AND WARRANTIES OF LICENSEE

a.    Each constituent entity of Licensee has taken all corporate and/or other action necessary to authorize the execution and delivery of this Agreement and the transactions contemplated hereby, and this Agreement are a valid and binding obligations of each constituent entity of Buyer, in accordance with its terms. Each constituent entity of Buyer has all necessary corporate or other power and authority to enter into this Agreement, and to consummate the transactions provided herein. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated herein will constitute a violation or breach of (i) the Articles of Incorporation or Bylaws of or other organizational or governing documents of the respective constituent entity of Buyer, (ii) any provision of any contract or other instrument to which any constituent entity of Buyer is a party or by which the business, assets or properties of any constituent entity of Buyer may be affected or secured, or of (iii) any order, writ, injunction, decree, statute, rule or regulation.

b.    All representations and warranties of Licensee under the Asset Purchase Agreement (in which document Licensee is identified as "Buyer") are incorporated herein as if here set forth in full.

Trademark License Agreement
Revised 6/9/99

EXHIBIT $\underline{B}$  PAGE $\underline{31}$



15

The financial statements previously delivered for each constituent entity of Buyer are true and complete and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods indicated.

12.  EVENTS OF DEFAULT

It shall constitute an event of default ("Event of Default") if any one or more of the following shall occur for any reason:

a.  The following schedule shall not be fulfilled: Licensee and/or its Affiliates will open, own and operate at least three (3) Clubs, in addition to the Melrose Improv, on or before June 1, 2001, all of which shall remain open as of such date, and beginning June 1, 2001, Licensee and/or its Affiliates will open, own and operate at least two (2) new Clubs each year, so that the cumulative number (net of any Clubs which close) open and operated by Licensee and/or its Affiliates will be increased by two each year (i.e. at least 5 by March 1, 2002, at least 7 by March 1, 2003, etc.) (for the avoidance of doubt, Clubs owned or operated by Third Parties shall be disregarded) until a cumulative total of twelve (12) Clubs are open;

b.  Licensee shall fail to pay on June 1, 2001, and on each June 1 thereafter, as a non-refundable advance against the license fees which shall become due pursuant to section 6.b. of this Agreement, the sum of $50,000, until a cumulative total of $300,000 has been paid pursuant to section 6.b. of this Agreement;

c.  Licensee shall fail to pay any amount which this Agreement requires Licensee to pay to Licensor when the same becomes due;

d.  Any representation or warranty made by Licensee in this Agreement or by Licensee in the Asset Purchase and Sale Agreement or in any report furnished by Licensee at any time to Licensor shall prove to be untrue in any material respect as of the date on which made or furnished;

e.  Licensee's failure to perform or observe, or Licensee's breach of, any material agreement or material covenant under this Agreement or the Asset Purchase and Sale Agreement;

f.  Any of the entities comprising Licensee shall become insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or if such a receiver or trustee otherwise shall be appointed; provided however, that none of the foregoing shall constitute an Event of Default so long as Licensee continues to fulfill in a timely manner all of its obligations under this Agreement;

Trademark License Agreement
Revised 6/9/99

EXHIBIT D PAGE 40

16

Any money, judgment, writ or warrant of attachment, or similar process shall be entered or filed against any of the entities comprising Licensee, or any material portion of their respective assets and shall remain unvacated, unbonded or unstayed for a period of thirty (30) days, if the amount of exposure exceeds Five Hundred Thousand Dollars ($500,000);

h.    Subject to any applicable limitations of the Bankruptcy Act, an involuntary bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted against any of the entities comprising Licensee, and such proceeding shall not be dismissed within sixty (60) days after its commencement;

i.    Subject to any applicable limitations of the Bankruptcy Act, a bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by any of the entities comprising Licensee;

j.    Any party other than Licensor shall deny that it has any further obligation under this Agreement or the Asset Purchase and Sale Agreement or any other instrument delivered hereunder or thereunder;

k.    Licensee shall fail to, or fail to confirm in writing, upon request by Licensor, to Licensor that it shall, perform or observe, or cause to be performed or observed, any material covenant or agreement contained in this Agreement or the Asset Purchase and Sale Agreement;

l.    The abandonment of the License or the Melrose Improv License, including but not limited to any failure by Licensee to observe and perform the covenants set forth in section 9.l. of this Agreement; or

m.    Any default by Licensee under the Asset Purchase Agreement.

13.    REMEDIES FOR EVENTS OF DEFAULT

a.    If an Event of Default exists, and if such Event of Default is susceptible of cure, Licensor shall give written notice thereof to Licensee and Licensee shall have thirty (30) days to cure such Event of Default. It is agreed that any failure of Licensee to fulfill the schedule set forth in section 12.a. shall be an Event of Default which is not susceptible of cure. If an Event of Default which is susceptible of cure is not cured within thirty (30) days after such notice, but Licensee is in good faith taking affirmative action to cure such default, the time period for doing so shall be extended for such time as reasonably and necessary to cure such default, or if the Event of Default is not susceptible of cure, then Licensor may, in its respective discretion, do any one or more of the following at any time or times and in any order, upon notice to Licensee:

17

(1)     Terminate this Agreement and/or the Melrose Improv License and/or the License for any one or more Clubs;

(2)     Terminate the merchandising rights granted hereunder;

(3)     Change the License from an exclusive to a non-exclusive license and proceed to open Clubs itself free of any restriction this Agreement may otherwise impose and/or grant licenses to Third Parties to own and operate Clubs, free of any restriction this Agreement may otherwise impose;

(4)     Rescind the Asset Purchase Agreement, in which event all Assets sold, transferred and assigned thereunder shall immediately be sold, transferred and assigned to Licensor and Licensor shall refund the Purchase Price (as defined in the Asset Purchase Agreement);

(5)     Terminate Licensee's rights to own or operate new Clubs; and/or

(6)     Terminate Licensee's rights to grant Third Parties the right to own or operate Clubs.

b.     Notwithstanding the above enumerated remedies, in the event Licensee fails to fulfill the schedule set forth in section 12.a., Licensor's sole remedy shall be as follows. Upon notice to Licensee, Licensee shall lose the right, power and License (i) to use the Trademarks in connection with any Clubs which are not, as of the date of such failure, under construction or open for business and operated by Licensee, an Affiliate of Licensee or other Operator and (ii) to sub-license Third Parties use the Trademarks in connection with any new Clubs. This section 12.b. shall have no effect upon any other remedies available to Licensor by reason of any other Event of Default, except that the payments due pursuant to sections 6.b. and 12.b. shall be due only with respect to Clubs which in fact open. If any Event of Default results only from the actions or failure to act of a Third Party as required under a sub-license, only the rights of such Third Party shall be subject to the remedies contained in this section 13. Except for failure to comply with the schedule set forth in section 12.a., if Licensee by its action or inaction permits any other Event of Default to exist and Licensor terminates any right, power or license of Licensee, Licensor shall not for such reason alone terminate the rights of any Third Party sub-licensee provided such Third Party sub-licensee is in full and timely compliance with all of its obligations under its respective sub-license, including such obligations as shall be required by this Agreement and provided Licensee assigns to Licensor all of Licensee's rights under such sub-license. In addition to the above enumerated remedies, if an Event of Default exists pursuant to section 12.l. of this Agreement, Licensee may require Licensor to sublease the Premises, or other location to which the "Improv Flagship" may have been moved, to Licensee for the balance of the lease term and any extensions, at a rent that

Trademark License Agreement
Revised 6/9/99

EXHIBIT  B  PAGE  42

18

does not exceed that payable by Licensee.  In addition, Licensor may require Licensee to sell all the fixtures, equipment and inventory of the Improv Flagship to Licensor for the value of the on-hand inventory alone.

     c.    Upon termination of the license for any Club, Licensee shall do the following, or shall cause the applicable Operator, as the case may be, to do the following with respect to such Club:

        (1)    take whatever action is necessary to assure that no use is made of any of the Trademarks;

        (2)    remove all distinctive signs, change the telephone listing and remove of all items bearing the Trademarks;

If any of the foregoing is not done within thirty (30) days after termination of the license for such Club, Licensor may cause the same to be done by Licensor or its agents, who may enter upon the premises of the Club for that purpose, at the expense and for the account of Licensee who may enter upon the premises of the Club for that purpose.  Licensor will cause its Affiliates and each Operator and its Affiliates to agree to the foregoing right of entry.

     d.    The enumeration herein of Licensor's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that Licensor may have under the UCC or other applicable law.  Licensor shall have the right, in its sole respective discretion, to determine which rights and remedies are to be exercised and in which order.  The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative.  Licensor may, without limitation, proceed directly against Licensee to collect the any amount due under this Agreement or the Asset Purchase and Sale Agreement without any prior recourse to the Collateral.

     e.    No failure or delay on the part of Licensor in the exercise of any power, right, remedy or privilege under this Agreement or the Asset Purchase shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, remedy or privilege preclude any other or further exercise thereof or of any other right, power, remedy or privilege. All rights and remedies existing under this Agreement or the Asset Purchase and Sale Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

     14.    CERTAIN PROVISIONS RELATING TO OPERATORS OTHER THAN LICENSOR

     In all instances in which this Agreement recites that Licensee will cause Operators to agree to perform in certain ways, or to observe certain requirements or

Trademark License Agreement
Revised 6/9/99

19

restrictions, licensee will insert appropriate provisions in its agreement or agreements with each Operator, and will expressly provide that Licensor is a third party beneficiary of such provision. Licensee will insert, for the benefit of Licensor, provisions in its agreement or agreements with each Operator stating that if such Operator fails to pay any amount which this Agreement requires such Operator pay to Licensor when the same becomes due, or fails to perform or observe any material agreement or material covenant under required or described by this Agreement, then Licensor may terminate such Operator's license to own or operate any Clubs owned or operated by such Operator.

### 15. SURVIVAL

All representations, warranties, covenants and agreements made by Licensor or Licensee in this Agreement or the Asset Purchase Agreement shall survive the termination of this Agreement, including the agreements to indemnify any party, and shall, except to the extent specifically limited elsewhere in this Agreement, be perpetual in term. The various provisions of this Agreement shall be severable, and the non-enforceability of one shall not affect the enforceability of any others.

### 16. INDEMNITY

a.   Licensee shall appear, defend, indemnify and hold Licensor harmless from and against any claims, liability, damage, deficiency or expense (including reasonable attorneys fees) sustained by Licensor in connection with any business carried on by Licensee, or any of its Affiliates, or any Operator, or any Operator's Affiliates in connection with any Club excepting only claims of Third Parties challenging the right of Licensor, Licensee, any of Licensee's Affiliates, any Operator or any Operator's Affiliates rights to use the Trademarks in connection with any Club as provided in this Agreement.

b.   Each party shall appear, defend, and indemnify and hold the other harmless from and against any claims, liability, damage, deficiency or expense (including reasonable attorneys fees) sustained by the other as a result of any misrepresentation, breach of warranty or nonfulfillment of any agreement or understanding of the parties under this Agreement, whether arising before or after the Closing.

### 17. ENTIRE AGREEMENT

This Agreement and the Asset Purchase Agreement contain the entire agreement of the parties hereto with respect to the transactions contemplated hereby, and all prior and contemporaneous negotiations, understanding and agreements are merged herein. This Agreement may not be amended, supplemented or otherwise modified except by

20

an instrument in writing signed by the parties hereto.  This Agreement may be executed in counterparts.

### 18.   WAIVER

The failure of any party to enforce any condition or part of this Agreement at any time shall not be construed as waiver of that condition or part nor shall it forfeit any rights to future enforcement thereof.

### 19.   APPLICABLE LAW

This Agreement shall be governed by and subject to the internal laws of the State of California.

### 20.   SURVIVAL

This Agreement shall extend to and be binding upon each of the parties hereto and their successors and permitted assigns.  All representations, warranties, covenants and agreements made herein shall survive any termination of this Agreement by Licensor.

### 21.   ASSIGNMENT

This Agreement may not be assigned by Licensee without the prior written consent of Licensor, which Licensor may grant or withhold in its sole discretion.

### 22.   ARBITRATION

All disputes relating to or arising under this Agreement or the Asset Purchase Agreement shall be resolved by arbitration in Los Angeles, California in accordance with the commercial arbitration rules of the American Arbitration Association.  In any such arbitration, the parties shall be entitled to discovery in the same manner as if the dispute were being litigated in Los Angeles Superior Court.  Notwithstanding this agreement to arbitrate, the parties, in addition to arbitration, shall be entitled to pursue equitable remedies and agree that the state and federal courts shall have exclusive jurisdiction for such purpose and for the purpose of compelling arbitration and/or enforcing any arbitration award.  The parties agree to submit to the jurisdiction of such courts and agree that service of process in any such action may be made by certified mail.  The prevailing party in any arbitration or action to enforce this Agreement or the Asset Purchase Agreement shall be entitled to its costs, including reasonable attorneys fees.

### 23.   NOTICES

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 45

21

All notices and other communications under this Agreement shall be in writing and shall be given in writing person, by recognized overnight delivery service or by mail, and shall become effective (a) on delivery if given in person, (b) on the date of delivery if sent by recognized overnight delivery service, or (c) four (4) business days after being deposited in the mail with proper postage for first class registered or certified mail, pre-paid.

Notices shall be addressed as follows:

If to Licensor:

IMPROV WEST ASSOCIATES
8162 Melrose Avenue
Los Angeles, California

With copies to:

Budd Friedman
875 Comstock Avenue, #5A
Westwood, California 90024.

Mark Lonow
2609 Laurel Pass Avenue
Los Angeles, California 90046

If to Licensee, any Affiliate of Licensee or any Operator other than Licensee or an Affiliate of Licensee:

COMEDY CLUB, INC.
1405 Airline Drive
Metairie, Louisiana

Any party may from time to time specify a different address for notices by notice to the other party.

24.    RELTIONSHIP OF THE PARTIES

a.    The parties hereto are independent contractors as to each other. No party is the legal representative or agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever.  The parties hereto expressly acknowledge that the relationship intended by them is a business relationship based entirely on, and defined by, the express provisions of this Agreement and the Asset Purchase Agreement and that no partnership, joint venture,

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 44

22

...cy, fiduciary or employment relationship is intended or created by reason of this Agreement.

b.   Licensee shall take such steps as are necessary and such steps as Licensor or Licensor may from time to time reasonably request to minimize the chance of a claim being made against Licensor for anything that occurs at any Club, or for acts, omissions or obligations of you or anyone associated or affiliated with any Club, and Licensee shall cause its Affiliates, and each Operator of a Club which is a Third Party to do the same.  Such steps may, for example, include giving notice in private rooms, public rooms and advertisements, on business forms and stationery, and any other materials, making clear to the public that Licensor is not the owner or operator of the Club and is not accountable for what happens at the Club.  Unless required by law, Licensee shall not, and Licensee shall cause each Operator to acknowledge and agree that it shall not, use the words "Improv", "the Improvisation" or any similar words in its corporate, partnership, or trade name, nor authorize or permit such use by anyone else.  Licensee shall not, and Licensee shall cause each Operator to acknowledge and agree that it shall not, use the words "Improv", "the Improvisation" or any similar words to incur any obligation or indebtedness on behalf of Licensor.

25.   CONDITIONS TO THE OBLIGATIONS OF LICENSOR

Licensor shall not be bound under this Agreement unless and until of the following conditions have been fulfilled no later than the date set forth under Section 4.a. of the Asset Purchase Agreement for the Closing thereunder:

a.   Compliance with the California Franchise Investment Act and regulations promulgated thereunder and compliance with all other applicable franchise and securities laws and regulations, to the satisfaction of counsel for Licensor.

b.   Licensee, as "Buyer" under the Asset Purchase Agreement shall have performed and complied with all covenants, agreements and conditions required in such Agreement to be performed or complied with by Licensee prior to or at the Closing, including but not limited to payment of the Purchase Price, and the Closing under the Asset Purchase Agreement shall have occurred;

c.   The representations and warranties of Licensee set forth in this Agreement be true and correct in all material respects and not contain any material errors or misstatements; and

d.   Licensor shall have been furnished with certificates of appropriate agents of each of the entities comprising Licensee, certifying to the best of the signer's knowledge in such detail as Licensor may reasonably request to the fulfillment of the foregoing conditions.

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 47

23

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

LICENSOR:

IMPROV-WEST ASSOCIATES

By:  IMPROV WEST, INC.

By: _____
Gerson "Budd" Friedman, President


By:  LONOW AND COMPANY

By: _____
Mark Lonow, President


LICENSEE:

COMEDY CLUB, INC.

By: _____
Al Copeland, CEO


AL COPELAND INVESTMENTS, INC

By: _____
Al Copeland, CEO


Trademark License Agreement
Revised 6/9/99

EXHIBIT B  PAGE 48



Schedule 3-1 to Trademark License Agreement

<u>(Rights of Third Parties to use the Trademarks in connection with Clubs)</u>



Schedule 4-1 to Trademark License Agreement

(Restrictive Agreements)

1.   All agreements listed on Schedule 3-1.

2.   [BF divorce agreement]

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 50



Schedule 5-1 to Trademark License Agreement

<u>(Conditions and Requirements as to Manner in which the Trademarks May Be Used)</u>

1.     All performances shall take place on a stage or elevated platform.

2.     All performances shall take place using first class, professional sound equipment and lighting.

3.     A sign saying "IMPROV" shall be placed on the wall behind the performers, in substantially similar to that now used at the Melrose Improv. The brick wall motif, similar to that now used at the Melrose Improv shall be used on the wall behind the performers.

4.     There shall be no dance performances in the Club.

5.     There shall be no topless performances in the Club.

6.     The Trademarks shall not be used in any way in connection with a "gentleman's club" or "strip club".