~~CONFORMED COPY~~

SHEPPARD MULLIN RICHTER & HAMPTON LLP
KENT R. RAYGOR, Cal. Bar No. 117224
FRED R. PUGLISI, Cal. Bar No. 121822
VALERIE E. ALTER, Cal. Bar No. 239905
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067-6017
Telephone: (310) 228-3700
Facsimile: (310) 228-3701
E-mail:   kraygor@sheppardmullin.com
          fpuglisi@sheppardmullin.com
          valter@sheppardmullin.com

E-FILED 03/29/12

LINK #25

*Attorneys for Defendant-In-Intervention and
Counterclaimant-In-Intervention* COMEDY CLUB, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA—WESTERN DIVISION

| | |
|---|---|
| IMPROV WEST ASSOCIATES,<br><br>Plaintiff,<br><br>v.<br><br>ROBERT HARTMANN; LEVITY PRODUCTIONS LLC; LEVITY ENTERTAINMENT GROUP, INC.; LEVITY ENTERTAINMENT GROUP, LLD; E-COMIC BRANDING, INC.; and DOES 1 through 10 inclusive,<br><br>Defendants. | Case No. CV 11-07103 PSG (SHx)<br><br>**[Proposed] INTERVENOR COMEDY CLUB, INC,'S:**<br><br>**(1) ANSWER TO COMPLAINT; AND**<br><br>**(2) COUNTERCLAIM FOR DECLARATORY JUDGMENT.**<br><br>Complaint filed:   August 29, 2011 |
| ROBERT HARTMANN, an individual; LEVITY PRODUCTIONS LLC, a Delaware limited liability company; LEVITY ENTERTAINMENT GROUP, INC., a California corporation; LEVITY ENTERTAINMENT GROUP, LLC, a Delaware limited liability company; E-COMIC BRANDING, INC., a California corporation,<br><br>Counterclaimants,<br><br>v.<br><br>IMPROV WEST ASSOCIATES, a California limited partnership, and DOES 1 through 10 inclusive,<br><br>Counterdefendants. | |

LODGED
CLERK, U.S. DISTRICT COURT
JAN 19 2012

W02-WEST:2BOA1\404095448.4

-1-
ANSWER-IN-INTERVENTION AND COUNTERCLAIM-IN-INTERVENTION

1
2  COMEDY CLUB, INC., a Louisiana corporation,

3                    Counterclaimant,

4        v.

5  IMPROV WEST ASSOCIATES, a
   California limited partnership, and
6  DOES 1 through 10 inclusive,

7                    Counterdefendants.

8

9        For its *Answer* to the *Complaint* by Improv West Associates

10 (**"Plaintiff"**), Defendant-In-Intervention Comedy Club, Inc. (**"CCI"**) admits, denies,

11 and avers as follows:

12

13                    **"JURISDICTION AND VENUE"**

14

15        1.    Paragraph 1 of the *Complaint* contains mere legal argument and

16 conclusions to which no response is required.  To the extent a response is required,

17 Defendant CCI denies the allegations in Paragraph 1 of the *Complaint*.

18

19        2.    Paragraph 2 of the *Complaint* contains mere legal argument and

20 conclusions to which no response is required.  To the extent a response is required,

21 Defendant CCI denies the allegations in Paragraph 2 of the *Complaint*.

22

23        3.    Paragraph 3 of the *Complaint* contains mere legal argument and

24 conclusions to which no response is required.  To the extent a response is required,

25 Defendant CCI denies the allegations in Paragraph 3 of the *Complaint*.

26
27
28

## "PARTIES"

4.     Defendant CCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4 of the *Complaint*, and, accordingly, denies such allegations.

5.     Defendant CCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 5 of the *Complaint*, and, accordingly, denies such allegations.

6.     Defendant CCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6 of the *Complaint*, and, accordingly, denies such allegations.

7.     Defendant CCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 7 of the *Complaint*, and, accordingly, denies such allegations.

8.     Defendant CCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8 of the *Complaint*, and, accordingly, denies such allegations.

9.     Defendant CCI lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 9 of the *Complaint*, and, accordingly, denies such allegations.

1   10. Paragraph 10 of the *Complaint* contains mere legal argument and

2 conclusions to which no response is required.  To the extent a response is required,

3 Defendant CCI denies the allegations in Paragraph 10 of the *Complaint*.

4

5   11. Paragraph 11 of the *Complaint* contains mere legal argument and

6 conclusions to which no response is required.  To the extent a response is required,

7 Defendant CCI denies the allegations in Paragraph 11 of the *Complaint*.

8

9          **"<u>BACKGROUND</u>"**

10

11   12. Defendant CCI admits that Plaintiff has federal trademark

12 registrations for "IMPROV" (Fed. Reg. Nos. 3691672 and 3691671), "IMPROV TV"

13 (Fed. Reg. No. 3629101), and "IMPROV TV" (Fed. Reg. Nos. 3629101).  Except as

14 expressly admitted herein, Defendant CCI lacks knowledge or information sufficient

15 to form a belief as to the truth of the remaining allegations in the first and last

16 sentences of Paragraph 12 of the *Complaint*, and, accordingly, deny such allegations.

17 Except as expressly admitted herein, Defendant CCI denies the remainder of the

18 allegations in this paragraph, in particular because Plaintiff has licensed to Defendant

19 CCI the exclusive right to use and allow others to use the term "improv" on the

20 Internet and in connection with the <u>www.improv.com</u> website.

21

22   13. Defendant CCI admits that Plaintiff has federal trademark

23 registrations for "IMPROV" (Fed. Reg. Nos. 3691672 and 3691671), "IMPROV TV"

24 (Fed. Reg. No. 3629101), and "IMPROV TV" (Fed. Reg. Nos. 3629101).  Defendant

25 CCI further admits that Plaintiff has licensed to it the exclusive right to use and allow

26 others to use the term "improv" on the Internet and in connection with the

27 <u>www.improv.com</u> website.  Except as expressly admitted herein, Defendant CCI

28 lacks knowledge or information sufficient to form a belief as to the truth of the

1  remaining allegations in the first and last sentences of Paragraph 13 of the *Complaint*,
2  and, accordingly, deny such allegations.

3

4        14.    Defendant CCI lacks knowledge or information sufficient to form
5  a belief as to the truth of the allegations in the first three sentences of Paragraph 14 of
6  the *Complaint*. Defendant CCI denies the allegations in the fourth sentence of
7  Paragraph 14 of the *Complaint* because Plaintiff has licensed to it the exclusive right
8  to use and allow others to use the term "improv" on the Internet and in connection
9  with the www.improv.com website and Defendant CCI, in turn, has permitted certain
10 of the other Defendants previously named in this action—with Plaintiff's knowledge
11 and acquiescence—to use the term "improv" on the Internet.

12

13       15.    Defendant CCI denies the allegations in Paragraph 15 of the
14 *Complaint* because since 1999 Plaintiff has licensed to Defendant CCI the exclusive
15 right to use and allow others to use the term "improv" on the Internet and in
16 connection with the www.improv.com website.

17

18       16.    Defendant CCI lacks knowledge or information sufficient to form
19 a belief as to the truth of the allegations in Paragraph 16 of the *Complaint*, and,
20 accordingly, denies such allegations.

21

22       17.    Defendant CCI lacks knowledge or information sufficient to form
23 a belief as to the truth of the allegations in Paragraph 17 of the *Complaint*, and,
24 accordingly, denies such allegations.

25

26       18.    Defendant CCI lacks knowledge or information sufficient to form
27 a belief as to the truth of the allegations in Paragraph 18 of the *Complaint*, and,
28 accordingly, denies such allegations. Defendant CCI further denies the allegations in

1  Paragraph 18 of the *Complaint* because Plaintiff has licensed to it the exclusive right
2  to use and allow others to use the term "improv" on the Internet and in connection
3  with the www.improv.com website and Defendant CCI, in turn, has permitted certain
4  of the other Defendants previously named in this action—with Plaintiff's knowledge
5  and acquiescence—to use the term "improv" on the Internet.

6

7         19.    Defendant CCI lacks knowledge or information sufficient to form
8  a belief as to the truth of the allegations in Paragraph 19 of the *Complaint*, and,
9  accordingly, denies such allegations. Defendant CCI further denies the allegations in
10  Paragraph 19 of the *Complaint* because Plaintiff has licensed to it the exclusive right
11  to use and allow others to use the term "improv" on the Internet and in connection
12  with the www.improv.com website and Defendant CCI, in turn, has permitted certain
13  of the other Defendants previously named in this action—with Plaintiff's knowledge
14  and acquiescence—to use the term "improv" on the Internet.

15

16         20.    Defendant CCI lacks knowledge or information sufficient to form
17  a belief as to the truth of the allegations in Paragraph 20 of the *Complaint*, and,
18  accordingly, denies such allegations. Defendant CCI further denies the allegations in
19  Paragraph 20 of the *Complaint* because Plaintiff has licensed to it the exclusive right
20  to use and allow others to use the term "improv" on the Internet and in connection
21  with the www.improv.com website and Defendant CCI, in turn, has permitted certain
22  of the other Defendants previously named in this action—with Plaintiff's knowledge
23  and acquiescence—to use the term "improv" on the Internet.

24

25         21.    Defendant CCI lacks knowledge or information sufficient to form
26  a belief as to the truth of the allegations in Paragraph 21 of the *Complaint*, and,
27  accordingly, denies such allegations. Defendant CCI further denies the allegations in
28  Paragraph 21 of the *Complaint* because Plaintiff has licensed to it the exclusive right

1 to use and allow others to use the term "improv" on the Internet and in connection

2 with the www.improv.com website and Defendant CCI, in turn, has permitted certain

3 of the other Defendants previously named in this action—with Plaintiff's knowledge

4 and acquiescence—to use the term "improv" on the Internet.

5

6        22.   Defendant CCI denies the allegations in Paragraph 22 of the

7 *Complaint.*

8

9 ## "FIRST CLAIM FOR RELIEF

10 ## [Trademark Infringement, 15 U.S.C. § 1114]"

11

12        23.   Defendant CCI incorporates its responses to Paragraphs 1-22 of

13 the *Complaint.*

14

15        24.   Defendant CCI denies the allegations in Paragraph 24 of the

16 *Complaint.*

17

18        25.   Defendant CCI denies the allegations in Paragraph 25 of the

19 *Complaint.*

20

21        26.   Defendant CCI denies the allegations in Paragraph 26 of the

22 *Complaint.*

23

24 ## "SECOND CLAIM FOR RELIEF

25 ## [False Designation of Origin, 15 U.S.C. § 1125(a)]"

26

27        27.   Defendant CCI incorporates its responses to Paragraphs 1-26 of

28 the *Complaint.*

28.   Defendant CCI denies the allegations in Paragraph 28 of the *Complaint*.

29.   Defendant CCI denies the allegations in Paragraph 29 of the *Complaint*.

30.   Defendant CCI denies the allegations in Paragraph 30 of the *Complaint*.

## "THIRD CLAIM FOR RELIEF
## [Trademark Dilution, 15 U.S.C. § 1125(c)]"

31.   Defendant CCI incorporates its responses to Paragraphs 1-30 of the *Complaint*.

32.   Defendant CCI denies the allegations in Paragraph 32 of the *Complaint*.

33.   Defendant CCI denies the allegations in Paragraph 33 of the *Complaint*.

34.   Defendant CCI denies the allegations in Paragraph 34 of the *Complaint*.

35.   Defendant CCI denies the allegations in Paragraph 35 of the *Complaint*.

## "FOURTH CLAIM FOR RELIEF

## [Common Law Unfair Competition]"

36.     Defendant CCI incorporates its responses to Paragraphs 1-35 of the *Complaint*.

37.     Defendant CCI denies the allegations in Paragraph 37 of the *Complaint*.

38.     Defendant CCI denies the allegations in Paragraph 38 of the *Complaint*.

39.     Defendant CCI denies the allegations in Paragraph 39 of the *Complaint*.

## "FIFTH CLAIM FOR RELIEF

## [Violation of Cal. Bus. & Prof. Code § 17000 *et seq.*]"

40.     Defendant CCI incorporates its responses to Paragraphs 1-39 of the *Complaint*.

41.     Defendant CCI denies the allegations in Paragraph 41 of the *Complaint*.

42.     Defendant CCI denies the allegations in Paragraph 42 of the *Complaint*.

1                                         **"PRAYER FOR RELIEF"**

2

3                  1.      Defendant CCI denies that Plaintiff is entitled to the relief sought

4 in Paragraph A of the Prayer For Relief.

5

6                  2.      Defendant CCI denies that Plaintiff is entitled to the relief sought

7 in Paragraph B of the Prayer For Relief.

8

9                  3.      Defendant CCI denies that Plaintiff is entitled to the relief sought

10 in Paragraph C of the Prayer For Relief.

11

12                  4.      Defendant CCI denies that Plaintiff is entitled to the relief sought

13 in Paragraph D of the Prayer For Relief.

14

15                  5.      Defendant CCI denies that Plaintiff is entitled to the relief sought

16 in Paragraph E of the Prayer For Relief.

17

18                  6.      Defendant CCI denies that Plaintiff is entitled to the relief sought

19 in Paragraph F of the Prayer For Relief.

20

21                                  **AFFIRMATIVE DEFENSES**

22

23          As separate and distinct affirmative defenses to Plaintiff's allegations,

24 Defendant CCI alleges as follows:

25

26

27

28

## FIRST AFFIRMATIVE DEFENSE
## [Failure To State A Claim]

1.      Plaintiff's *Complaint*, and each purported claim for relief contained therein, fails to state a claim upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE
## [Consent And Acquiescence]

2.      Plaintiff's *Complaint*, and each purported claim for relief contained therein, fails because Plaintiff has licensed to it the exclusive right to use and allow others to use the term "improv" on the Internet and in connection with the www.improv.com website and Defendant CCI, in turn, has permitted certain of the other Defendants previously named in this action—with Plaintiff's knowledge and acquiescence—to use the term "improv" on the Internet.

## THIRD AFFIRMATIVE DEFENSE
## [Statute Of Limitations]

3.      Plaintiff's *Complaint*, and each purported claim for relief contained therein, is barred by the applicable statute of limitations, including, but not limited to, CAL. CIV. PROC. CODE § 337.

## FOURTH AFFIRMATIVE DEFENSE
## [Laches]

4.      Plaintiff's *Complaint*, and each purported claim for relief contained therein, is barred by the equitable doctrine of laches.

1

## FIFTH AFFIRMATIVE DEFENSE

2

### [Failure To Previously Assert Claim]

3

4      5.      Plaintiff's *Complaint*, and each purported claim for relief contained

5   therein, is barred due to Plaintiff's failure to previously assert its pleaded claims in

6   prior legal proceedings to which Plaintiff was a party.

7

8

## SIXTH AFFIRMATIVE DEFENSE

9

### [Waiver]

10

11      6.      Plaintiff's *Complaint*, and each purported claim for relief contained

12   therein, is barred by the doctrine of waiver.

13

14

## SEVENTH AFFIRMATIVE DEFENSE

15

### [Bad Faith Commencement And Maintenance Of Litigation]

16

17      7.      Plaintiff's *Complaint*, and each purported claim for relief contained

18   therein, has been and continues to be frivolous, unreasonable, groundless, and

19   asserted and maintained in bad faith.

20

21

## EIGHTH AFFIRMATIVE DEFENSE

22

### [Additional Defenses]

23

24      8.      Defendant CCI reserves the right to assert additional affirmative

25   defenses as it learns additional facts during the course of this action.

26

27

28

1   Dated:  January ___, 2012        SHEPPARD MULLIN RICHTER & HAMPTON LLP

2

3                                    By _____

4                                            KENT R. RAYGOR

5                                    Attorneys for Defendant-in-Intervention
                                     COMEDY CLUB, INC.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## COUNTERCLAIM

2

3          For its Counterclaim against Counterdefendant **Improv West Associates**
4   and Does 1 through 10 (collectively referred to as "**Counterdefendants**"),
5   Counterclaimant-In-Intervention **Comedy Club, Inc.** ("**CCI**") avers the following:

6

## THE PARTIES

7

8

9          1.      At all times pertinent to this action Counterclaimant CCI was and
10   is a corporation organized and existing under the laws of Louisiana, with its principal
11   offices in Metairie, Louisiana.

12

13          2.      Upon information and belief, at all times pertinent to this action
14   Counterdefendant IWA was and is a limited partnership organized and existing under
15   the laws of California, with its principal offices in Los Angeles County, California.

16

17          3.      The true names and capacities of the Counterdefendants named
18   herein as Does 1 through 10, whether individual, corporate, associate or otherwise,
19   are unknown to Counterclaimant CCI, who therefore sues said Counterdefendants by
20   said fictitious names.  Counterclaimant CCI is informed and believes, and thereon
21   alleges, that each of the Doe Counterdefendants is legally responsible for the events
22   and happenings hereinafter alleged and legally caused injury and damages
23   proximately thereby to Counterclaimant CCI as herein alleged.  Counterclaimant CCI
24   will seek leave to amend this *Complaint* when the true names and capacities of the
25   Doe Counterdefendants have been ascertained.

26

27

28

## JURISDICTION AND VENUE

4.     Counterclaimant CCI seeks a declaratory judgment regarding, among other things, its exclusive right to use certain trademarks and service marks claimed by Counterdefendants, some of which are federally registered with the United States Patent and Trademark Office, in connection with the www.improv.com website and on the Internet.  Thus, this Court has original jurisdiction over that counterclaim pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.  This counterclaim is so related to the claims asserted in Counterdefendant IWA's underlying *Complaint* that it forms part of the same case or controversy under Article III of the United States Constitution.

5.     This Court also has supplemental jurisdiction over Counterclaimant CCI's declaratory judgment First Counterclaim For Relief because its counterclaim concerns Counterclaimant CCI's exclusive right to use the term "improv"—the same term at issue in Counterdefendant IWA's underlying *Complaint*—in connection with the www.improv.com website and the Internet more broadly—the same media at issue in Counterdefendant IWA's underlying *Complaint*. Thus, Counterclaimant CCI's counterclaim is so related to the claims asserted in the underlying *Complaint* that it forms part of the same case or controversy under Article III of the United States Constitution and this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

6.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Counterdefendant IWA resides in this District and for the additional reason that Counterdefendant IWA has consented to venue by filing its underlying *Complaint* in this District.

# **FACTS**

**A.    Counterdefendant IWA's Lawsuits And Failure To Include Counterclaimant CCI.**

7.    On August 23, 2011, six days before filing this action on August 29, 2011, Counterdefendant IWA filed an action in the Los Angeles County Superior Court (Case No. BC468164, hereinafter referred to as "**the Superior Court Action**") that largely duplicates the present action it filed in this Court (hereinafter referred to as "**the Federal Court Action**"). [A true and correct copy of the *Complaint* in the Superior Court Action is attached hereto as **EXHIBIT A** and incorporated herein.] Four of the five Defendants named in the Federal Court Action (Robert Hartmann; Levity Productions LLC; Levity Entertainment Group, Inc.; and E-Comic Branding, Inc.) were also named as Defendants in Counterdefendant IWA's Superior Court Action.

8.    In the Superior Court Action, Counterdefendant IWA asserted purported claims for:  (1) breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) breach of fiduciary duty; (4) constructive fraud; (5) intentional interference with contract; (6) aiding and abetting breach of fiduciary duty; (7) common law unfair competition; and (8) violation of CAL. BUS. & PROF. CODE § 17200.  All arise from the same trademark-related claims being asserted in this Federal Court Action filed six days later.  In its Superior Court Action, Counterdefendant IWA asserted:

> "Plaintiff Improv West Associates ('IWA') owns the world-famous 'Improv' trademarks and trade dress (collectively, the 'Improv Brand') for various goods and services, including for the

1    presentation of live stand-up comedy performances.  For the past
2    eight years, IWA has entrusted defendant Robert Hartmann and his
3    affiliates with responsibility for the marketing, promotion, and
4    management of the Improv Brand on the internet.  Hartmann and
5    his affiliates accepted that responsibility and undertook to act on
6    behalf of IWA and in the best interests of the Improv Brand.
7    Instead, Hartmann and the other defendants, motivated solely by
8    their own greed, hatched a scheme to siphon off the good will
9    associated with the Improv Brand for their own pecuniary gain.
10   Hartmann and the other defendants have built a valuable comedy
11   business conglomerate on the back of the Improv Brand and have
12   retained all benefits for themselves, to the exclusion of IWA and
13   its other licensees.  Having misappropriated the good will,
14   customer information, and other property of IWA, Hartmann and
15   the other defendants are now poised to launch a chain of comedy
16   clubs and internet services in direct competition with IWA and the
17   Improv Brand."

18

19   [*See* the *Complaint* in the Superior Court Action, ¶¶ 1 and 2 (**EXHIBIT A**
20   hereto).]

21

22         9.      Counterdefendant IWA's first cause of action in the Superior Court
23   Action, for alleged breach of contract, is based on Defendants Robert Hartmann and
24   Levity Productions LLC allegedly "exploiting the Improv Brand, including without
25   limitation on the Improv Websites".  [*Id*., ¶ 31.]  The second cause of action (for
26   alleged breach of the implied covenant of good faith and fair dealing), third cause of
27   action (for alleged breach of fiduciary duty), fourth cause of action (for alleged
28   constructive fraud), fifth cause of action (for alleged intentional interference with

1   contractual relations), sixth cause of action (for alleged aiding and abetting breach of

2   fiduciary duty), seventh cause of action (for alleged common law unfair

3   competition—"Defendants have appropriated and used the Improv Brand and

4   associated good will to develop independent and competing businesses"), and the

5   eighth cause of action (for alleged violation of CAL. BUS. & PROF. CODE § 17200), are

6   all based on that same allegation. [*Id.*, ¶¶ 33, 35, 38-41, 44-46, 49, 54, 59-62, 65-66.]

7   That same allegation forms the basis for all of Counterdefendant IWA's claims for

8   relief in the Federal Court Action. [*See* the *Complaint* in the Federal Court Action, ¶¶

9   18-24, 27-28, 31, 33, 36-37, 40-41.]

10

11         10.   Counterdefendant IWA's Superior Court Action also arises out of

12   an alleged contract between it, on the one hand, and Defendants Robert Hartmann and

13   Levity Productions LLC, on the other hand, regarding the use of the term "improv" in

14   connection with the www.improv.com website. [*See* the *Complaint* in the Superior

15   Court Action, ¶¶ 17 and 18 (**EXHIBIT A** hereto).] That is the same allegation that

16   Counterdefendant IWA makes in the Federal Court Action. [*See* the *Complaint* in the

17   Federal Court Action, ¶ 15.]

18

19         11.   In other words, in both the Superior Court Action and the Federal

20   Action, Counterdefendant IWA seeks a determination of who has the right to control

21   the use of the term "improv" in connection with the www.improv.com website and on

22   the Internet. As a result, all of the causes of action asserted by Counterdefendant

23   IWA in the Superior Court Action could have and should have been asserted in this

24   subsequently filed Federal Court Action. Each of the claims asserted in its Superior

25   Court Action is inextricably intertwined with the claims for relief being asserted in the

26   present Federal Court Action and all arise out of the same alleged accused conduct.

27   The previously named Defendants in the Superior Court Action (the Defendants other

28   than Defendant-In-Intervention CCI) thus have filed a motion to stay that action

1   pending the resolution of this Federal Court Action.  That motion will be heard by the

2   Superior Court on April 11, 2012.

3

4          12.    In both the Superior Court Action and the Federal Court Action,

5   Counterdefendant IWA has filed a lawsuit seeking to control the use of the

6   www.improv.com website without naming Counterclaimant CCI, even though

7   Counterclaimant CCI owns the www.improv.com website and domain name and the

8   exclusive rights to the uses of which Counterdefendant IWA complains in both

9   actions.

10

11  **B.    Counterclaimant CCI's Exclusive Right To Use The Term "Improv"**

12  **In Connection With The www.improv.com Website And The**

13  **Internet.**

14

15         13.    Counterclaimant CCI owns and operates the www.improv.com

16  website.  Counterclaimant CCI also owns the <Improv.com> domain name for that

17  website, registered in 1997.

18

19         14.    In 1999, Counterdefendant IWA granted Counterclaimant CCI an

20  exclusive license to use the term "improv" on the Internet.  More specifically, in a

21  *Trademark License Agreement* dated June 13, 1999, Counterdefendant IWA granted

22  Counterclaimant CCI the right to use the term in connection with restaurant, bar,

23  and/or nightclub facilities.  [A true and correct copy of the *Trademark License*

24  *Agreement* is attached hereto as **EXHIBIT B** and incorporated herein.]  On October

25  19, 1999, Counterdefendant IWA and Counterclaimant CCI executed an *Amendment*

26  *To Trademark License Agreement* (the "***Amendment***") that granted Counterclaimant

27  CCI "the exclusive rights and license to use, utilize, and/or license the trademarks,

28  trade dress and content associated therewith for the purpose of use on the internet,

1  including broadband or other internet related media, and radio . . . ."  [A true and

2  correct copy of the *Amendment To Trademark License Agreement* is attached hereto

3  as **EXHIBIT C** and incorporated herein.]  Counterdefendant IWA acknowledges this

4  *Amendment* in its Superior Court *Complaint*, even though it falsely claims that the

5  *Amendment* terminated in 2003.  [*See* the *Complaint* in the Superior Court Action,

6  ¶ 16 (**EXHIBIT A** hereto).]  That license, and Counterclaimant CCI's exclusive right

7  to use the term "improv" on the Internet, continues in effect.

8

9       15.    On January 6, 2010, Counterdefendant IWA entered into a written

10  *Settlement Agreement* with Counterclaimant CCI in which Counterdefendant IWA

11  affirmed Counterclaimant CCI's continuing exclusive right to use those marks in

12  connection with the www.improv.com website and on the Internet.  [A true and

13  correct copy of the *Settlement Agreement* is attached hereto as **EXHIBIT D** and

14  incorporated herein; *see also* Exhibit "D" to the previously named Defendants'

15  *Counterclaims* filed against IWA in this action on October 11, 2011 (ECF Doc. No. 9,

16  pages 67-73 of 96).]  That *Settlement Agreement* also provides, in relevant part, that

17  "the Parties shall observe the status quo existing as of December 21, 2009 with

18  respect to the Internet domain name 'Improv.com' and with respect to the use of the

19  marks 'Improv' and 'Improvisation' on the Internet."  The "status quo" existing in

20  December 2009 was that Counterclaimant CCI had the exclusive right to the

21  www.improv.com website and to use the term "improv" in connection therewith and

22  on the Internet generally.

23

24       16.    Counterdefendant IWA was repeatedly notified of

25  Counterclaimant CCI's interest in, and importance to, any lawsuit related to the use of

26  the term "improv" on the www.improv.com website or the Internet generally before

27  Counterdefendant IWA filed this lawsuit on August 29, 2011:

28

1     •    On April 28, 2011, Counterdefendant IWA sent a letter to

2           Counterclaimant CCI, complaining about the use of the term "improv" in

3           connection with the www.improv.com website. [A true and correct copy

4           of that letter is attached hereto as **EXHIBIT E** and incorporated herein;

5           *see also* Exhibit "C" to the previously named Defendants' *Counterclaims*

6           filed against IWA in this action on October 11, 2011 (ECF Doc. No. 9,

7           pages 75-77 of 96).]

8

9     •    Counterclaimant CCI responded on May 10, 2011 and explained that

10          Counterclaimant CCI's continued operation of the www.improv.com

11          website was expressly permitted by various agreements between the

12          parties and that Counterdefendant IWA's demand that Counterclaimant

13          CCI cease certain activities in connection with use of the term "improv"

14          on the website lacked any legitimate basis. [A true and correct copy of

15          that May 10, 2011 response is attached hereto as **EXHIBIT F** and

16          incorporated herein; *see also* Exhibit "D" to the previously named

17          Defendants' *Counterclaims* filed against IWA in this action on October

18          11, 2011 (ECF Doc. No. 9, pages 79-82 of 96).]

19

20     •    On June 16, 2011, previously named Defendants Robert Hartmann and

21          Levity Entertainment Group separately wrote to Counterdefendant IWA

22          —in response to additional complaints by IWA about the

23          www.improv.com website—and informed IWA that its complaints

24          should be directed to Counterclaimant CCI, which owns and controls the

25          website, and not to them. [A true and correct copy of that June 16, 2011

26          letter is attached hereto as **EXHIBIT G** and incorporated herein; *see also*

27          Exhibit "E" to the previously named Defendants' *Counterclaims* filed

28

against IWA in this action on October 11, 2011 (ECF Doc. No. 9, page
84 of 96).]

▪   On August 24, 2011—five days before this lawsuit was filed—
Counterclaimant CCI sent three additional letters to Counterdefendant
IWA in which it reiterated that it, and not Counterdefendant IWA, holds
the exclusive right to control the exploitation of the term "improv" on the
Internet and in connection with the www.improv.com website in
particular, and that Counterdefendant IWA's demand that
Counterclaimant CCI cease certain activities in connection with use of
the term "improv" on the website was baseless.  [True and correct copies
of those three letters are attached hereto as **EXHIBIT H** and incorporated
herein; *see also* Exhibit "F" to the previously named Defendants'
*Counterclaims* filed against IWA in this action on October 11, 2011
(ECF Doc. No. 9, pages 86-95 of 96).]

17.     Despite all of these and other notices to Counterdefendant IWA—
each of which were sent to its counsel of record in this action—and despite the clear
terms of the *Trademark License Agreement*, the *Amendment* thereto, and the
*Settlement Agreement*, Counterdefendant IWA filed it *Complaint* in this action in
which it purposely omitted Counterclaimant CCI, while simultaneously seeking to
deny Counterclaimant CCI's exclusive contractual rights to use and license others to
use the term "improv" on the www.improv.com website and the Internet generally.

18.     Counterdefendant IWA's omission of Counterclaimant CCI is
particularly egregious because each of the alleged uses of the term "improv" on the
Internet about which Counterdefendant IWA complains was done with the permission
of Counterclaimant CCI, the exclusive licensee and rights holder, pursuant to

1    agreements between it and certain of the previously named Defendants in both the

2    Superior Court Action and the Federal Court Action.  Counterdefendant IWA chose to

3    sue those Defendants—various third parties with whom Counterclaimant CCI had

4    contracted—instead of Counterclaimant CCI itself.  Upon information and belief,

5    Counterdefendant IWA intentionally omitted Counterclaimant CCI from both the

6    Superior Court Action and this Federal Court Action because it knew that, pursuant to

7    the *Trademark License Agreement*, had Counterdefendant IWA sought a declaration

8    against Counterclaimant CCI, Counterdefendant IWA could be liable for

9    Counterclaimant CCI's attorneys' fees.

10

11   **C.    Counterdefendant IWA's Attempt To State Claims Based On**

12   **        Actions Taken Pursuant To Counterclaimant CCI's Exclusive**

13   **        Rights To Use And Allow Others To Use The Term "Improv" On**

14   **        The Internet.**

15

16         19.    The alleged improper uses of the term "improv" on the Internet

17   about which Counterdefendant IWA complains, including on the www.improv.com

18   website, were done with Counterclaimant CCI's permission pursuant to its exclusive

19   right to use and allow others to use the term "improv" on the Internet.

20

21         20.    In this action (the Federal Court Action), Counterdefendant IWA

22   pleads that in 2003 it extended a revocable license to two of the previously named

23   Defendants to use the term "improv" "in connection with the marketing, promotion,

24   and management of the Improv Marks at www.Improv.com and related websites".

25   [*See Complaint*, at ¶ 15.]  That cannot be true.  Counterdefendant IWA could not have

26   extended any such license to those Defendants to use the marks in connection with the

27   www.improv.com website or the Internet because Counterdefendant IWA had already

28   exclusively licensed all such uses to Counterclaimant CCI.

1    21.    Counterdefendant IWA then pleads in the Federal Court Action
2  that after August 11, 2008 it "permitted [Defendants] Hartmann and Levity to
3  continue to use the Improv Marks in connection with the Improv Websites". [*Id.* ¶¶
4  17-18.] Again, Counterdefendant IWA could not have done so as Counterdefendant
5  IWA had already exclusively licensed all such uses to Counterclaimant CCI, and that
6  license continues in existence today.

7

8    22.    Counterdefendant IWA then pleads in the Federal Court Action
9  that the previously named Defendants are committing trademark infringement and
10  other torts by using the term "improv" marks on the www.improv.com website and
11  the Internet. [*Id.* ¶¶ 19-22.] But such use is permitted under Counterdefendant IWA's
12  exclusive license for such uses that it granted to Counterclaimant CCI.
13  Counterdefendant IWA, therefore, has sued the previously named Defendants for uses
14  that are permitted and its claims, if any, are properly asserted, not against those
15  Defendants, but against Counterclaimant CCI, which Counterdefendant IWA did not
16  name as a party to this action.

17

18    23.    Counterdefendant IWA alleges in the Superior Court Action that
19  previously named Defendant Robert Hartmann requested that Counterdefendant IWA
20  allow him to use the term "improv" on the Internet, including on the
21  www.improv.com website. [*See* the *Complaint* in the Superior Court Action, ¶ 17
22  (**EXHIBIT A** hereto).] However, during that time period, Counterclaimant CCI
23  owned the www.improv.com website and had the exclusive right to use and allow
24  others to use the term "improv" in connection therewith, and Defendant Robert
25  Hartmann acted with regard to the www.improv.com website with Counterclaimant
26  CCI's express consent.

27

28

24.     Counterdefendant IWA complains in the Superior Court Action that previously named Defendants Robert Hartmann and Levity Entertainment Group LLC "undertook to offer on-line ticketing for 'Improv' clubs nationwide" and other comedy clubs through the www.improv.com website, in violation of Counterdefendant IWA's rights.  [*See* the *Complaint* in the Superior Court Action, ¶¶ 23(a) and 23(c) (**EXHIBIT A** hereto).]  However, during the relevant time period, Counterclaimant CCI owned the www.improv.com website and had the exclusive right to use and allow others to use the term "improv" in connection therewith, and previously named Defendants Robert Hartmann and Levity Entertainment Group, LLC acted with regard to the www.improv.com website with Counterclaimant CCI's express consent.

25.     Counterdefendant IWA complains in the Superior Court Action that previously named Defendants Robert Hartmann and Levity Entertainment, Inc. pursued an online partnership with www.myspace.com "to create an online community for established and up-and-coming comedians" and also created Facebook and Twitter pages using the term "improv," again in violation of Counterdefendant IWA's rights.  [*See* the *Complaint* in the Superior Court Action, ¶¶ 23(b) and (d) (**EXHIBIT A** hereto).]  However, during the relevant time period, Counterclaimant CCI had the exclusive right to use and allow others to use the term "improv" in connection with the Internet, and previously named Defendants Robert Hartmann and Levity Entertainment, Inc. acted with Counterclaimant CCI's express consent.

# FIRST COUNTERCLAIM FOR RELIEF

## [Declaratory Relief]

26.    Counterclaimant CCI realleges and incorporates herein by reference the allegations contained in Paragraphs 1 through 25 of these *Counterclaims*, as set forth above.

27.    An actual controversy has arisen and exists between Counterdefendants and Counterclaimant CCI concerning the effect of the *Trademark License Agreement*, the *Amendment* thereto, and the *Settlement Agreement*, including whether Counterclaimant CCI has the exclusive right to control the use of, and allow others to use, the term "improv" on the Internet.

28.    A further controversy has arisen and exists between Counterdefendants and Counterclaimant CCI as to whether Counterclaimant CCI, when permitting certain of the previously named Defendants in the Superior Court Action and the Federal Court Action to use the term "improv" on the Internet and in connection with the www.improv.com website in the manner complained of in both the Superior Court Action and the Federal Court Action, infringed Counterdefendants' rights.

29.    Counterclaimant CCI therefore, seeks a declaration from the Court that, pursuant to the *Trademark License Agreement*, the *Amendment* thereto, and the *Settlement Agreement*, Counterclaimant CCI has the exclusive right to the www.improv.com website and to control the use of, and allow others to use, the term "improv" on the Internet.

30.   Counterclaimant CCI further seeks a declaration from the Court that it, when permitting certain of the previously named Defendants in the Superior Court Action and the Federal Court Action to use the term "improv" on the Internet and in connection with the www.improv.com website in the manner complained of in both the Superior Court Action and the Federal Court Action, did not infringe Counterdefendants' rights.

## **PRAYER FOR RELIEF**

WHEREFORE, Counterclaimant CCI prays for judgment against Counterdefendants as follows:

1.   That the Court issue a declaratory judgment declaring the items set forth in Paragraphs 30 and 31, above;

2.   That the Court award Counterclaimant CCI its attorneys' fees incurred in this action as a result of Counterdefendants efforts to deny Counterclaimant CCI's rights under the *Trademark License Agreement*, the *Amendment* thereto, and the *Settlement Agreement*;

3.   That the Court award Counterclaimant CCI its costs of suit incurred in this action; and

4.   That the Court provide such other and further relief as the Court may deem just and proper.

Dated: January 19, 2012    SHEPPARD MULLIN RICHTER & HAMPTON LLP

By _____

KENT R. RAYGOR

Attorneys for Defendant-In-Intervention and
Counterclaimant-In-Intervention
COMEDY CLUB, INC.

404095448.4

# Exhibit A

1   KENDALL BRILL & KLIEGER LLP
    Robert N. Klieger (192962)
2     rklieger@kbkfirm.com
    10100 Santa Monica Blvd., Suite 1725
3   Los Angeles, California 90067
    Telephone: 310.556.2700
4   Facsimile: 310.556.2705

5   DENNIS ARDI ATTORNEY AT LAW
      PROFESSIONAL CORPORATION
6   Dennis Ardi (117739)
    340 N Camden Drive, Third Floor
7   Beverly Hills, California 90210
    Telephone: 310.271-6900
8   Facsimile: 310.271.6963

9   Attorneys for Plaintiff
    Improv West Associates
10

**FILED**
SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

AUG 23 2011

John A. Clarke, Executive Officer/Clerk

BY _____, Deputy
    Rubeena Juliano

11

12            SUPERIOR COURT OF THE STATE OF CALIFORNIA

13               COUNTY OF LOS ANGELES, CENTRAL DISTRICT

14

15   IMPROV WEST ASSOCIATES, a California       Case No.    **BC 4 6 8 1 6 4**
     limited partnership,
16                                               **COMPLAINT FOR:**
                    Plaintiff,
17                                               **(1) BREACH OF CONTRACT;**
          v.
18                                               **(2) BREACH OF IMPLIED COVENANT**
                                                 **OF GOOD FAITH AND FAIR**
19   ROBERT HARTMANN, an individual;            **DEALING;**
     LEVITY PRODUCTIONS LLC, a Delaware
20   limited liability company; STU SCHREIBERG,  **(3) BREACH OF FIDUCIARY DUTY;**
     an individual; JUDI BROWN-MARMEL, an
21   individual; LEVITY ENTERTAINMENT            **(4) CONSTRUCTIVE FRAUD;**
     GROUP, INC., a California corporation;
22   LEVITY LIVE, LLC, a Delaware limited        **(5) INTENTIONAL INTERFERENCE**
     liability company; E-COMIC BRANDING,        **WITH CONTRACTUAL**
23   INC., a California corporation; and DOES 1   **RELATIONS;**
     through 50, inclusive,
24                                               **(6) AIDING AND ABETTING BREACH**
                    Defendants.                   **OF FIDUCIARY DUTY;**
25
                                                 **(7) COMMON LAW UNFAIR**
26                                                **COMPETITION;**

27                                               **(8) VIOLATION OF BUS. & PROF.**
                                                  **CODE §§ 17200 et seq.**
28
                                                 **DEMAND FOR JURY TRIAL**

89568.1

COMPLAINT

## BACKGROUND

1. Plaintiff Improv West Associates ("IWA") owns the world-famous "Improv" trademarks and trade dress (collectively, the "Improv Brand") for various goods and services, including for the presentation of live stand-up comedy performances. For the past eight years, IWA has entrusted defendant Robert Hartmann and his affiliates with responsibility for the marketing, promotion, and management of the Improv Brand on the internet. Hartmann and his affiliates accepted that responsibility and undertook to act on behalf of IWA and in the best interests of the Improv Brand.

2. Instead, Hartmann and the other defendants, motivated solely by their own greed, hatched a scheme to siphon off the good will associated with the Improv Brand for their own pecuniary gain. Hartmann and the other defendants have built a valuable comedy business conglomerate on the back of the Improv Brand and have retained all benefits for themselves, to the exclusion of IWA and its other licensees. Having misappropriated the good will, customer information, and other property of IWA, Hartmann and the other defendants are now poised to launch a chain of comedy clubs and internet services in direct competition with IWA and the Improv Brand.

3. IWA brings this action to redress this grievous misconduct and to recover the significant damages that it has suffered at the hands of defendants and all amounts by which the defendants have been unjustly enriched.

## PARTIES

4. Plaintiff is a California limited partnership with its principal place of business in Los Angeles, California.

5. Defendant Robert Hartmann ("Hartmann") is an individual who, on information and belief, resides in Los Angeles, California. At all material times, the activities of Hartmann and the other defendants complained of herein were undertaken while Hartmann and the other defendants maintained their respective principal places of business in Los Angeles, California and were taken from and out of their respective principal places of business.

EXHIBIT __B__ PAGE __17__

89568.1

1

COMPLAINT

6.   Defendant Levity Productions LLC ("Levity") is a Delaware limited liability company with its principal place of business in Los Angeles, California.

7.   Defendant Stu Schreiberg ("Schreiberg") is an individual who, on information and belief, resides in Los Angeles, California.

8.   Defendant Judi Brown-Marmel ("Brown-Marmel") is an individual who, on information and belief, resides in Los Angeles, California.

9.   Defendant Levity Entertainment Group, Inc. ("Levity Entertainment Group") is a California corporation with its principal place of business in Los Angeles, California.

10.   Defendant Levity Live, LLC ("Levity Live") is a Delaware limited liability company with its principal place of business in Los Angeles, California.

11.   Defendant E-Comic Branding, Inc. ("E-Comic Branding") is a California corporation with its principal place of business in Los Angeles, California. Schreiberg, Brown-Marmel, Levity Entertainment Group, Levity Live, and E-Comic Branding are referred to collectively herein as the "Non-Hartmann Defendants."

12.   IWA is ignorant of the true names and capacities of defendants sued herein as Does 1 through 50, inclusive, and therefore sues these defendants by these fictitious names. IWA will amend this complaint to allege their true names and capacities when ascertained. IWA is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged, and that IWA's injuries as herein alleged were proximately caused by the wrongful conduct of these fictitiously named defendants.

13.   IWA is informed and believes and thereon alleges that at all times herein mentioned, Does 1 through 50, inclusive, were the agents or employees of the other defendants and in doing the things hereinafter alleged were acting within the course and scope of that agency or employment.

## BACKGROUND

14.   IWA and its predecessors-in-interest have used and actively promoted the Improv Brand continuously for nearly half a century, since the establishment of the "Improv" as the world's first "comedy club" in 1963. IWA has invested substantial time and resources in

EXHIBIT _A_ PAGE _18_

2

1 establishing throughout the United States exclusive rights in the Improv Brand for a wide array of

2 goods and services. As a result of IWA's efforts, the Improv Brand is one of the premier brands in

3 the world of comedy. The substantial good will that IWA has developed in the Improv Brand is of

4 incalculable value.

5      15.     IWA has licensed various third parties to operate "Improv" branded comedy clubs.

6 At present, there are 23 IWA-licensed or operated "Improv" clubs located across the country.

7 Hartmann, through several companies in which he is a substantial owner, has been and remains a

8 long-time licensee of the "Improv" marks in connection with clubs located Brea, Irvine, and

9 Ontario, California (the "Hartmann Clubs"). Those licenses do not permit Hartmann or his

10 affiliated companies to make any use of the Improv Brand except in connection with the operation

11 of those specific clubs.

12      16.     In or about October 1999, IWA licensed to a third party the exclusive rights and

13 license to exploit the Improv Brand on the internet, including at www.Improv.com and related

14 websites (the "Improv Websites"). That license terminated no later than August 2003.

15      17.     Following the termination of that third-party license, Hartmann requested that IWA

16 allow him to promote the Improv Brand and the business of the various "Improv" comedy clubs

17 on the internet. Based on IWA's longstanding relationship with Hartmann and his demonstrated

18 commitment to the "Improv" clubs, IWA believed that Hartmann had IWA's best interests at heart

19 and therefore granted him a revocable license to market, promote, and manage the Improv Brand

20 via the Improv Websites (the "License Agreement"). Hartmann was not required to pay any

21 license fee or royalty pursuant to the License Agreement. Instead, Hartmann's consideration for

22 the license was his promise to develop the Improv Websites and to market, promote, and manage

23 the Improv Brand via those sites for the benefit of IWA, the Improv Brand, and IWA's other

24 licensees.

25      18.     In undertaking to act on behalf of and for the benefit of IWA in connection with the

26 marketing, promotion, and management of the Improv Brand via the Improv Websites, Hartmann

27 knowingly assumed fiduciary duties, including duties of the utmost loyalty, care, disclosure, and

28 fair dealing, to IWA. IWA placed a high degree of trust and confidence in Hartmann, afforded

89568.1

EXHIBIT A PAGE 19

1  him considerable discretion in his marketing, promotion, and management of the Improv Brand
2  via the Improv Websites, and proceeded at all times in reliance on Hartmann's undertaking to act
3  in the best interests of IWA, the Improv Brand, and IWA's other licensees.

4    19.    In or about August 2005, Hartmann and Schreiberg formed Levity, a production
5  company that produces television series, television specials, DVDs, and television segments and
6  promotional videos featuring stand-up comedy performances. The License Agreement was
7  extended to include Levity as an additional licensee. So extended, the License Agreement
8  afforded Hartmann and Levity jointly the right to market, promote, and manage the Improv Brand
9  via the Improv Websites, with each committed to act on behalf of and for the benefit of IWA.
10  Hartmann publicly touted Levity as IWA's "partner."

11    20.    In early August 2006, Hartmann asked IWA to grant him an "overall license" to
12  use the Improv Brand for many products and services and across all media. When IWA declined
13  to grant an "overall license" on the terms proposed by Hartmann, Hartmann nonetheless took it
14  upon himself to seize for his own benefit what he could not obtain through negotiation and
15  attempted to sell a deal to a cruise line for Levity to supply "Improv" branded live stand-up
16  comedy entertainment to the cruise line. IWA admonished Hartmann that he had no right to make
17  such a deal and, in particular, reminded him that he was not authorized to use the contact
18  information for visitors to the Improv Website for any purpose other than ticket sales to IWA-
19  licensed "Improv" comedy clubs.

20    21.    In or about November 2007, again without the knowledge or authorization of IWA,
21  Hartmann caused Levity to file applications with the United States Patent and Trademark Office to
22  register the marks "Improv" and "The Improv" *in Levity's name* for use in connection with a
23  variety of goods and services, including CDs and DVDs, hats, toys, television programming, and
24  restaurants. IWA did not authorize the filing of the applications and, upon learning of them, asked
25  that Hartmann withdraw the applications, which he did. Hartmann explained he had made the
26  applications for IWA's benefit and to protect the value of the Improv Brand. Hartmann
27  acknowledged in writing that IWA owned all rights in the "Improv" marks and that any use of the
28  marks by Hartmann, Levity, or their affiliates was at IWA's sufferance.

89568.1                    EXHIBIT A PAGE4 26
                                    COMPLAINT

22.　On information and belief, Hartmann's attempted registration of the "Improv" marks had not been intended to benefit IWA, as Hartmann represented. Rather, unbeknownst to IWA, Hartmann, with the encouragement and assistance of Schreiberg and Brown-Marmel, had hatched a scheme to appropriate the good will associated with the Improv Brand for the purpose of developing independent businesses under the umbrella of the Levity Entertainment Group, which Hartmann owned with Schreiberg and Brown-Marmel and which they planned to operate in competition with IWA.

23.　From 2008 through IWA's termination of the License Agreement effective July 31, 2011, Hartmann and Levity repeatedly breached their obligations to IWA. Virtually all of the activities that Hartmann and Levity undertook using the Improv Brand, and for the supposed benefit of IWA, were in fact calculated to advance the interests of Hartmann and his partners to the ultimate detriment of IWA and the Improv Brand. By way of example:

a.　Hartmann and Levity undertook to offer on-line ticketing for "Improv" clubs nationwide through the Improv Website, ostensibly for the purpose of boosting ticket sales and thereby the license fees due to IWA under its various club licenses. On information and belief, Hartmann's and Levity's true motivation was not to benefit IWA at all, but instead to amass a large database of the names and contact information for hundreds of thousands of Improv customers and stand-up comedy fans that Hartmann and Levity could independently exploit or sell to third parties for their own pecuniary gain. Hartmann and Levity have refused to share this Improv customer database with IWA and have instead used the information for their own pecuniary gain, including in connection with their development of the Levity Entertainment Group and its planned line of competing "Levity Live" comedy clubs.

b.　Hartmann and Levity pursued various partnerships ostensibly on IWA's behalf, including an "Improv" branded partnership with MySpace.com to create an online community for established and up-and-coming comedians, often without IWA's knowledge or authorization. On information and belief, Hartmann and Levity used the MySpace.com partnership not to benefit IWA and the Improv Brand, but instead to cement

EXHIBIT 🅱 PAGE 21

89568.1

5

COMPLAINT

their control over comedy content on the internet and to thereby leverage comedians into signing with Hartmann, Levity, and their affiliated companies, including E-Comic Branding, to manage, market, and promote their careers.

c.   In or about January 2009, Hartmann and Levity began offering ticketing for the Gotham Comedy Club, a New York comedy club in which Hartmann is a partial owner, through the Improv Websites.  Hartmann represented that he intended rebrand the Gotham Comedy Club as an "Improv" club, such that license fees would be paid to IWA based on the success of the club.  Indeed, Hartmann and his affiliates publicly referred to the Gotham Comedy Club as the "New York Improv."  On information and belief, Hartmann did not intend to rebrand the Gotham Comedy Club as an "Improv" club, and he has instead used the good will associated with the Improv Brand to develop what may soon become a flagship club in the competing chain of comedy clubs.

d.   Hartmann and Levity created Improv-branded Facebook and Twitter pages, without the knowledge or authorization of IWA, and have used those pages to promote Hartmann's and his affiliates' other ventures, including "The Comedy Sideshow," "Tweet the Caption," "Joke Or Joker," "The 5 Spot," and, most recently, their competing "Levity Live" comedy clubs.

e.   Hartmann and Levity, without IWA's knowledge or approval, created an "Improv ad network," managed by E-Comic Branding, to build relationships with companies targeting their goods and services to fans of stand-up comedy.  Hartmann and Levity have not disclosed or shared any revenues generated by the "Improv ad network" with IWA and, on information and belief, intend to use that "ad network" to generate revenues for one or more websites they are building to compete with IWA, including www.LevityLive.com (the "Levity Live Website").

f.   Hartmann and Levity, without IWA's knowledge or approval, have used the Improv Brand to promote their independent businesses by falsely holding themselves out as the managers of all the "Improv" comedy clubs, all of IWA's retail business, and all of IWA's media ventures.

EXHIBIT A PAGE 22

89568.1

6

COMPLAINT

g.     Hartmann and Levity, without IWA's knowledge or approval, have used the Improv Brand to promote their independent businesses by falsely claiming that Hartmann was responsible for an NBC network television special celebrating the 40th anniversary of the "Improv" comedy clubs, which was in fact produced by IWA.

h.     Hartmann and Levity, without IWA's knowledge or approval, have otherwise used the Improv Brand to promote their independent businesses, including without limitation their business of booking comedians to give live stand-up comedy performances at corporate events.

24.     Since at least 2008, Hartmann and Levity have consistently leveraged their management of and association with the Improv Brand to establish themselves as "gatekeepers" to reaching stand-up comedy fans via the internet. Hartmann has falsely represented that he owns The Improv (he does not) and that he is the CEO of The Improv (he is not). Levity Entertainment Group has similarly pitched itself as the majority owner of The Improv (it is not) and attempted to brand independent businesses with the "Improv" marks. Comedians and companies who want to reach a broad audience of stand-up comedy fans have been forced to deal with Hartmann, Levity, and their affiliates as the supposed owners of the premier brand in stand-up comedy. Upon information and belief, Hartmann, Levity and their affiliates have wrongfully used their control over the booking of comedians into various "Improv" comedy clubs to browbeat comedians into allowing Levity to manage their careers under threat that they would not otherwise be permitted to perform at "Improv" comedy clubs. Hartmann and Levity have exerted this control not for the benefit of IWA, but instead for their own benefit and in preparing to compete with IWA and the Improv Brand.

25.     Throughout this period, Hartmann and his affiliates sought to assuage IWA's concerns regarding the independent businesses he was building on the back of the Improv Brand by expressing an interest in buying out or merging with IWA and making several lucrative proposals to do just that. On information and belief, Hartmann and his affiliates had no genuine interest in buying out or merging with IWA, and they were instead stringing along IWA while

EXHIBIT A PAGE 23

1  they used the good will associated with the Improv Brand to build their own competing ventures
2  before unilaterally abandoning all negotiations.

3      26.    Hartmann's and the other defendants' true motivations have only recently come to
4  light. On or about July 11, 2011, Levity Entertainment Group filed an application to register the
5  mark "Levity Live" for comedy club and internet services—*i.e.*, the same services offered under
6  the Improv Brand. Within the past week, IWA discovered the Levity Live Website, which is
7  presently a holding page for a new chain of comedy clubs branded as "Levity Live." Remarkably,
8  the LevityLive.com domain was registered roughly six months ago *in the name of Improv.com*, a
9  brazen signal of the defendants' intent to transfer the good will associated with the Improv Brand
10  and Improv Websites to their competing venture. Hartmann, without IWA's knowledge or
11  consent, added an endorsement for "Levity Live" to the official Hartmann-managed "Improv"
12  Facebook page and has been directing Improv fans to his new competing venture. Some recent
13  postings on the "Improv" Facebook page are now listed as originating with the "Improv Comedy
14  Clubs via Levity Live." And Levity Entertainment Group has recently launched a "test site" for
15  Levity Live ticket sales through LaughStub, the very same ticketing platform through which
16  Hartmann and Levity control ticketing for "Improv" clubs nationwide.

17      27.    IWA terminated the License Agreement effective July 31, 2011.

18      **FIRST CLAIM FOR RELIEF**

19      **Breach of Contract**

20      **(Against Defendants Hartmann and Levity)**

21      28.    IWA realleges and incorporates by reference each of the foregoing paragraphs as
22  though fully set forth herein.

23      29.    The License Agreement was and remains a valid and legally enforceable
24  agreement.

25      30.    IWA has performed all promises, covenants, and obligations required of it pursuant
26  to the terms of the License Agreement, except as such performance many have been excused or
27  prevented.

28      EXHIBIT A PAGE 24

1   31.   As described above, Hartmann and Levity materially breached the License

2   Agreement by exploiting the Improv Brand, including without limitation on the Improv Websites,

3   for their own pecuniary gain and in a manner that was calculated to advance the interests of

4   Hartmann and his partners to the ultimate detriment of IWA and the Improv Brand.

5   32.   As a direct and proximate result of Hartmann's and Levity's breaches, IWA has

6   suffered damages in an amount to be proven at trial.

7   ## SECOND CLAIM FOR RELIEF

8   ### Breach of Implied Covenant of Good Faith and Fair Dealing

9   ### (Against Defendants Hartmann and Levity)

10   33.   IWA realleges and incorporates by reference each of the foregoing paragraphs as

11   though fully set forth herein.

12   34.   In every contract, there is an implied covenant of good faith and fair dealing that

13   prohibits a party to a contract from taking any action that is intended to or has the natural tendency

14   to deprive the other party of the full benefits of its bargain. This covenant was implied into the

15   License Agreement and imposed upon Hartmann and Levity a duty not to engage in any acts or

16   omissions that would deprive IWA of the rights and benefits of the License Agreement.

17   35.   Hartmann and Levity breached the implied covenant of good faith and fair dealing

18   by their conduct described herein, including without limitation through their misuse of the license

19   rights granted by IWA to advance their own pecuniary interests to the ultimate detriment of IWA

20   and the Improv Brand.

21   36.   The conduct of Hartmann and Levity as alleged herein unfairly frustrated the

22   common purposes of the License Agreement and the reasonable expectations of IWA, thereby

23   depriving IWA of the benefits of the License Agreement.

24   37.   As a direct and proximate result of Hartmann's and Levity's breaches, IWA has

25   suffered damages in an amount to be proven at trial.

26

27

28


EXHIBIT A PAGE 25

8956 8.1

9

COMPLAINT

## THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty

### (Against Defendants Hartmann and Levity)

38. IWA realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

39. Hartmann and Levity undertook to act on behalf of and for the benefit of IWA in connection with the development, promotion, and management of the Improv Brand on the internet for the purpose of promoting the business of the various "Improv" comedy clubs. In connection with such activities, IWA vested Hartmann and Levity with considerable discretion, and placed a high degree of trust and confidence in them.

40. Hartmann and Levity owed fiduciary duties, including duties of the utmost loyalty, care, disclosure, and fair dealing, in connection with their development, promotion, and management of the Improv Brand on the internet as allowed by IWA.

41. By the conduct alleged herein, Hartmann and Levity repeatedly breached their fiduciary duties to IWA.

42. As a direct and proximate result of Hartmann's and Levity's breaches of fiduciary duty, IWA has suffered, and will continue to suffer, damages in an amount to be proven at trial.

43. Hartmann's and Levity's acts were undertaken intentionally and in conscious disregard of IWA's rights. In addition, Hartmann's and Levity's acts were malicious, oppressive, and/or fraudulent. Therefore, IWA should be awarded punitive and exemplary damages sufficient to punish Hartmann and Levity and to deter similar conduct in the future.

## FOURTH CLAIM FOR RELIEF

### Constructive Fraud

### (Against Defendants Hartmann and Levity)

44. IWA realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

EXHIBIT A PAGE 24

45. Hartmann and Levity owed fiduciary duties to IWA, including duties of the utmost loyalty, care, disclosure, and fair dealing, in connection with their development, promotion, and management of the Improv Brand as allowed by IWA.

46. By the conduct alleged herein, Hartmann and Levity took unfair advantage in IWA. Hartmann and Levity did not act in the best interests of IWA and the Improv Brand.

47. As a direct and proximate result of Hartmann's and Levity's constructive fraud, IWA has suffered, and will continue to suffer, damages in an amount to be proven at trial.

48. Hartmann's and Levity's acts were undertaken intentionally and in conscious disregard of IWA's rights. In addition, Hartmann's and Levity's acts were malicious, oppressive, and/or fraudulent. Therefore, IWA should be awarded punitive and exemplary damages sufficient to punish Hartmann and Levity and to deter similar conduct in the future.

## FIFTH CLAIM FOR RELIEF

### Intentional Interference with Contractual Relations

### (Against The Non-Hartmann Defendants)

49. IWA realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

50. The Non-Hartmann Defendants knew of the License Agreement between IWA, on the one hand, and Hartmann and Levity, on the other hand.

51. The Non-Hartmann Defendants intended to induce a breach of the License Agreement or to otherwise disrupt its performance, each for their own respective advantage and benefit.

52. The Non-Hartmann Defendants' conduct induced a breach of the License Agreement by Hartmann and Levity or otherwise disrupted its performance.

53. As a direct and proximate result of the Non-Hartmann Defendants' conduct, IWA has been harmed in an amount to be proven at trial. The Non-Hartmann Defendants' conduct was a substantial factor in causing that harm.

EXHIBIT A PAGE 27

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Breach of Fiduciary Duty

### (Against The Non-Hartmann Defendants)

54. IWA realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

55. The Non-Hartmann Defendants, and each of them, each for their own respective advantage and benefit, have provided substantial assistance to Hartmann and Levity in performing the wrongful conduct that has given rise to Hartmann's and Levity's breaches of their fiduciary duties.

56. The Non-Hartmann Defendants were fully aware that Hartmann and Levity owed fiduciary duties, including a duty of loyalty, to IWA and facilitated Hartmann's and Levity's conduct in breaching those duties willfully and maliciously in order to benefit themselves.

57. As a direct and proximate result of the breaches of fiduciary duty described herein, IWA has suffered, and will continue to suffer, damages in an amount to be proven at trial.

58. The Non-Hartmann Defendants' acts were undertaken intentionally and in conscious disregard of IWA's rights. In addition, the Non-Hartmann Defendants' acts were malicious, oppressive, and/or fraudulent. Therefore, IWA should be awarded punitive and exemplary damages sufficient to punish the Non-Hartmann Defendants and to deter similar conduct in the future.

## SEVENTH CLAIM FOR RELIEF

### Common Law Unfair Competition

### (Against All Defendants)

59. IWA realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

60. IWA invested substantial time and resources in developing the Improv Brand and the good will associated therewith.

61. As alleged above, Defendants have appropriated and used the Improv Brand and associated good will to develop independent and competing businesses.

EXHIBIT A PAGE 28

895€8.1

12

COMPLAINT

1    62.    Defendants' appropriation and use of the Improv Brand and associated good will

2  was done under false pretenses, and without the informed authorization and consent of IWA.

3    63.    As a direct and proximate result of Defendants' acts of unfair competition, IWA

4  has suffered, and will continue to suffer, damages in an amount to be proven at trial.

5    64.    Defendants' acts were undertaken intentionally and in conscious disregard of

6  IWA's rights. In addition, Defendants' acts were malicious, oppressive, and/or fraudulent.

7  Therefore, IWA should be awarded punitive and exemplary damages sufficient to punish

8  Defendants and to deter similar conduct in the future.

9  **EIGHTH CLAIM FOR RELIEF**

10  **Violation of Bus. & Prof. Code §§ 17200 *et seq.***

11  **(Against All Defendants)**

12    65.    IWA realleges and incorporates by reference each of the foregoing paragraphs as

13  though fully set forth herein.

14    66.    Defendants' actions as described herein constitute unlawful, unfair, and fraudulent

15  business practices proscribed by California Business and Professions Code Sections 17200 *et seq.*

16    67.    As a result of Defendants' acts in violation of California Business and Professions

17  Code Sections 17200 *et seq.*, IWA has suffered and, unless those acts are enjoined by the Court,

18  will continue to suffer irreparable harm for which it has no adequate remedy at law

19  **PRAYER FOR RELIEF**

20  WHEREFORE, IWA respectfully prays for the following relief:

21    A.    For compensatory damages in an amount to be proven at trial;

22    B.    For an accounting of and constructive trust over the profits, revenues, and reciepts of

23  Defendants dervied from the wrongful conduct alleged herein;

24    C.    For punitive and exemplary damages;

25  //

26  //

27  //

28  //

EXHIBIT _A_ PAGE 29

89563.1

13

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2  Plaintiff Improv West Associates hereby demands a trial by jury of all issues so triable.

3

Dated: August 22, 2011                    KENDALL BRILL & KLIEGER LLP

4

5                                          By: _____

6                                              Robert N. Klieger

7                                              - and -

8

9                                          DENNIS ARDI ATTORNEY AT LAW
                                           PROFESSIONAL CORPORATION

10                                         Attorneys for Plaintiff Improv West Associates

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EXHIBIT __X__ PAGE _30_

89568.1

15

COMPLAINT

1

## DEMAND FOR JURY TRIAL

2  Plaintiff Improv West Associates hereby demands a trial by jury of all issues so triable.

3

Dated: August 22, 2011                    KENDALL BRILL & KLIEGER LLP

4

5                                          By: _____

6                                              Robert N. Klieger

7

8                                              - and -

9                                          DENNIS ARDI ATTORNEY AT LAW
                                           PROFESSIONAL CORPORATION

10                                         Attorneys for Plaintiff Improv West Associates

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                        EXHIBIT A PAGE 31

28

89568.1                              15
                                  COMPLAINT

# Exhibit B

## TRADEMARK LICENSE AGREEMENT

THIS TRADEMARK LICENSE AGREEMENT is dated as of June 13, 1999, and is entered into by and among, on the one hand, COMEDY CLUB, INC., a Louisiana corporation, ("CCI"), having its principal executive office at 1405 Airline Drive, Metairie, Louisiana, and AL COPELAND INVESTMENTS, INC., a Louisiana corporation, ("ACII"), having its principal executive office at 1405 Airline Drive, Metairie, Louisiana, jointly and severally (CCI and ACII are hereinafter, jointly and severally, referred to as "Licensee"); and, on the other hand, IMPROV WEST ASSOCIATES, a California limited partnership ("Licensor"), having its principal executive office at 8162 Melrose Avenue, Los Angeles, California.

WHEREAS, Licensor owns and operates a restaurant, bar and nightclub at 8162 Melrose Avenue, Los Angeles, California known as the "IMPROV" (the "Melrose Improv") and controls the rights to use and license the trademarks "IMPROV" and "IMPROVISATION" (such trademarks, together with the related trade dress and related trade secrets, are hereinafter referred to as the "Trademarks") at such location; and

WHEREAS, Licensor, except as otherwise herein set forth or disclosed, owns the Trademarks and controls the rights to use the Trademarks at all locations other than at the Melrose Improv and also is engaged in the business of licensing others to use the Trademarks in connection with restaurants, bars and nightclubs; and

WHEREAS, Licensor and Licensee are entering into a Asset Purchase and Sale Agreement (the "Asset Purchase Agreement") concurrently with this Agreement, pursuant to which Licensor agrees to sell, assign and transfer and Licensee agrees to purchase certain assets of the Melrose Improv; and

WHEREAS, Licensor wishes to grant to Licensee and Licensee wishes to acquire an exclusive license to use the trademarks "IMPROV" and "IMPROVISATION" (the "Trademarks') in connection with the business that Licensee plans to operate at the premises now used by the Melrose Improv; and

WHEREAS, Licensor wishes to grant to Licensee and Licensee wishes to acquire from Licensor a license to use the Trademarks in connection with other restaurant/bar/nightclub facilities that Licensor may own or open at other locations and the right to grant to third parties a sub-license to use the Trademarks in connection with other restaurant/bar/nightclub facilities that such third parties may own or open at other locations;

2

NOW THEREFORE, in consideration of the premises and the mutual covenants and conditions contained herein, and intending to be legally bound hereby, the parties agree as follows:

1.   DEFINITIONS

"Adjusted Gross Sales" means, for any Club, all gross receipts at such Club, less credit card chargebacks not ultimately collected, less complimentary food, beverages and admissions (not exceeding the level of complimentary food, beverages and admissions as the Melrose Improv has customarily afforded to its business guests and entertainment industry performers, executives, managers, lawyers and agents), less any receipts for food and beverages consumed in any area of the Club (the "Non-Improv Area") which is both physically separate and apart (which may mean a separate building, but may also mean a separate dining room) from that portion of the Club in respect of which the Trademarks are used and not used for the presentation of live entertainment, plus, if and to the extent any discounts are allowed to Club patrons for food, beverages or Club admission by reason of their patronage of the Non-Improv Area or as a means of marketing or promoting the Non-Improv Area, a deemed admission equal to the discount.

"Affiliate" means, as to any natural person, or any corporation, partnership, joint venture, limited liability company, business association, trust, governmental agency or other entity (each, a "Person"), any other Person controlled by, under common control with, or which controls, directly (or indirectly through one or more intermediaries), the Person in question. The term "Control" for these purposes means the ability, whether by direct or indirect ownership of shares or other equity interest, by contract or otherwise, to elect a majority of the directors of a corporation, to select the managing partner or member of a partnership or limited liability company, or otherwise to select, or have the power to remove and then select, a majority of those persons exercising governing authority over an entity, and, in the case of a limited partnership or limited liability company, shall mean the sole general partner thereof, all of the general partners thereof, to the extent each has equal management control or authority, or the managing general partner or member or managing general partners or members thereof, as appropriate (and in any event shall mean the ownership and control [that is, the right to vote] of fifty percent (50%) or more of the residual equity interest in an entity). The term "Affiliate" shall also mean and include: (i) a trust of which the Person, or a direct or indirect shareholder of such Person, is a trustee, or which has as its principal income or residuary beneficiaries such Person, or any direct or indirect shareholder of such Person, or members of the immediate family of such Person, or direct or indirect shareholder; and (ii) any members of such Person's immediate family, or the member of the immediate family of any direct or indirect shareholder of such Person. For purposes hereof, shares or other ownership interests held by a trust shall be deemed to be owned pro rata by the income and residuary beneficiaries of such trust. Further, the members of the immediate family of any Person shall include all collateral

EXHIBIT _B_ PAGE _33_

relatives of such Person having a common linear ancestor with such Person, and the spouse or any former spouse of such Person or any of such collateral relatives of such spouse.

"Club" means any bar, restaurant, nightclub or other facility in respect of which any of the Trademarks is in any way used or displayed and any restaurant, nightclub or other facility adjacent to or within 50 yards of such facility which is owned or operated by an Affiliate of the owner or operator of such bar, restaurant, nightclub or other facility.

"Operator" means any Person, including Licensee or any Affiliate of Licensee or any Third Party, which owns or operates a Club licensed or sub-licensed pursuant to this Agreement, whether for its own account or as manager or agent for any other person duly licensed or sub-licensed to own or operate a Club.

"Term" means, in the case of the License (hereinafter defined), the duration of the License pursuant to Section 3 of this Agreement, and, in the case of the Melrose Improv License (hereinafter defined), the duration of the Melrose Improv License pursuant to Section 3 of this Agreement.

"Third Party" means any Person other than Licensor, an Affiliate of Licensor, Licensee or an Affiliate of Licensee.

2.     GRANT OF LICENSES

a.     Subject to the terms and conditions of this Agreement, and except as herein otherwise provided, Licensor hereby grants to Licensee, for the Term and the Territory (as hereinafter defined), the exclusive right, power and license (the "License") to use the Trademarks in connection with one or more Clubs (other than the Melrose Improv, which is covered by Section 2.b. below), each containing a restaurant, bar and nightclub which presents, in a showroom with a minimum of 150 seats, at least three nights each week (including Friday and Saturday), entertainment consisting exclusively of live, stand-up or sketch comedy performances and live improvisational comedy performances substantially as presented at the Melrose Improv during the period January 1, 1998 through the date of this Agreement and the right, power and license to sub-license Third Parties to do so.     Licensee's License is expressly conditioned upon Licensee and its Affiliates and all sub-licensees complying with any and all applicable local, state and federal laws, rules or regulations, including but not limited to securities laws, franchising laws and alcoholic beverage licensing laws.     Any sub-license granted by Licensee: (i) shall be subject to this Agreement; (ii) shall not grant rights which are broader in any way than the license granted hereunder; (iii) shall not grant any television rights nor any merchandising rights, other than the right to sell merchandise as herein contemplated; (iv) shall provide that the sub-licensee shall not have the right to grant further sub-licenses; (v) shall contain every provision required or

4

implied by this Agreement (as when this Agreement states that "Licensee shall cause all Operators [to undertake certain actions or to observe certain requirements]"); and (vi) shall be subject to Licensor's prior written approval, which approval shall not be unreasonably withheld provided the proposed sub-licensee and each of its Affiliates is financially capable and responsible and is not an Affiliate of any Person who has been convicted of a felony or a crime involving moral turpitude in any jurisdiction.

    b.    Subject to the terms and conditions of this Agreement, and except as herein otherwise provided, Licensor hereby grants to Licensee, for the Melrose Improv License Term (as hereinafter defined), an exclusive license (the "Melrose Improv License") to use the Trademarks at 8156 Melrose Avenue and 8162 Melrose Avenue, Los Angeles, California (the "Premises") in connection with a restaurant, bar and nightclub which presents, at least three nights each week (including Friday and Saturday), entertainment consisting exclusively of live, stand-up or sketch comedy performances and live improvisational comedy performance in substantially the same manner as such entertainment has been presented by Licensor at the Melrose Improv since January 1, 1998.

    3.    TERM

    a.    The License shall commence on the date of this Agreement and continue until May 31, 2019, unless terminated sooner in accordance with the terms of this Agreement. Upon termination of this Agreement, the License and the rights granted hereunder and the obligations imposed hereunder shall cease, except that Licensee and any sub-licensee shall remain liable for any obligations remaining hereunder including obligations accrued as of the date of such termination and except as otherwise expressly set forth herein. On condition that Licensee fully performs all of its obligations under this Trademark License Agreement and is not in default, then Licensee shall have the option, exercisable by written notice given to Licensor after June 1, 2018 and before December 1, 2018, to extend the License until May 31, 2029.

    b.    The Melrose Improv License shall commence on the date of this Agreement and continue until May 31, 2019, unless terminated sooner in accordance with the terms of this Agreement.  Upon termination of this Agreement, the Melrose Improv License and the rights granted hereunder and the obligations imposed hereunder shall cease, except that Licensee shall remain liable for any obligations remaining hereunder including obligations accrued as of the date of such termination and except as otherwise expressly set forth herein.  On condition that Licensee fully performs all of its obligations under this Trademark License Agreement and is not in default, then Licensee shall have the option, exercisable by written notice given to Licensor after June 1, 2018 and before December 1, 2018, to extend the Melrose Improv License until May 31, 2029.

5

c.     Any sub-license granted during the Term may be for an initial term of twenty (20) years and may give the sub-licensee the option to extend the term of the sub-license for an additional ten (10) years all on condition that at all times the sub-licensee fully perform all of its obligations under the sub-license, including such obligations as shall be required by this Agreement.

d.     Licensor, for itself and its Affiliates, hereby expressly reserves all of its rights and interests under and with respect to: (i) all agreements listed on Schedule 3-1 attached hereto (relating to rights of Third Parties to use the Trademarks in connection with Clubs), all amendments, extensions and renewals of such agreements, and all fees or other amounts required to be paid thereunder; (ii) any direct or indirect ownership or other interest in any Club now or at any time hereafter operated at any location covered by the agreements listed on Schedule 3-1 (such interests to include, without limitation, a profit participation or royalty interest in such Club, any direct ownership of such Club, or the ownership of stock, partnership or joint venture interests, interests in limited liability companies and the like, in entities owning or controlling any such Clubs); and (iii) all other rights of Licensor provided for herein or otherwise; and (iv) any and all other rights of any nature in respect of or in connection with the Trademarks, including but not limited to television (except as otherwise herein provided), radio, motion picture, merchandising (except as otherwise herein provided), sound recording, publishing, computer game, internet, on-line computer network, live performance rights (regardless of where live performances are presented) and the right to use the Trademarks on cruise ships (regardless of the point of origination or termination of the cruise).

4.     TERRITORY

The territory within which Licensee may exercise the rights herein granted (the "Territory") shall mean the 48 contiguous continental states of the United States with the following exceptions:

a.     Certain pre-existing agreements to which Licensor and/or its Affiliates are parties contain covenants restricting the right of Licensor and/or its Affiliates and licensees, to own or operate a restaurant, bar, or nightclub or otherwise use the Trademarks as provided in such agreements (the "Restrictive Agreements"). The Restrictive Agreements are listed on Schedule 4-1 attached hereto. Licensee hereby acknowledges that it has received and read copies of certain portions of the Restrictive Agreements which create restrictions on Licensor. Before opening any Club and before entering into any sub-license that might reasonably be expected to violate or cause Licensor or it Affiliates to be in violation of any of the Restrictive Agreements, Licensee agrees that it shall provide written notice of its intention to do so and the details thereof to Licensor.  Licensor shall, within 30 days following receipt of any such notice, advise Licensee whether or not the proposed Club or sub-license might violate any of the Restrictive Agreements listed on Schedule 4-1.   If Licensor

◯                                                                                                                   6

determines and advises Licensee that the proposed Club or sub-license might result in a violation of a Restrictive Agreement, Licensee agrees that it shall not open such Club and/or grant the sub-license until after expiration (if applicable) of the Restrictive Agreement in question, and then only in accordance with the provisions of this Agreement. If Licensee disagrees with Licensor's determination, and the parties are unable to negotiate a resolution, then they shall submit the issue to arbitration in the same manner as provided in section 22 of this Agreement.

b.      Licensee may not open and may not grant sub-licenses in respect of any Club in the State of Nevada or in or within a 25 mile radius of Tunica, Mississippi. Subject to the preceding sentence and the other provisions of this Agreement, Licensor and Licensee may each own or operate (but Licensee may not sub-license) a Club in any other area or in any other venue (such as riverboats) in which gambling is legal provided that the other party has not first opened a Club in such area, or provided, in the case of Licensee, that Licensor is not otherwise using the Trademarks in such area (e.g. as by presenting shows or other entertainment).

## 5.      MANNER IN WHICH THE TRADEMARKS SHALL BE USED

Licensee shall observe and conform, and shall cause its Affiliates and sub-licensees and their Affiliates, to observe and conform to the following requirements and requirements with respect to the use of the Trademarks, each of which requirements are of the essence of this Agreement:

a.      Unless Licensor in each instance otherwise specifically and in writing agrees, the Trademarks shall be used in substantially the same manner as the Trademarks are now used at the Melrose Improv, and the typeface and format of all such uses, including but not limited to exterior signs, shall be substantially identical to that used for the Trademarks at present in corresponding ways and places at the Melrose Improv.

b.      If any of the Trademarks is used at any Club at which there is a Non-Improv Area at which another name or trademark (such as a restaurant name) is used to identify the business carried on there, the Trademarks shall be given signage at least equal in size and prominence to the signage of the name and trademarks such other business to the extent applicable zoning laws and regulations allow, unless otherwise agreed on a case by case basis.  No tradename other than "the Improv" or "the Improvisation" shall be used at 8162 Melrose Avenue, Los Angeles, California.

c.      Admission shall be charged for any live performance at any Club.  The amount of such admission shall be comparable to the charges at present imposed at the Melrose Improv and other Clubs covered by the agreements listed on Schedule 3-1 or as may in the future be imposed by any of the Clubs covered by the agreements listed on Schedule 3-1.  In addition to the admission charge, there shall be a two drink

7

minimum (or equivalent minimum food service minimum). Liquor, beer, wine and food service shall be available at all times in the room in which entertainment is presented.

      d.    Such further conditions and requirements as may be set forth on any Schedule 5-1 attached hereto.

      6.    LICENSE FEES AND ROYALTIES

      a.    Upon execution of this Agreement, Licensee will pay Licensor an initial, non-refundable license fee of $25,000 for the Melrose Improv License. Such initial, non-refundable license fee shall not be applicable to any other fees or royalties payable under this Agreement.

      b.    Two weeks before the opening of any Club, which is owned or operated by Licensee or by an Affiliate of Licensee, Licensee shall pay Licensor an initial, non-refundable license fee in respect of such Club, of $25,000. Against and in reduction of the fees payable pursuant to this Section 6.b., Licensee shall pay Licensor a non-refundable advance of $50,000 upon execution of this Agreement, and a further non-refundable advance of $50,000 on June 1, 2000.

      c.    In addition to the initial license fee payable pursuant to Section 6.a. above, Licensee will pay Licensor for the Melrose Improv License a royalty of 3 1/2% of the Adjusted Gross Sales at the Melrose Improv and all business owned or licensed by Licensee at the Premises (i.e., including but not limited to the business of any Club operated there). Such royalty shall be accounted for weekly, and paid in the week following the week for which accounting is made, except that if Second City or a similar business opens at 8156 Melrose Avenue, then, upon the opening of such business, the amount due in respect of such business located at 8156 Melrose Avenue shall be $500 per month, payable on the first of each month, regardless of the Adjusted Gross Receipts or lack thereof of such business.

      d.    In addition to the initial license fee payable pursuant to Section 6.b. above, Licensee will pay Licensor a royalty equal to the percentage set forth on the following table of the Adjusted Gross Sales of each Club, other than the Melrose Improv, which is opened, owned and operated by Licensee or an Affiliate of Licensee:

EXHIBIT _D_ PAGE _38_

| Club | Royalty Rate |
|------|--------------|
| First 15 Clubs | 4% |
| Each Club after 15th Club, up to 25th Club | 3.5% |
| Each Club after 25th Club | 3% |

For purposes of determining the applicable royalty rate under the preceding table, the Melrose Improv shall not count towards the number of Clubs. The applicable royalty shall be paid weekly, in respect of the preceding week. Notwithstanding the foregoing provisions of this Section 6.d., royalties for a Club shall not be payable for a period of three months following the opening of such Club on condition that Licensee uses the royalties otherwise payable, in addition to at least an equivalent amount provided by the Operator of such Club, to promote and advertise such Club and accounts to Licensor for the amounts so paid for promotion and advertising.

e.    In the case of Clubs which are owned and operated by Operators other than Licensee or its Affiliates:

(i)    Licensee shall cause such Operators to pay a royalty based upon the Adjusted Gross Sales of each such Club. Such royalty shall be divided equally between Licensor and Licensee, except that Licensor shall be entitled to a royalty rate of at least 2 ½%.

*For example:* If an Operator other than Licensee or its Affiliates pays a royalty rate of 5%, Licensor shall receive a royalty rate of 2 ½%. If an Operator other than Licensee or its Affiliates pays a royalty rate of 6%, Licensor shall receive a royalty rate of 3%. If an Operator other than Licensee or its Affiliates pays a royalty rate of 4%, Licensor shall receive a royalty rate of 2 ½%.

(ii)    Licensee shall pay Licensor an amount equal to the greater of (A) fifty percent (50%) of any other amounts paid by such Operators to Licensee or its Affiliates, as and when paid, after Licensee recoups from 100% of such other amounts an amount equal to all training and opening expenses incurred by Licensee in connection with the Improv area of such Club or (B) $12,500 upon the opening of such Club.

All sub-licenses shall contain provisions with respect to accounting, payment and default substantially equivalent to the provisions of this Agreement and shall name Licensor as a third party beneficiary of such sub-licenses. Unless Licensee itself pays



9

Licensor the full amount of royalties due pursuant to this Agreement, Licensee shall cause such Operators to account for and pay directly to Licensor Licensor's share of such royalties and other amounts.

### 7.   MERCHANDISING

Licensee shall have the following merchandising rights with respect to the Trademarks and no others.

Licensee shall have the right to create, subject to Licensor's approval, which approval shall not be unreasonably withheld, merchandising items in the categories set forth on Schedule 7-1 (the "Items") for sale only at Clubs or in restaurants owned, operated or sub-licensed by Licensee or its Affiliates. Licensee shall offer approved merchandising items for sale, as aforesaid, in a manner similar to the way that merchandising items have been offered and sold at the Melrose Improv from January 1, 1998 to the date of this Agreement, in the Improv area of all Clubs owned or operated by Licensee or any Affiliate of Licensee. Licensee shall require as a condition of every sub-license that the sub-licensee offer approved merchandising items for sale to the public, in such similar manner, and shall manufacture and sell approved merchandising items at an appropriate and reasonable wholesale price to all Operators for such purpose. Licensee shall permit Licensor to purchase any quantity of the Items, for its own use or for resale, at Licensee's cost. Licensee shall itself account, and shall cause all Operators to account, to Licensor and pay Licensor, on a monthly basis, a royalty equal to three and one half percent (3-1/2%) of the gross retail sales price of each merchandising item sold in any Club during the preceding month and a royalty equal to ten percent (10%) of the gross retail sales price of each merchandising item sold outside of a Club during the preceding month. The sales price for each Item as to which Licensor receives a royalty shall not be included in Adjusted Gross Sales.

### 8.   TELEVISION

a.      If, in connection with any television, radio, or internet program or series of programs that Licensor produces, it wishes to use as a location the Melrose Improv or any other Club operated by Licensee or an Affiliate of Licensee, Licensor shall have the right to do so on such rental terms as are reasonable and customary for the use of such a facility and as shall be negotiated in good faith.

b.      Licensor agrees that if it wishes to produce any television program or series of programs for initial exhibition on broadcast television in the United States using the Trademarks or any radio or internet program or series of programs using the Trademarks, it shall afford Licensee the right of first refusal to finance such program or series of programs.  Such right of first refusal shall mean that if Licensor is interested in such program or series, it shall by notice to Licensee offer Licensee the opportunity to finance such program or series and, if Licensee notifies Licensor within one week of

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 40

10

the receipt of such notice that it is interested in financing such program or series, Licensor shall negotiate with Licensee the terms and conditions upon which Licensee would make such financing commitment. If a mutually satisfactory agreement is not reached within three weeks of the date Licensor first sends notice, then Licensor shall be free to enter into any agreement for the financing of such program or series. In the event of a "hot offer", the foregoing time periods, respectively, shall be shortened to three days and one week. If Licensee at any time develops a concept or program idea by its own efforts or because Licensee opens a Club in a new city and/or a local entity approaches Licensee to do a show, then Licensee may do so subject to complying with procedures outlined in section 8.c. If, however, a national network or cable service or national program producer asks Licensee to do a show at any Club located in Los Angeles, or if any one approaches Licensee to do a show by reason of the fact that Licensee is operating a Club in Los Angeles, then this paragraph shall not apply.

     c.     The following shall apply beginning three years after the Closing Date: If Licensee wishes to produce any television program or series of programs for initial exhibition on broadcast television in the United States or any radio or internet program or series of programs, it may do so beginning three years after the Closing Date, provided it shall offer Licensor the opportunity to function as the production company, on terms and conditions appropriate to the program, in keeping with customary industry standards, and as shall be negotiated in good faith. If Licensor chooses not to be the production company, then Licensee shall instead pay Licensor a "packaging fee" in connection with such program or series of programs in the same manner as the "packaging fees" customarily paid to the William Morris Agency on the formula known as "10, 5 and 5", meaning Licensor shall receive ten percent (10%) of the license fee, payable out of the budget of the program, five percent (5%) of all syndication sales and five percent (5%) of the net profits. Beginning three years after the Closing Date, if Licensor finances and produces a television program or series of programs for initial exhibition on broadcast television in the United States using the Trademarks or any radio or internet program or series of programs using the Trademarks, it will pay Licensee a similar "packaging fee".

9.    LICENSEE'S COVENANTS

     a.    Licensee shall submit to Licensor as soon as available but not later than ninety (90) days after Licensee's fiscal year, complete financial statements for such year for Licensee and for each Affiliate of Licensee which owns or operates one or more Clubs. Licensee shall certify them to be true and correct and to have been prepared in accordance with generally accepted accounting principles consistently applied, and any materially false or inaccurate certification shall be a breach of this Agreement. Licensor may also request, from time to time, information with respect to gross operating profits percentages and certain operating statistics for each such Club, and Licensee shall provide such information within a reasonable time after any such request. Licensor shall cause each Operator which is a Third Party to submit to

Trademark License Agreement
Revised 6/9/99

11

Licensor, as soon as available but not later than ninety (90) days after such Operator's fiscal year, complete financial statements for such year for such Operator.   The respective Operator shall certify them to be true and correct and to have been prepared in accordance with generally accepted accounting principles consistently applied, and any materially false or inaccurate certification shall be a breach of such Operator's sub-license and a breach by Licensee of this Agreement.   Licensor may also request, from time to time, that Licensee cause each Operator which is a Third Party to provide information with respect to gross operating profits percentages and certain operating statistics for each Club, and Licensee shall cause such information to be provided within a reasonable time after any such request.

b.      Licensee acknowledges that the Licensor is the sole and exclusive owner of the Trademarks and that nothing contained in this Agreement shall be construed to convey any rights or proprietary interest in the Trademarks to Licensee other than the specific licenses granted hereunder.   Licensee shall cause each Operator to make a similar acknowledgment.   Licensee covenants that it shall not at any time challenge or contest the validity, ownership, title or registration of Licensor in and to the Trademarks or the validity of the licenses granted under this Agreement. Licensee shall cause each Operator to make a similar covenant.

c.      Licensee covenants promptly to notify Licensor, and to cause each Operator promptly to notify Licensor, of any suspected infringement of, or challenge to the validity of ownership of or the right of Licensor to use the Trademarks licensed hereunder.   Licensee acknowledges, and will cause each Operator to acknowledge, Licensor's right to control any administrative proceeding or litigation involving the Trademarks.   Licensor is not obligated by this Agreement or otherwise to protect any rights granted to the Licensee to use the Trademarks, or to protect the Licensee against claims of infringement or unfair competition, provided however, that if Licensor elects not to act, and if action is reasonably necessary to protect Licensee's rights in the Trademarks, Licensee may, upon notice to Licensor, act in Licensor's place, and may recoup the cost of doing so from any royalties thereafter payable hereunder.   In the event Licensor undertakes the defense or prosecution of any litigation relating to the Trademarks, Licensee agrees, on behalf of itself and its Affiliates, and Licensee shall cause each Operator to agree, on behalf of itself and its Affiliates, to execute any and all documents and to do such acts and things as may in the opinion of Licensor be necessary to carry out such defense or prosecution.

d.      Licensee agrees that Licensor may enter any Club at any time during regular business hours for purposes of reviewing Licensee's operation in general, to assure compliance with the standard of quality established by Licensor for goods sold and services provided under in connection with the Trademarks.   Licensor shall cause all Operators to afford Licensee such right of entry.

Trademark License Agreement
Revised 6/9/99

EXHIBIT B  PAGE 42

All royalties due pursuant to this Agreement shall be paid weekly in respect of the preceding week. Unless Licensee itself pays Licensor the full amount of royalties due pursuant to this Agreement, Licensee shall cause all Operators to pay directly to Licensor any royalties due to Licensor on a weekly basis in respect of the preceding week. Once each month, Licensee shall submit to Licensor a report (the "Monthly Report") setting forth, in reasonable detail, and with respect to each separate Club (including Clubs owned and operated by Third Parties): (i) the amount of gross receipts received by each such Club, broken down by type of income (such as restaurant receipts, bar receipts, showroom admissions, etc.); (ii) the amount of permissible deductions from such gross receipts to reach Adjusted Gross Sales pursuant to this Agreement; (iii) a calculation of the royalties payable; and (iv) a reconciliation of the royalties payable with the amounts theretofore paid weekly. A separate Monthly Report shall be prepared and submitted to Licensor for the Melrose Improv. Licensee will cause each Operator to prepare and supply the foregoing information for each Club that such Operator owns or operates. Each Monthly Report submitted to Licensor in accordance with the provisions of this Section shall be certified on behalf of Licensee by its Chief Financial Officer as being true and correct in all material respects. All information supplied by an Operator which is a Third Party shall be certified on behalf of such Third Party by its Chief Financial Officer as being true and correct in all material respects. Each Monthly Report shall be accompanied by the payment shown thereon to be due to Licensor.

f.      Licensee shall maintain, and shall cause each Operator to maintain, accurate books and records sufficient, for all purposes, for the preparation of the Monthly Reports, and to verify the information contained therein, and otherwise to calculate the royalties required to be paid pursuant to this Agreement. Licensee shall grant to Licensor and each of its agents, accountants, employees and other authorized representatives full and complete access to all books and records of Licensee relating to this Agreement, and shall cause each Operator to do so with respect to the Clubs that they respectively own or operate. To the extent such information is contained in electronic storage media, Licensee agrees to provide, and to cause each Operator to provide, upon request of Licensor, hard copies of all such data. Any investigation or audit conducted by Licensor, or their respective employees or agents shall be upon reasonable prior written notice and during normal business hours and shall be conducted in a manner so as to minimize disruption of the operations of Licensee or the Operator being audited. If, as a result of any such investigation or audit, Licensor shall determine that the amount of royalties theretofore paid to Licensor pursuant hereto is less than the amount required to have been paid, Licensee or the Operator responsible for the underpayment, as the case may be, shall promptly remit the deficiency to together with a late payment fee of 10% of the amount of the underpayment. Licensor shall cause all Operators to agree to payment of such a late payment fee in the case of any underpayment. In addition, if any such investigation or audit discloses an underpayment to Licensor for any monthly period of five percent (5%) or more, Licensee or the Operator responsible for the underpayment, as the case may be, shall

13

promptly reimburse Licensor for all reasonable costs and expenses incurred by Licensor in conducting such investigation or audit for all periods then being investigated or audited. Licensor shall cause all Operators to agree to such reimbursement in such event.

g.      Licensor will maintain, and will cause all Operators to maintain, insurance customary to the operation of businesses such as the Clubs, including general liability insurance, and will add the persons listed on Schedule 8-3 of the Asset Purchase Agreement as additional insureds.

h.      Licensor will provide Budd Friedman and his assistant with office space at the Premises or other location to which the "Improv Flagship" (as defined in section 9.1.) may be moved as provided by section 9.1., comparable in size, furnishing and amenities to the office which Budd Friedman has at the Melrose Improv as of the date of this Agreement, for the entire duration of the time which Licensee or any of its Affiliates occupies the Premises, free of any charge. Such office shall include light, heat, air conditioning, local telephone service and the continued use of all office equipment used by Budd Friedman in his office as of the date of this Agreement, all without charge.

i.      Licensee shall allow Mark Lonow to use the main showroom or other facilities at the Melrose Improv or other location to which the "Improv Flagship" (as defined in section 9.1.) may be moved as provided by section 9.1., on up to three mutually agreed dates each year, for the entire duration of the time which Licensee or any of its Affiliates occupies the Premises, for purposes of "graduation" ceremonies and celebrations for his acting students, all without charge. Licensee shall allow Mark Lonow to showcase acts at the Melrose Improv as he has in the past.

j.      Licensee shall not own or operate, and Licensee shall ensure that none of its Affiliates shall own or operate any bar, restaurant, nightclub or other facility which presents live stand-up or sketch comedy performances or live improvisational performances, other than the Melrose Improv or a Club, or Second City.

k.      Licensee will fulfill the schedule set forth in section 12.a. of this Agreement, and pay the advances set forth in section 12.b. of this Agreement

l.      For the duration of the Melrose Improv License, Licensee will operate a restaurant, bar and nightclub under the name "the Improv", or "the Improvisation", at 8162 Melrose Avenue, Los Angeles, California which presents, at least three nights each week (including Friday and Saturday), entertainment consisting exclusively of live, stand-up or sketch comedy performances and live improvisational comedy performance in substantially the same manner as such entertainment has been presented by Licensor at the Melrose Improv since January 1, 1998, provided however, that Licensee may move such business (the "Improv Flagship") to another location within

14

the City of Los Angeles with Licensor's consent, which consent shall not be unreasonably withheld.  If Licensee determines that the "Improv Flagship" (regardless of its location) is not financially viable, then it may sublease the location (it being understood that the business of the "Improv Flagship" may not be sublicensed or assigned) provided that Licensee first by notice offers to assign to Licensor all its rights to the "Improv Flagship" and to sublease the Premises (or other location to which the "Improv Flagship" may be moved) to Licensor for no cost other than the cost of inventory on hand.  Licensee shall cause the Lessor of the Premises (or other location to which the "Improv Flagship" may be moved) to insert into the lease for the Premises (or other location, as the case may be) a clause stating that if Licensee elects to sublease to Licensor, the Lessor will approve such sublease.

10.    REPRESENTATION AND WARRANTIES OF LICENSOR

Licensor represents and warrants to Licensee that as of the date of this Agreement it is a corporation duly organized, validly existing and in good standing under the laws of the State of California and has full corporate power and authority to enter into this agreement and to carry out the transactions contemplated hereby.  The execution and delivery of this Agreement and the consummation of the transactions contemplated hereby by Licensor have been duly and validly authorized by all necessary corporate action of Licensor.

11.    REPRESENTATIONS AND WARRANTIES OF LICENSEE

a.    Each constituent entity of Licensee has taken all corporate and/or other action necessary to authorize the execution and delivery of this Agreement and the transactions contemplated hereby, and this Agreement are a valid and binding obligations of each constituent entity of Buyer, in accordance with its terms. Each constituent entity of Buyer has all necessary corporate or other power and authority to enter into this Agreement, and to consummate the transactions provided herein. Neither the execution and delivery of this Agreement, nor the consummation of the transactions contemplated herein will constitute a violation or breach of (i) the Articles of Incorporation or Bylaws of or other organizational or governing documents of the respective constituent entity of Buyer, (ii) any provision of any contract or other instrument to which any constituent entity of Buyer is a party or by which the business, assets or properties of any constituent entity of Buyer may be affected or secured, or of (iii) any order, writ, injunction, decree, statute, rule or regulation.

b.    All representations and warranties of Licensee under the Asset Purchase Agreement (in which document Licensee is identified as "Buyer") are incorporated herein as if here set forth in full.

EXHIBIT B PAGE 45

15

The financial statements previously delivered for each constituent entity of Buyer are true and complete and have been prepared in accordance with generally accepted accounting principles consistently applied throughout the periods indicated.

12. EVENTS OF DEFAULT

It shall constitute an event of default ("Event of Default") if any one or more of the following shall occur for any reason:

a. The following schedule shall not be fulfilled: Licensee and/or its Affiliates will open, own and operate at least three (3) Clubs, in addition to the Melrose Improv, on or before June 1, 2001, all of which shall remain open as of such date, and beginning June 1, 2001, Licensee and/or its Affiliates will open, own and operate at least two (2) new Clubs each year, so that the cumulative number (net of any Clubs which close) open and operated by Licensee and/or its Affiliates will be increased by two each year (i.e. at least 5 by March 1, 2002, at least 7 by March 1, 2003, etc.) (for the avoidance of doubt, Clubs owned or operated by Third Parties shall be disregarded) until a cumulative total of twelve (12) Clubs are open;

b. Licensee shall fail to pay on June 1, 2001, and on each June 1 thereafter, as a non-refundable advance against the license fees which shall become due pursuant to section 6.b. of this Agreement, the sum of $50,000, until a cumulative total of $300,000 has been paid pursuant to section 6.b. of this Agreement;

c. Licensee shall fail to pay any amount which this Agreement requires Licensee to pay to Licensor when the same becomes due;

d. Any representation or warranty made by Licensee in this Agreement or by Licensee in the Asset Purchase and Sale Agreement or in any report furnished by Licensee at any time to Licensor shall prove to be untrue in any material respect as of the date on which made or furnished;

e. Licensee's failure to perform or observe, or Licensee's breach of, any material agreement or material covenant under this Agreement or the Asset Purchase and Sale Agreement;

f. Any of the entities comprising Licensee shall become insolvent, or admit in writing its inability to pay its debts as they mature, or make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or if such a receiver or trustee otherwise shall be appointed; provided however, that none of the foregoing shall constitute an Event of Default so long as Licensee continues to fulfill in a timely manner all of its obligations under this Agreement;

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 46

Any money, judgment, writ or warrant of attachment, or similar process shall be entered or filed against any of the entities comprising Licensee, or any material portion of their respective assets and shall remain unvacated, unbonded or unstayed for a period of thirty (30) days, if the amount of exposure exceeds Five Hundred Thousand Dollars ($500,000);

h.      Subject to any applicable limitations of the Bankruptcy Act, an involuntary bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted against any of the entities comprising Licensee, and such proceeding shall not be dismissed within sixty (60) days after its commencement;

i.      Subject to any applicable limitations of the Bankruptcy Act, a bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by any of the entities comprising Licensee;

j.      Any party other than Licensor shall deny that it has any further obligation under this Agreement or the Asset Purchase and Sale Agreement or any other instrument delivered hereunder or thereunder;

k.      Licensee shall fail to, or fail to confirm in writing, upon request by Licensor, to Licensor that it shall, perform or observe, or cause to be performed or observed, any material covenant or agreement contained in this Agreement or the Asset Purchase and Sale Agreement;

l.      The abandonment of the License or the Melrose Improv License, including but not limited to any failure by Licensee to observe and perform the covenants set forth in section 9.l. of this Agreement; or

m.      Any default by Licensee under the Asset Purchase Agreement.

13.      REMEDIES FOR EVENTS OF DEFAULT

a.      If an Event of Default exists, and if such Event of Default is susceptible of cure, Licensor shall give written notice thereof to Licensee and Licensee shall have thirty (30) days to cure such Event of Default.  It is agreed that any failure of Licensee to fulfill the schedule set forth in section 12.a. shall be an Event of Default which is not susceptible of cure.  If an Event of Default which is susceptible of cure is not cured within thirty (30) days after such notice, but Licensee is in good faith taking affirmative action to cure such default, the time period for doing so shall be extended for such time as reasonably and necessary to cure such default, or if the Event of Default is not susceptible of cure, then Licensor may, in its respective discretion, do any one or more of the following at any time or times and in any order, upon notice to Licensee:

(1)     Terminate this Agreement and/or the Melrose Improv License and/or the License for any one or more Clubs;

(2)     Terminate the merchandising rights granted hereunder;

(3)     Change the License from an exclusive to a non-exclusive license and proceed to open Clubs itself free of any restriction this Agreement may otherwise impose and/or grant licenses to Third Parties to own and operate Clubs, free of any restriction this Agreement may otherwise impose;

(4)     Rescind the Asset Purchase Agreement, in which event all Assets sold, transferred and assigned thereunder shall immediately be sold, transferred and assigned to Licensor and Licensor shall refund the Purchase Price (as defined in the Asset Purchase Agreement);

(5)     Terminate Licensee's rights to own or operate new Clubs; and/or

(6)     Terminate Licensee's rights to grant Third Parties the right to own or operate Clubs.

b.     Notwithstanding the above enumerated remedies, in the event Licensee fails to fulfill the schedule set forth in section 12.a., Licensor's sole remedy shall be as follows. Upon notice to Licensee, Licensee shall lose the right, power and License (i) to use the Trademarks in connection with any Clubs which are not, as of the date of such failure, under construction or open for business and operated by Licensee, an Affiliate of Licensee or other Operator and (ii) to sub-license Third Parties use the Trademarks in connection with any new Clubs. This section 12.b. shall have no effect upon any other remedies available to Licensor by reason of any other Event of Default, except that the payments due pursuant to sections 6.b. and 12.b. shall be due only with respect to Clubs which in fact open. If any Event of Default results only from the actions or failure to act of a Third Party as required under a sub-license, only the rights of such Third Party shall be subject to the remedies contained in this section 13. Except for failure to comply with the schedule set forth in section 12.a., if Licensee by its action or inaction permits any other Event of Default to exist and Licensor terminates any right, power or license of Licensee, Licensor shall not for such reason alone terminate the rights of any Third Party sub-licensee provided such Third Party sub-licensee is in full and timely compliance with all of its obligations under its respective sub-license, including such obligations as shall be required by this Agreement and provided Licensee assigns to Licensor all of Licensee's rights under such sub-license. In addition to the above enumerated remedies, if an Event of Default exists pursuant to section 12.l. of this Agreement, Licensee may require Licensor to sublease the Premises, or other location to which the "Improv Flagship" may have been moved, to Licensee for the balance of the lease term and any extensions, at a rent that

18

does not exceed that payable by Licensee. In addition, Licensor may require Licensee to sell all the fixtures, equipment and inventory of the Improv Flagship to Licensor for the value of the on-hand inventory alone.

c.      Upon termination of the license for any Club, Licensee shall do the following, or shall cause the applicable Operator, as the case may be, to do the following with respect to such Club:

(1)      take whatever action is necessary to assure that no use is made of any of the Trademarks;

(2)      remove all distinctive signs, change the telephone listing and remove of all items bearing the Trademarks;

If any of the foregoing is not done within thirty (30) days after termination of the license for such Club, Licensor may cause the same to be done by Licensor or its agents, who may enter upon the premises of the Club for that purpose, at the expense and for the account of Licensee who may enter upon the premises of the Club for that purpose. Licensor will cause its Affiliates and each Operator and its Affiliates to agree to the foregoing right of entry.

d.      The enumeration herein of Licensor's rights and remedies is not intended to be exclusive, and such rights and remedies are in addition to and not by way of limitation of any other rights or remedies that Licensor may have under the UCC or other applicable law.   Licensor shall have the right, in its sole respective discretion, to determine which rights and remedies are to be exercised and in which order. The exercise of one right or remedy shall not preclude the exercise of any others, all of which shall be cumulative. Licensor may, without limitation, proceed directly against Licensee to collect the any amount due under this Agreement or the Asset Purchase and Sale Agreement without any prior recourse to the Collateral.

e.      No failure or delay on the part of Licensor in the exercise of any power, right, remedy or privilege under this Agreement or the Asset Purchase shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right, remedy or privilege preclude any other or further exercise thereof or of any other right, power, remedy or privilege. All rights and remedies existing under this Agreement or the Asset Purchase and Sale Agreement are cumulative to, and not exclusive of, any rights or remedies otherwise available.

14.      CERTAIN PROVISIONS RELATING TO OPERATORS OTHER THAN LICENSOR

In all instances in which this Agreement recites that Licensee will cause Operators to agree to perform in certain ways, or to observe certain requirements or

Trademark License Agreement
Revised 6/9/99

EXHIBIT _B_ PAGE _49_

restrictions, Licensee will insert appropriate provisions in its agreement or agreements with each Operator, and will expressly provide that Licensor is a third party beneficiary of such provision. Licensee will insert, for the benefit of Licensor, provisions in its agreement or agreements with each Operator stating that if such Operator fails to pay any amount which this Agreement requires such Operator pay to Licensor when the same becomes due, or fails to perform or observe any material agreement or material covenant under required or described by this Agreement, then Licensor may terminate such Operator's license to own or operate any Clubs owned or operated by such Operator.

### 15. SURVIVAL

All representations, warranties, covenants and agreements made by Licensor or Licensee in this Agreement or the Asset Purchase Agreement shall survive the termination of this Agreement, including the agreements to indemnify any party, and shall, except to the extent specifically limited elsewhere in this Agreement, be perpetual in term. The various provisions of this Agreement shall be severable, and the non-enforceability of one shall not affect the enforceability of any others.

### 16. INDEMNITY

a.     Licensee shall appear, defend, indemnify and hold Licensor harmless from and against any claims, liability, damage, deficiency or expense (including reasonable attorneys fees) sustained by Licensor in connection with any business carried on by Licensee, or any of its Affiliates, or any Operator, or any Operator's Affiliates in connection with any Club excepting only claims of Third Parties challenging the right of Licensor, Licensee, any of Licensee's Affiliates, any Operator or any Operator's Affiliates rights to use the Trademarks in connection with any Club as provided in this Agreement.

b.     Each party shall appear, defend, and indemnify and hold the other harmless from and against any claims, liability, damage, deficiency or expense (including reasonable attorneys fees) sustained by the other as a result of any misrepresentation, breach of warranty or nonfulfillment of any agreement or understanding of the parties under this Agreement, whether arising before or after the Closing.

### 17. ENTIRE AGREEMENT

This Agreement and the Asset Purchase Agreement contain the entire agreement of the parties hereto with respect to the transactions contemplated hereby, and all prior and contemporaneous negotiations, understanding and agreements are merged herein. This Agreement may not be amended, supplemented or otherwise modified except by

an instrument in writing signed by the parties hereto.  This Agreement may be executed in counterparts.

### 18.   WAIVER

The failure of any party to enforce any condition or part of this Agreement at any time shall not be construed as waiver of that condition or part nor shall it forfeit any rights to future enforcement thereof.

### 19.   APPLICABLE LAW·

This Agreement shall be governed by and subject to the internal laws of the State of California.

### 20.   SURVIVAL

This Agreement shall extend to and be binding upon each of the parties hereto and their successors and permitted assigns.  All representations, warranties, covenants and agreements made herein shall survive any termination of this Agreement by Licensor.

### 21.   ASSIGNMENT

This Agreement may not be assigned by Licensee without the prior written consent of Licensor, which Licensor may grant or withhold in its sole discretion.

### 22.   ARBITRATION

All disputes relating to or arising under this Agreement or the Asset Purchase Agreement shall be resolved by arbitration in Los Angeles, California in accordance with the commercial arbitration rules of the American Arbitration Association.  In any such arbitration, the parties shall be entitled to discovery in the same manner as if the dispute were being litigated in Los Angeles Superior Court.  Notwithstanding this agreement to arbitrate, the parties, in addition to arbitration, shall be entitled to pursue equitable remedies and agree that the state and federal courts shall have exclusive jurisdiction for such purpose and for the purpose of compelling arbitration and/or enforcing any arbitration award.  The parties agree to submit to the jurisdiction of such courts and agree that service of process in any such action may be made by certified mail.  The prevailing party in any arbitration or action to enforce this Agreement or the Asset Purchase Agreement shall be entitled to its costs, including reasonable attorneys fees.

### 23.   NOTICES

Trademark License Agreement
Revised 6/9/99

21

All notices and other communications under this Agreement shall be in writing and shall be given in writing person, by recognized overnight delivery service or by mail, and shall become effective (a) on delivery if given in person, (b) on the date of delivery if sent by recognized overnight delivery service, or (c) four (4) business days after being deposited in the mail with proper postage for first class registered or certified mail, pre-paid.

Notices shall be addressed as follows:

If to Licensor:

IMPROV WEST ASSOCIATES
8162 Melrose Avenue
Los Angeles, California

With copies to:

Budd Friedman
875 Comstock Avenue, #5A
Westwood, California 90024.

Mark Lonow
2609 Laurel Pass Avenue
Los Angeles, California 90046

If to Licensee, any Affiliate of Licensee or any Operator other than Licensee or an Affiliate of Licensee:

COMEDY CLUB, INC.
1405 Airline Drive
Metairie, Louisiana

Any party may from time to time specify a different address for notices by notice to the other party.

24.    RELTIONSHIP OF THE PARTIES

a.    The parties hereto are independent contractors as to each other. No party is the legal representative or agent of, or has the power to obligate (or has the right to direct or supervise the daily affairs of) the other for any purpose whatsoever.  The parties hereto expressly acknowledge that the relationship intended by them is a business relationship based entirely on, and defined by, the express provisions of this Agreement and the Asset Purchase Agreement and that no partnership, joint venture,

22

other agency, fiduciary or employment relationship is intended or created by reason of this Agreement.

b.      Licensee shall take such steps as are necessary and such steps as Licensor or Licensor may from time to time reasonably request to minimize the chance of a claim being made against Licensor for anything that occurs at any Club, or for acts, omissions or obligations of you or anyone associated or affiliated with any Club, and Licensee shall cause its Affiliates, and each Operator of a Club which is a Third Party to do the same. Such steps may, for example, include giving notice in private rooms, public rooms and advertisements, on business forms and stationery, and any other materials, making clear to the public that Licensor is not the owner or operator of the Club and is not accountable for what happens at the Club. Unless required by law, Licensee shall not, and Licensee shall cause each Operator to acknowledge and agree that it shall not, use the words "Improv", "the Improvisation" or any similar words in its corporate, partnership, or trade name, nor authorize or permit such use by anyone else. Licensee shall not, and Licensee shall cause each Operator to acknowledge and agree that it shall not, use the words "Improv", "the Improvisation" or any similar words to incur any obligation or indebtedness on behalf of Licensor.

25.    CONDITIONS TO THE OBLIGATIONS OF LICENSOR

Licensor shall not be bound under this Agreement unless and until of the following conditions have been fulfilled no later than the date set forth under Section 4.a. of the Asset Purchase Agreement for the Closing thereunder:

a.      Compliance with the California Franchise Investment Act and regulations promulgated thereunder and compliance with all other applicable franchise and securities laws and regulations, to the satisfaction of counsel for Licensor.

b.      Licensee, as "Buyer" under the Asset Purchase Agreement shall have performed and complied with all covenants, agreements and conditions required in such Agreement to be performed or complied with by Licensee prior to or at the Closing, including but not limited to payment of the Purchase Price, and the Closing under the Asset Purchase Agreement shall have occurred;

c.      The representations and warranties of Licensee set forth in this Agreement be true and correct in all material respects and not contain any material errors or misstatements; and

d.      Licensor shall have been furnished with certificates of appropriate agents of each of the entities comprising Licensee, certifying to the best of the signer's knowledge in such detail as Licensor may reasonably request to the fulfillment of the foregoing conditions.

Trademark License Agreement
Revised 6/9/99

EXHIBIT B PAGE 53

23

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

LICENSOR:

IMPROV-WEST ASSOCIATES

By:  IMPROV WEST, INC.

By:_____
Gerson "Budd" Friedman, President


By:  LONOW AND COMPANY

By:_____
Mark Lonow, President



LICENSEE:

COMEDY CLUB, INC.

By:_____
Al Copeland, CEO


AL COPELAND INVESTMENTS, INC

By:_____
Al Copeland, CEO



Trademark License Agreement
Revised 6/9/99

EXHIBIT B  PAGE 54

Schedule 3-1 to Trademark License Agreement

(Rights of Third Parties to use the Trademarks in connection with Clubs)

EXHIBIT B PAGE 55



Schedule 4-1 to Trademark License Agreement

(Restrictive Agreements)

1.   All agreements listed on Schedule 3-1.

2.   [BF divorce agreement]



Schedule 5-1 to Trademark License Agreement

(Conditions and Requirements as to Manner in which the Trademarks May Be Used)

1.      All performances shall take place on a stage or elevated platform.

2.      All performances shall take place using first class, professional sound equipment and lighting.

3.      A sign saying "IMPROV" shall be placed on the wall behind the performers, in substantially similar to that now used at the Melrose Improv.  The brick wall motif, similar to that now used at the Melrose Improv shall be used on the wall behind the performers.

4.      There shall be no dance performances in the Club.

5.      There shall be no topless performances in the Club.

6.      The Trademarks shall not be used in any way in connection with a "gentleman's club" or "strip club".

# Exhibit C




10-11    FROM    P. 2

## AMENDMENT TO TRADEMARK LICENSE AGREEMENT

THIS AGREEMENT IS MADE THIS ⅃⅃ day of October_____, 1999

by and between Comedy Club, Inc., LICENSEE, and Improv West Associates,

LICENSOR,

WHEREAS, the parties entered into a Trademark License Agreement dated June

13, 1999 granting certain rights related to the trademarks Improv and Improvisation and

trade dress associated therewith and now wish to expand and modify the rights contained

in that agreement as follows:

1. Comedy Club, Inc. will agree to open 12 clubs in 3 years of which 4 will be opened

   by October 13, 2001 and 4 will be opened by October 13, 2002 and the balance by

   October 13, 2003. Eight (8) clubs may be either company owned, joint venture or

   franchise. Four (4) clubs must be either joint venture or company owned. All fees

   and royalties shall be payable as set forth in the June 13, 1999 agreement. This

   modification to the development schedule shall supercede and satisfy the

   development obligations set forth in the June 13, 1999 License Agreement.

2. LICENSOR will grant to LICENSEE the exclusive rights and license to use, utilize,

   and/or license the trademarks, trade dress and content associated therewith for the

   purpose of use on the Internet, including broadband or other internet related media,

   and radio as deemed appropriate by LICENSEE. Ownership in the marks will remain

   vested in LICENSOR who agrees not to enter into any other usage without prior

   approval from Comedy Club, Inc. whose consent will not be unreasonably withheld

   provided any such use by LICENSOR shall not impair the rights of LICENSEE. This

   will supercede and expand the license rights set forth in the June 13, 1999 agreement.

EXHIBIT C  PAGE 58




10-
FROM   FROM

P. 3

3.  The provisions of Paragraph 8 addressing only television set forth in the June 13, 1999 agreement will stay in effect however LICENSOR will agree not to enter into any television arrangement without prior consultation with Comedy Club, Inc. and adequate time to discuss the implications of any such agreement.

4.  LICENSOR will forward a copy of the agreement with Larry O'Daily concerning the "Evening at the Improv" library immediately. LICENSOR will cooperate with and use its very best efforts and do whatever is necessary to help LICENSEE obtain the rights to that library. Thereafter, LICENSEE shall have the exclusive usage of the library for the areas covered by this and the June 13, 1999 agreement. It is contemplated that a fee based on industry standards may have to be paid.

5.  In further consideration hereof, Improv West will receive 15% interest or net profit in the new company formed to exploit the rights covered by this Addendum to the License Agreement and the sum of $150,000 in cash upon final execution of this agreement and the transfer of the rights contained herein.

6.  This agreement shall modify and supercede any and all provisions of the June 13, 1999 License Agreement which are inconsistent or conflict with this agreement. In the event of any conflict or dispute, the terms of this agreement shall prevail.

7.  These additional rights will remain in effect as long as Comedy Club, Inc. is not in default of the terms and provisions of both the agreement dated June 13, 1999 and this amendment dated October 13, 1999.

8.  Improv West will have the right to audit the company to verify its position.

EXHIBIT C PAGE 59

  

12-ᴺᴼⱽ 3:28PM   FROM                                        P. 2

9.  Budd Friedman and Improv West will provide their best efforts to resolve and assist
    Comedy Club, Inc. to obtain the rights to Improv.com.

10. Improv West will provide its best efforts to clear up any and all issues related to its
    franchise deals.

AGREED TO AND ACCEPTED THIS 19 day of  October , 1999

IMPROV WEST ASSOCIATES                COMEDY CLUB, INC.

By: _Budd Friedman_                   By: _____
        Pres.

LONOW & COMPANY

By: _____

EXHIBIT C PAGE 60

# Exhibit D

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is entered into by and among Comedy Club, Inc. ("Comedy") and Al Copeland Investments, Inc. ("ACI"), on the one hand, and Improv West Associates ("Improv") and California Comedy, Inc. ("CCI"), on the other hand (Comedy, ACI, Improv and CCI are sometimes hereinafter referred to collectively as the "Parties").

## RECITALS

A.     Comedy, ACI, Improv and CCI are parties to a Trademark License Agreement dated June 13, 1999, as subsequently amended by (i) an Amendment dated October 19, 1999; (ii) a letter dated August 20, 2001 from California Comedy, Inc. to Comedy Club, Inc, which the Parties regarded as a Second Amendment; (iii) a Third Amendment dated March 3, 2002; and (iv) a Fourth Amendment, dated March 3, 2002 (collectively, the "License Agreement");

B.     On or about November 7, 2003, Comedy and ACI filed a Complaint in the United States District Court for the Central District of California ("District Court"), Case No. CV 03-8134, seeking declaratory relief in relation to the License Agreement ("Complaint");

C.     On or about March 19, 2004, Improv and CCI filed a Demand for Arbitration against Comedy and ACI with the American Arbitration Association, Case No. 72 181 00274 04 ("Demand");

D.     On or about July 28, 2004, the District Court ordered the Complaint to arbitration;

E.     Thereafter, Comedy and ACI filed counter-claims to the Demand ("Counter-Demand") (the Demand, Counter-Demand, and the Parties' respective positions regarding the various disputes which existed in the arbitration shall be collectively referred to herein as the "Arbitration");

F.     On or about February 25, 2005, the arbitrator issued a Partial Final Arbitration Award;

G.     On or about April 12, 2005, the District Court issued an Order confirming the Partial Final Arbitration Award;

H.     On or about May 4, 2005, the District Court entered a Judgment confirming the Partial Final Arbitration Award ("Partial Judgment");

I.     On or about May 20, 2005, the arbitrator issued a Final Arbitration Award;

J.     On or about August 25, 2005, the District Court entered a Judgment confirming the Final Arbitration Award (the "Final Judgment");

EXHIBIT D PAGE 61

K.     Comedy and ACI appealed the Partial Judgment and Final Judgment to the United States Court of Appeals for the Ninth Circuit;

L.     On or about September 7, 2007, the Ninth Circuit issued an opinion affirming in part, vacating in part, and remanding to the District Court for further proceedings consistent with its opinion;

M.     On or about January 23, 2008, the Ninth Circuit issued an amended opinion affirming in part, vacating in part, and remanding to the District Court of further proceedings;

N.     On or about October 8, 2008, the United States Supreme Court granted the Petition for Writ of Certiorari filed by Improv and CCI, and the case was remanded to the United States Court of Appeals for the Ninth Circuit for further review;

O.     On or about January 29, 2009, the United States Court of Appeals for the Ninth Circuit issued its Opinion that vacated in part, affirmed in part, and remanded to the District Court for further proceedings consistent with its opinion (the "Decision");

P.     Improv and CCI filed a second Petition for Writ of Certiorari with the United States Supreme Court that was denied on October 5, 2009 (the original appeal and all subsequent efforts by the parties in connection therewith, including each Petition for Writ of Certiorari and all related briefing, are collectively referred to as the "Appeal"); and

Q.     Pursuant to the Decision, the District Court has been charged with determining the amount of reasonable attorneys' fees and costs that should be awarded to Improv and CCI.

## AGREEMENT

In consideration of the terms and conditions set forth in this Agreement, the Parties agree as follows:

1.     <u>Stipulated Judgment</u>.  Concurrently with the execution of this Agreement, the Parties shall execute the Stipulated Judgment delivered concurrently herewith and held in escrow by the Parties' respective attorneys.  This Agreement, and the effectiveness of the Stipulated Judgment, are expressly conditioned upon Comedy timely and fully paying to Improv of the sum of Three Hundred Seventy-Five Thousand Dollars ($375,000) as set forth in section 4 of this Agreement.  If such payment is not paid in full on or before January 15, 2010, this Agreement shall be void and of no force and effect.  Promptly following such timely and full payment, the Parties shall cause their attorneys to file such Stipulated Judgment with the United States District Court. If the Stipulated Judgment is filed in accordance with the terms of this Agreement, then the Parties agree that no party shall file an appeal from or otherwise challenge or seek review of the Stipulated Judgment.

2.     <u>Optional License and Melrose Improv License Extensions</u>.  If Comedy and ACI have previously exercised the option set forth in Section 3(a) of the Trademark License Agreement dated June 13, 1999, as amended, and on condition that Comedy and ACI have fully performed all of their obligations under the License Agreement and are not in default,

IDOCS:11466.2:992528.1                          - 2 -

39737.1

EXHIBIT ___D___ PAGE __62__

then Comedy and ACI shall have the option, exercisable by written notice given to Improv and CCI after June 1, 2020 and before December 1, 2028, to extend the License (as defined in the License Agreement) until May 31, 2039, which extension right shall also apply to the sublicense for the Tampa, Florida "Improv" club.  If Comedy and ACI have previously exercised the option set forth in Section 3(b) of the Trademark License Agreement dated June 13, 1999, as amended, and on condition that Comedy and ACI have fully performed all of their obligations under the License Agreement and are not in default, then Comedy and ACI shall have the option, exercisable by written notice given to Improv and CCI after June 1, 2020 and before December 1, 2028, to extend the Melrose Improv License (as defined in the License Agreement) until May 31, 2039.  For purposes of this Section 2, any defaults which have occurred prior to the date of this Agreement shall be excluded, including but not limited to any defaults of Comedy or ACI with respect to the obligations of Section 12(a) of the Trademark License Agreement dated June 13, 1999, as amended by Section 1 of the Amendment dated October 19, 1999.  The Parties agree that Comedy and ACI shall not be obligated to open additional new "Improv" clubs pursuant to Section 12(a) of the Trademark License Agreement dated June 13, 1999, as amended by Section 1 of the Amendment dated October 19, 1999.

3.    Internet.  Unless and until otherwise agreed in writing or resolved by proceedings undertaken pursuant to the License Agreement, the Parties shall observe the status quo existing as December 21, 2009 with respect to the Internet domain name "Improv.com" and with respect to the use of the marks "Improv" and "Improvisation" on the Internet.

4.    Attorneys' Fees.  On or before January 15, 2010, Comedy shall pay to Improv the sum of Three Hundred Seventy-Five Thousand Dollars ($375,000) as payment in full for all costs, attorneys' fees and expenses incurred by Improv in connection with the Arbitration, Award, Judgment and subsequent Appeal.  Such payment shall be made by check made payable to, or wire transfer sent to, Improv care of its legal counsel, Dennis Ardi, Esq.  Except for such payment, each party shall bear its own attorneys' fees and costs incurred in connection with the Complaint, Arbitration, and Appeal, and in the negotiation and drafting of this Agreement.

5.    No Oral Modification.  This Agreement may not be amended or modified except by means of a written instrument signed by all Parties.  No right of any party under this Agreement shall be deemed waived unless that waiver is in the form of a written instrument signed by the party who has purportedly waived that right.

6.    Representation of Authority.  Each individual party signator to this Agreement who is executing this Agreement on behalf of a business entity represents and warrants that he/she has the authority to execute this Agreement on behalf of that entity and to bind that entity to the terms of this Agreement.

7.    Rules of Interpretation.  The Parties acknowledge that they have been represented by legal counsel in preparing this Agreement.  The Parties waive the application of any rule of contract interpretation that would require that issues of interpretation be construed against the drafter.

EXHIBIT D  PAGE 63

8.   <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of California, excluding any conflicts of laws principles of that state that would apply the laws of another state.  Venue shall be in Los Angeles, California.

9.   <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the Parties with respect to the subject matter of this Agreement, and supersedes in its entirety all other agreements between the Parties, whether oral or written, with respect to that subject matter.  Each party represents that it has not relied on any promises or inducements that are not disclosed in or incorporated into this Agreement.  Parol evidence shall be inadmissible to show agreements among the Parties to any term contrary or in addition to those in this Agreement.

10.   <u>Counterparts</u>.  This Agreement may be signed in two or more counterparts, each of which will be deemed to be an original.  Any signature by facsimile shall be deemed the equivalent of an original.

Dated: _January 6_, 2010

COMEDY CLUB, INC.

By: _____

Its: _CFO_____

Address: _1001 Harrimon Ct South_

_Metairie, LA 70001_

Dated: _January 6_, 2010

AL COPELAND INVESTMENTS, INC.

By: _____

Its: _CFO_____

Address: _1001 Harrimon Ct South_

_Metairie, LA 70001_

Dated: _____, 2010

IMPROV WEST ASSOCIATES

By: _____

Its: _____

Address: _____

_____

IDOCS:11466.2:992528.1

39737.1

- 4 -

EXHIBIT _D_ PAGE _64_

8.     Governing Law. This Agreement shall be governed by and construed in accordance with the laws of California, excluding any conflicts of laws principles of that state that would apply the laws of another state. Venue shall be in Los Angeles, California.

9.     Entire Agreement. This Agreement contains the entire agreement between the Parties with respect to the subject matter of this Agreement, and supersedes in its entirety all other agreements between the Parties, whether oral or written, with respect to that subject matter. Each party represents that it has not relied on any promises or inducements that are not disclosed in or incorporated into this Agreement. Parol evidence shall be inadmissible to show agreements among the Parties to any term contrary or in addition to those in this Agreement.

10.     Counterparts. This Agreement may be signed in two or more counterparts, each of which will be deemed to be an original. Any signature by facsimile shall be deemed the equivalent of an original.

Dated: _____1_____, 2010          COMEDY CLUB, INC.

                                  By:_____

                                  Its:_____

                                  Address:_____

                                  _____

Dated: _____, 2010         AL COPELAND INVESTMENTS, INC.

                                  By:_____

                                  Its:_____

                                  Address:_____

                                  _____

Dated: __1/7____, 2010            IMPROV WEST ASSOCIATES

                                  By: _Budd Friedman_____

                                  Its: _Gen. Ptr._____

                                  Address: _8162 melrose Av___

                                  _____LA CA 90046_____

LDOCS:11466.2:992528.1                    - 4 -

39737.1

EXHIBIT _D_ PAGE _65_

8.    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of California, excluding any conflicts of laws principles of that state that would apply the laws of another state.  Venue shall be in Los Angeles, California.

9.    Entire Agreement.  This Agreement contains the entire agreement between the Parties with respect to the subject matter of this Agreement, and supersedes in its entirety all other agreements between the Parties, whether oral or written, with respect to that subject matter.  Each party represents that it has not relied on any promises or inducements that are not disclosed in or incorporated into this Agreement.  Parol evidence shall be inadmissible to show agreements among the Parties to any term contrary or in addition to those in this Agreement.

10.   Counterparts.  This Agreement may be signed in two or more counterparts, each of which will be deemed to be an original.  Any signature by facsimile shall be deemed the equivalent of an original.


Dated: _____, 2010          COMEDY CLUB, INC.

                                      By:_____

                                      Its:_____

                                      Address:_____

                                      _____


Dated: _____, 2010          AL COPELAND INVESTMENTS, INC.

                                      By:_____

                                      Its:_____

                                      Address:_____

                                      _____


Dated: _____, 2010          IMPROV WEST ASSOCIATES

                                      By: _Mark Lonow Jonow_____
                                           _and Company_____
                                      Its: _General Partner_____

                                      Address:_____

                                      _____

EXHIBIT D PAGE 66

Dated: ___1/7___, 2010

CALIFORNIA COMEDY, INC

By: _Bruce Friedman_

Its: _Pres._

Address: _8162 Melrose Av_

_L.A. Ch Averb_

EXHIBIT D PAGE 67

# Exhibit E

# DENNIS ARDI
### Attorney at Law
### Professional Corporation

340 N CAMDEN DRIVE, THIRD FLOOR
BEVERLY HILLS, CALIFORNIA 90210

Tel: (310) 271-6900  •  E-mail: DA@DennisArdi.com  •  Fax: (310) 271-6963

April 28, 2011

BY EMAIL TO: kluer@ecjlaw.com

Kenneth Luer, Esq.
Ervin Cohen & Jessup LLP
9401 Wilshire Boulevard, Ninth Floor
Beverly Hills, California  90212-2974

Dear Ken:

As you probably know, Ron Wendel and Mark Lonow have been talking about cooperating on internet activities by giving IWA an interest in Improv.com and the business being done through it.  IWA is hopeful that something can be worked out.  This letter is an attempt to progress the discussion.  It should not be taken as a waiver of any rights that IWA has.

Ron and Mark have discussed various participations the IWA may be given in adjusted gross receipts and net profits. In order to have a meaningful further discussion, however, it is necessary for the parties to define the parameters of the business and to define the terms "adjusted gross receipts" and "net profits".   Would you kindly help your clients to supply IWA with the following information:

      a.      What business is being conducted by, through or using Improv.com?

      b.      What is the current cost of running the site? Who is paid how much for what services?

      c.      What are the sources of revenue? How much has each source of revenue generated, by month, over the last six months?

      d.      How much is earned from advertising on the site?

      e.      How much is earned from sales of merchandise on the site?

      f.      How much is earned from ticket sales: (i) by the site; (ii) from the owners of the sites to which ticket purchasers are re-directed; (iii) by LaughStub?

      g.      Who gets the $3.50 per ticket fee that is charged for online sales?

EXHIBIT E PAGE 68

h.    Please supply copies of the contracts with every business that supplies an ad or a service or that sells products through Improv.com or that can be accessed by a hyperlink on Improv.com

Regarding activities conducted on the site, it has just come to IWA attention that many of these are unauthorized by any agreement between Copeland or Levity and IWA, and that many of the activities constitute infringements upon IWA's trademarks, including:

1.    Listing Gotham Comedy Club on the "Improv" site. It is not an Improv Club, yet it is being treated as if it is and being given the same benefits as licensed Improv Clubs enjoy. When you click on the "New York, Gotham" on the drop down menu from the word "Clubs", you get a box that says "Upcoming Shows at the New York Improv". When you click on that, you get all the same information as for any of the Improv Clubs, and the opportunity to buy tickets. All this must be removed from the site immediately. We would also want to know how much Gotham Comedy Club paid for being included on the site. No comedy club other than and Improv Club should be accessible through Improv.com.

2.    Allowing comedy clubs and comedy businesses to benefit from the use of and association with the "Improv" brand without paying a license fee to do so, including:

A.    Video of comics performing at comedy clubs that are not Improv Clubs, such as (this list is not intended to be exhaustive) Jay Washington performing at Riddles Comedy Club, Beau Elliot at Sherlock's in Houston, Dan Currie at Connxtions Comedy Club, Raj Shama at The Ice House, and Brad Goodwin at Comedy Zone;

B.    Using the site to display and promote productions of Ecomic Branding, including "Dear Comic" and "Tweet the Joke";

C.    Use of the "Improv" trademark on "The Comedy Sideshow" title card and use of the "Improv" trademark in the program (which was not done in compliance with the Copeland Trademark License Agreement if the program was done at a Copeland owned Club);

3.    Including "Ads by Google";

4.    Selling products, such as Mike Birbiglia CDs and digital downloads from Comedy Central;

5.    Selling "Improv" t-shirts and sweatshirts and other merchandise (i.e., all licenses that do allow the sale of such items allow sales *only at* licensed Improv Clubs); and

6.    Using the "Improv" name for a contest (e.g. promoting a Doug Stanhope CD/DVD package through a contest entered by mailing "ImprovContests@gmail.com").

We would like to make a mutually satisfactory agreement for IWA's participation in the



DENNIS ARDI Attorney at Law Professional Corporation                                    3

adjusted gross receipts and net profits of the Improv.com site and the ticket sales made directly
or indirectly through the site. IWA will make every reasonable effort to do so. The immediately
preceding list of problematic items, however, will have to be addressed and resolved as well.
Please have your clients promptly supply the information requested above so that they and IWA
can proceed to work out a mutually acceptable agreement and resolve the issues herein
identified.

Very truly yours,

DENNIS ARDI

cc:     Budd Friedman, Mark Lonow

EXHIBIT __6__ PAGE __70__

# Exhibit F

# ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9ᵗʰ Floor
Beverly Hills, CA 90212-2974
kscott@ecjlaw.com
PH: 310.281.6348
FX: 310.887.6848
File 11466-2

May 10, 2011

**VIA FACSIMILE (310)271-6963**
**AND FIRST CLASS MAIL**

Dennis Ardi, Attorney at Law
A Professional Corporation
340 North Camden Drive, Third Floor
Beverly Hills, CA 90210

Re:  Improv West Associates and California Comedy, Inc. v. Comedy Club, Inc. and Al
     Copeland Investments, Inc.

Dear Mr. Ardi:

I am in receipt of your letter dated April 28, 2011, addressed to my business partner, Ken Luer,
and I write in response thereto. As you alluded to in your letter, it is my understanding that our
respective clients have been in discussions regarding sums derived from the continued
operation of the "improv.com" website (the "Website") which, as you know, related to the
possible creation of a Comedy Club, Inc. subsidiary. As is set forth below, however, your letter
has used this occasion to assert rights and demand information without factual or legal basis in
a manner which offends the spirit and intent of the discussion at hand.

As you will recall, previous discussions regarding the Website came to a head on June 30, 2008.
At that time, Improv West Associates ("IWA") threatened to commence an action to prevent
Comedy Club, Inc./Al Copeland Investments, Inc.'s (collectively, "CCI") so-called "unauthorized"
use of the Website. Your correspondence to my clients at that time even went so far as to
declare that an award in IWA's favor will "be essentially pro forma." While much has happened
over the last three years, our analysis concerning CCI's continued lawful operation of the
Website has not changed from the position that I communicated directly to you on August 14,
2008. CCI's operation and use of the Website is in compliance with the terms of the June 13,
1999 Trademark License Agreement ("Trademark License Agreement"), the October 19, 1999
Amendment thereto ("Amendment"), and, more recently, the January 6, 2010 Settlement
Agreement ("Settlement Agreement"). Accordingly, for each of the reasons set forth herein,
CCI will not cease operating the Website with its current content, nor is it required to supply
the detailed information sought in your April 28 letter.


EXHIBIT F PAGE 71

ERVIN COHEN & JESSUP LLP

Dennis Ardi, Attorney at Law
May 10, 2011
Page 2

As you are aware, the Trademark License Agreement creates a broad grant of rights in the marks "Improv" and "Improvisation" to CCI. To wit, the Recitals to the Trademark License Agreement provide as follows:

> WHEREAS, [IWA] wishes to grant to [CCI] and [CCI] wishes to acquire an exclusive license to use the trademarks "IMPROV" and "IMPROVISATION" (the 'Trademarks') in connection with the business that [CCI] plans to operate at the premises now used by the Melrose Improv; and . . . in connection with other restaurant/bar/nightclub facilities that [IWA] may own or open at other locations and the right to grant to third parties a sub-license to use the Trademarks in connection with other restaurant/bar/nightclub facilities that such third parties may own or open at other locations.

The language of the Trademark License Agreement is unmistakably broad enough to confer to CCI the right to use the Improv marks in any manner, provided, of course, that the use thereof "is in connection with" the operation of the underlying restaurant/bar/nightclub business. The grant would therefore include the use of a website for ticket sales, promotional purposes and any and all merchandise that is related thereto, as is common in the restaurant and entertainment industries. The conduct of which you complain in your April 28 letter is therefore part and parcel of CCI's continued operation of the underlying business and effectuates the very purpose of the broad grant of the use of the Improv mark. IWA therefore has no basis under which to prevent any of the complained of activities.

Equally fatal to IWA's position is the language of the Amendment and the parties' conduct relating thereto. Paragraph 2 of the Amendment grants CCI "the exclusive rights and license to use, utilize, and/or license the trademarks, trade dress and content associated therewith for the purpose of use on the Internet...as deemed appropriate by [CCI]." CCI is thus empowered to use the Improv marks on the Internet as it deems appropriate and without any control of IWA, which is precisely what it has done for years.

Moreover, Paragraph 9 of the Amendment provides, "Budd Friedman and Improv West will provide their best efforts to resolve and assist Comedy Club, Inc. to obtain the rights to Improv.com." Through this provision, IWA effectively relinquished complete control and ownership of the Website for at least the duration of the Trademark License Agreement. In fact, IWA has never provided any content for the Website nor has it exercised any influence or control over the contents of the Website. CCI is entitled to operate the Website in any manner that it deems fit as long as the use of the Improv marks on the Website is "in connection with" the operation of the underlying business. Thus, whether CCI elects to use the Website to include "Ads by Google," sell DVDs, promote CDs or provide links to other sites, is within CCI's prerogative under both the Trademark License Agreement and the Amendment thereto.

EXHIBIT F PAGE 72

ERVIN COHEN & JESSUP LLP

Dennis Ardi, Attorney at Law
May 10, 2011
Page 3

IWA's stated position is also directly contradicted by Paragraph 3 of the Settlement Agreement. The parties' January, 2010 Settlement Agreement addressed all outstanding disputes between the parties, including the threatened action regarding the Website raised in your June 30, 2008 correspondence. To this end, Paragraph 3 of the Settlement Agreement provides, "[u]nless and until otherwise agreed in writing or resolved by proceedings undertaken pursuant to the License Agreement, the Parties shall observe the status quo existing as December 21, 2009 with respect to the Internet domain name "Improv.com" and with respect to the use of the marks 'Improv' and 'Improvisation' on the Internet."

Thus, pursuant to the Settlement Agreement, the types of content (i.e., comic blog pages and video performances) that existed on the Website or before December 21, 2009 are part of the "status quo" and are properly displayed on the Website. With this in mind, we have conducted a full and complete investigation into the manner in which the Website was maintained and the types of content that existed pre-December 21, 2009, as compared to the types of content as it exists today, and no substantive changes to the "status quo" have been made. In fact, while information such as headliners and performance dates has obviously been updated, the Website is operated in much the same fashion as it has since prior to December 2009. This includes, but is not limited to, the posting of advertisements and performance videos, the sale of merchandise, and the listing of the New York Gotham Comedy Club as a venue. In light of such, we view IWA's current complaints regarding the Website's operation as a contrived attempt to gain leverage in the parties' current discussions.

All of the foregoing is made with reservation of all of CCI's rights with respect to equitable and procedural defenses, including that IWA's purported claims are barred by the relevant statute of limitations and are subject to the defenses of laches, waiver, and unclean hands. Some of these defenses were described to you in my August 14, 2008 correspondence. Suffice it to say that, from the time of the default of the Trademark License Agreement in October, 2002, substantial sums of money have been spent on designing, operating and monitoring the Website without any assistance from IWA. Further, since that time, CCI has openly operated the Website without IWA's control over the Website or its content. Moreover, IWA continued to directly profit from CCI's Website throughout this time period. Accordingly, we believe that the parties' course of conduct over more than eight preceding years and, indeed, since 1999, will serve to prevent any steps IWA may take to assert control over the Website at this time.

IDOCS:11466.2:1210991.3

EXHIBIT __F__ PAGE 73

**ERVIN COHEN & JESSUP**LLP

Dennis Ardi, Attorney at Law
May 10, 2011
Page 4

In sum, CCI has no wish to continue discussions under demands and assertions of rights that do not accurately reflect the reality of the situation. Accordingly, we will consider the matter of the Website closed. Of course, our respective clients remain free to discuss business matters as they deem necessary.

Very truly yours,

Kelly O. Scott
ERVIN COHEN & JESSUP LLP

KOS:LJK

cc:     Kenneth A. Luer, Esq.
        Ronald Wendel

IDOCS:11466.2:1210991.3

EXHIBIT F PAGE 74

# Exhibit G





## cohen gardner llp

June 16, 2011

<u>VIA ELECTRONIC AND US MAIL</u>

Robert N. Klieger
Kendall Brill & Klieger LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

RE:   <u>LETTER DATED JUNE 13, 2011</u>

Dear Mr. Kleiger:

The websites you have mentioned are actually owned and controlled by Comedy Club, Inc. I suggest you discuss these issues with their counsel.

Please note that this letter does not constitute an exhaustive list of the circumstances. Nothing contained herein shall be deemed a waiver of any of my client's rights, claims, remedies or defenses at law or in equity in connection with this matter, all of which are expressly reserved.

Sincerely,

Jeff B. Cohen, Esq.
Cohen Gardner LLP

cc:   Robert Hartmann, Levity Entertainment Group
      Bradley J. Garrett, Esq., Cohen Gardner LLP
      Karina B. Sterman, Esq. Ervin Cohen & Jessup, LLP

EXHIBIT G PAGE 95

# Exhibit H

# ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor
Beverly Hills, CA 90212-2974
kscott@ecjlaw.com
PH: 310.281.6348
File No. 11466-2

August 24, 2011

**VIA FACSIMILE (310)271-6963**
**AND FIRST CLASS MAIL**

Dennis Ardi, Attorney at Law
A Professional Corporation
340 North Camden Drive, Third Floor
Beverly Hills, CA  90210

       Re:   **Improv West Associates August 22, 2011 Demand to Gotham**
              **Comedy Club**

Dear Mr. Ardi:

As you are aware, this firm represents Comedy Club, Inc. / Al Copeland Investments, Inc. (collectively "CCI").  I have been forwarded a copy of your most recent correspondence dated August 22, 2011, and addressed to Christopher Mazzilli of Gotham Comedy Club, and I write in response thereto.  Much like your letter correspondence dated April 28, 2011, addressed to my partner, Ken Luer, Esq., your August 22, 2011 correspondence ignores the terms of our respective clients' June 13, 1999 Trademark License Agreement ("Trademark License Agreement"), the October 19, 1999 Amendment thereto ("Trademark Amendment"), and, most recently, the parties' January 6, 2010 Settlement Agreement ("Settlement Agreement"), and purports to dictate to a third party what content can and cannot be displayed on the Improv.com website (the "Website").  As I previously expressed to you in my May 5, 2011, response to your April 28 letter, and as reiterated herein, CCI has at all times operated the Website in accordance with the parties' respective contractual agreements, and Improv West Associates' ("IWA") demand to remove content from the Website—whether made to CCI or to Gotham Comedy Club—is hereby rejected.

There is little question that the Trademark License Agreement creates a broad grant of rights in the trademarks "Improv" and "Improvisation" to CCI.  To wit, the Recitals to the Trademark License Agreement provide as follows:

11466.2:1262634.1

EXHIBIT _H_ PAGE _76_

ERVIN COHEN & JESSUP LLP

Dennis Ardi, Attorney at Law
August 24, 2011
Page 2

WHEREAS, [IWA] wishes to grant to [CCI] and [CCI] wishes to acquire an **exclusive license** to use the trademarks "IMPROV" and "IMPROVISATION" (the 'Trademarks') **in connection with the business that [CCI] plans to operate** at the premises now used by the Melrose Improv; and . . . **in connection with other restaurant/bar/nightclub facilities** that [IWA] may own or open at other locations and the right to grant to third parties a sub-license to use the Trademarks in connection with other restaurant/bar/nightclub facilities that such third parties may own or open at other locations . . ..(Emphasis added)

The language of the Trademark License Agreement is unmistakably broad enough to confer to CCI the right to use the trademark "Improv" or "Improvisation" in any manner, provided, of course, that the use thereof "is in connection with" the operation of the underlying business. The grant would therefore include the use of a website for ticket sales, promotional purposes and any and all merchandise that is related thereto, as is common in the restaurant and entertainment industries. The conduct of which you previously complained in your April 28 letter, and which you again raise in your August 22 letter to Gotham Comedy Club, is in connection with CCI's continued operation of the business, including the broad grant of the use of the "Improv" trademark.

IWA's demand that any reference to Gotham Comedy Club be removed from the Website is equally unavailing in light of the language of the Trademark Amendment and the parties' conduct relating thereto. CCI's **"exclusive license"** to use the trademarks as set forth in the Trademark License Agreement was further confirmed and expanded upon in the Trademark License Amendment. The Trademark License Amendment provides, in pertinent part:

LICENSOR will grant to LICENSEE the **exclusive rights and license to use, utilize, and/or license the trademarks, trade dress and content associated therewith for the purpose of the use on the Internet,** including broadband or other internet related media, and radio as deemed appropriate by LICENSEE. Ownership in the marks will remain vested in LICENSOR **who agrees not to enter into any other usage without prior approval from Comedy Club, Inc.** whose consent will not be unreasonably withheld provided any such use by LICENSOR shall not impair the rights of LICENSEE . . .. Budd Freedman and Improv West will provide their best efforts to resolve and assist Comedy Club, Inc. to **obtain the rights to Improv.com."** (Emphasis added)

Through these provisions, CCI effectively relinquished complete control and ownership of the Website for the duration of the Trademark License Agreement. In fact, IWA has never provided any content for the Website nor has it exercise any influence or control

EXHIBIT H PAGE 77

ERVIN COHEN & JESSUP LLP

Dennis Ardi, Attorney at Law
August 24, 2011
Page 3

over the contents of the Website. CCI is entitled to operate the Website in any manner that it deems fit, again assuming that any activity on the Website is "in connection with" the operation of the underlying business, which it is. Thus, CCI's election to grant permission to Gotham Comedy Club to sell tickets on the website is within CCI's prerogative under both the Trademark License Agreement and the Trademark Amendment thereto.

Similarly, IWA's stated position that Gotham Comedy Club is somehow infringing upon IWA's trademark is also directly belied by Paragraph 3 of the Settlement Agreement. The parties' January, 2010 Settlement Agreement addressed all outstanding disputes between the parties, including the threatened action regarding the Website that was raised by you prior to that time. To this end, Paragraph 3 of the Settlement Agreement provides, "[u]nless and until otherwise agreed in writing or resolved by proceedings undertaken pursuant to the License Agreement, the Parties **shall observe the status quo existing as December 21, 2009** with respect to the Internet domain name "Improv.com" and with respect to the use of the marks 'Improv' and 'Improvisation' on the Internet." (Emphasis added).

Thus, pursuant to the Settlement Agreement, both specific content (*i.e.*, verbatim language) as well as any specified types of content (*i.e.*, links for ticket sales and reference to Gotham Comedy Club) that existed on the Website or before December 21, 2009 are part of the "status quo" and are properly displayed on the Website. As we outlined in response to your April 22 letter, we have investigated the manner in which the Website was maintained and the content that existed pre-December 21, 2009, as compared to the content as it exists today. Rest assured that no substantive changes to the "status quo" have been made. In fact, while the content is obviously updated, the Website has operated in much the same fashion as it has since its inception. In light of such, we view IWA's current complaints regarding the Website's operation and the demands made of CCI, and most recently of Gotham Comedy Club, as factually and legally baseless.

Put simply, IWA's most recent attempts to hijack the Website are as unavailing now as they were when prior demands were made back in August, 2003, June, 2008 and May, 2011. We find it troubling that much of your correspondence on these subjects arrives at times when our respective clients are discussing business solutions to the various issues, effectively chilling such discussions and fostering an atmosphere of distrust. Nevertheless, CCI will continue to operate the Website in accordance with the parties'

EXHIBIT 4 PAGE 78

**ERVIN COHEN & JESSUP** LLP

Dennis Ardi, Attorney at Law
August 24, 2011
Page 4

contractual obligations, which includes reference on the Website to, and ticket sales from, Gotham Comedy Club.  In the future, should you have any questions or concerns about CCI's course of conduct related to the Website, please send them to me directly.

Very truly yours,

Kelly O. Scott
ERVIN COHEN & JESSUP LLP

KOS:LJK

cc:     Kenneth A. Luer, Esq.
        Lauren J. Katunich, Esq.

11466.2:1262634.1

EXHIBIT ⱨ PAGE 79

ERVIN COHEN & JESSUP LLP

Dennis Ardi, Attorney at Law
August 24, 2011
Page 5

bcc:   Bryan White
       Ronald Wendel

EXHIBIT H PAGE 80

# ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 9th Floor
Beverly Hills, CA 90212-2974
kscott@ecjlaw.com
PH: 310.281.6348
File No. 11466-2

August 24, 2011

<u>VIA FACSIMILE (310)271-6963</u>
<u>AND FIRST CLASS MAIL</u>

Dennis Ardi, Attorney at Law
A Professional Corporation
340 North Camden Drive, Third Floor
Beverly Hills, CA  90210

      Re:   **Comedy Club, Inc. and Al Copeland Investments, Inc. v. Improv West Associates**

Dear Dennis:

As you know, this firm represents Comedy Club, Inc. / Al Copeland Investments, Inc. (collectively "CCI"). I am writing to you in connection with a letter dated August 5, 2011, addressed generically to certain unspecified "Improv Club Owners" from PixoFactor Entertainment ("PixoFactor"). The August 5 letter indicates that Pixofactor has "partnered with Budd and Mark and Improv to build and expand the Improv brand across all digital platforms". The letter goes on to describe, in very general terms, plans for the future of the Improv on the Internet. In addition, through a press release dated August 3, 2011, PixoFactor announced to the world that it has partnered with Budd Friedman and Mark Lonow build a new Improv website and engage in various Internet activities using in the Improv name. It is clear that PixoFactor is under the mistaken impression that Budd Friedman and Mark Lonow are authorized to engage or otherwise "partner" with PixoFactor to "build and expand the Improv brand across all the digital platforms." Unfortunately, to the extent that such authorization has been communicated to PixoFactor, whether by Improv West Associates ("IWA") or its principals, PixoFactor has been woefully misled.

The announcements from PixoFactor are merely the most recent efforts made on behalf of IWA to gain control of the Improv brand on the Internet, and in particular, the "Improv.com" website (the "Website"). As you will recall, the issue of CCI's continued operation of the Website first was raised by you by email dated June 30, 2008. At that

EXHIBIT <u>A</u> PAGE <u>81</u>

ERVIN COHEN & JESSUP LLP

Dennis Ardi, Attorney at Law
August 24, 2011
Page 2

time, IWA threatened to commence an action to prevent CCI's so-called "unauthorized"
use of the Website. Your email contained a bold proclamation that, unless CCI
discontinued use of the Website, IWA would commence legal action and an award in
IWA's favor would "be essentially pro forma." My responsive letter to you, dated August
14, 2008, made it clear that IWA's claims were baseless.

Nearly three years later, on April 28, 2011, IWA again made an effort to wrongfully gain
control of the Website with the accusation that CCI's continued operation of the Website
was in violation of the parties' Trademark License Agreement and the Trademark
License Amendment thereto. I responded to these unfounded allegations in my letter to
you dated May 5, 2011—which was similar to the response I provided you on August
14, 2008 in reply to your June 30, 2008 email—wherein I explained that CCI would not
cease operating the Website with its current content, nor would it supply the detailed
information you sought in your April 28, 2011 demand letter.

Fast forward approximately three months to early August, 2011. Clearly realizing that
IWA has no lawful basis under which to claim control of the Website, IWA, by and
through Budd Friedman and Mark Lonow, now seeks to circumvent the parties'
Trademark License Agreement and Trademark License Amendment altogether by
creating new Internet content for the Improv in a partnership with PixoFactor. This will
not stand.

As you are aware, the Trademark License Agreement creates a broad grant of rights in
the trademarks "Improv" and "Improvisation" to CCI. To wit, the Recitals to the
Trademark License Agreement provide as follows:

> WHEREAS, [IWA] wishes to grant to [CCI] and [CCI] wishes to acquire an
> **exclusive license to use the trademarks "IMPROV" and**
> **"IMPROVISATION"** (the 'Trademarks') in connection with the business
> that [CCI] plans to operate at the premises now used by the Melrose
> Improv; and . . . in connection with other restaurant/bar/nightclub facilities
> that [IWA] may own or open at other locations and the right to grant to
> third parties a sub-license to use the Trademarks in connection with other
> restaurant/bar/nightclub facilities that such third parties may own or open
> at other locations . . . .(Emphasis added)

The language of the Trademark License Agreement is thus unmistakably broad and
confers to CCI "an **exclusive** license" to use the trademark "Improv" or "Improvisation"
in any manner, provided, of course, that the use thereof "is in connection with" the
operation of the underlying business.

EXHIBIT H PAGE 82

**ERVIN COHEN & JESSUP** LLP

Dennis Ardi, Attorney at Law
August 24, 2011
Page 3

CCI's "exclusive license" to use the trademarks as set forth in the Trademark License Agreement was further confirmed and expanded upon in the Trademark License Amendment. The Trademark License Amendment provides, in pertinent part:

> LICENSOR will grant to LICENSEE the **exclusive rights and license to use, utilize, and/or license the trademarks, trade dress and content associated therewith for the purpose of the use on the Internet,** including broadband or other Internet related media, and radio as deemed appropriate by LICENSEE. Ownership in the marks will remain vested in LICENSOR **who agrees not to enter into any other usage without prior approval from Comedy Club, Inc.** whose consent will not be unreasonably withheld provided any such use by LICENSOR shall not impair the rights of LICENSEE . . ..(Emphasis added)

The terms of the Trademark License Amendment remain in full force and effect today. This is particularly true since the parties' January, 2010 Settlement Agreement ("Settlement Agreement"), which addressed all outstanding disputes between the parties, including the threatened action regarding the Website raised in your June, 2008 correspondence, and provides, "[u]nless and until otherwise agreed in writing or resolved by proceedings undertaken pursuant to the License Agreement, the Parties **shall observe the status quo existing as December 21, 2009** with respect to the Internet domain name "Improv.com" and with respect to the use of the marks 'Improv' and 'Improvisation' on the Internet." (Emphasis added).

Needless to say, IWA's planned use of the "Improv" trademark on the Internet to create a competing website with rival content is not observing the status quo as it existed in December of 2009 and is in clear violation of the Trademark License Agreement and the Trademark License Amendment. Nor does CCI consent to the use of the "Improv" name on the Internet in this manner. At the risk of stating the obvious, CCI does not and cannot consent to the creation of an all-encompasing Improv website or of any Internet content that would detract from, or compete with, the Website or otherwise potentially cause confusion in the marketplace as to the only source of information concerning the Improv which is authorized to use the "Improv" name .

CCI therefore demands that IWA cease and desist in the development of Internet content and the creation of a website that utilizes the "Improv" or "Improvisation" trademarks in any respect. IWA's failure to comply will necessarily result in the commencement of litigation, wherein CCI will seek all available remedies, including damages, injunctive relief, attorneys' fees and costs, all of which rights and remedies are hereby specifically reserved.

11466.2:1262537.5

EXHIBIT H PAGE 83

ERVIN COHEN & JESSUP LLP

Dennis Ardi, Attorney at Law
August 24, 2011
Page 4

I trust that IWA will govern itself accordingly.

Very truly yours,

Kelly O. Scott
ERVIN COHEN & JESSUP LLP

KOS:LJK

cc:   Kenneth A. Luer, Esq.
      Lauren J. Katunich, Esq.

11468.2:1262537.5

EXHIBIT H PAGE 84

Dennis Ardi, Attorney at Law
August 24, 2011
Page 5

bcc:    Bryan White
        Ronald Wendel

EXHIBIT _K_ PAGE _85_

# ERVIN COHEN & JESSUP LLP

9401 Wilshire Blvd., 9th Floor
Beverly Hills, CA 90212-2974
kscott@ecjlaw.com
PH: 310.281.6348
FX: 310.887.6848
File 11466.2

August 24, 2011

**VIA FEDERAL EXPRESS**

Sean Hurwitz
Chief Executive Officer
PixoFactor Entertainment
209 West 6th
Royal Oak, MI  48067

Re:     **Partnership with Improv West Associates for Planned Exploitation of "Improv"
         Trademark on the Internet**

Dear Mr. Hurwitz:

This firm represents Comedy Club, Inc. / Al Copeland Investments, Inc. (collectively "CCI"), and I
write in response to your letter dated August 5, 2011 addressed generically to certain
unspecified "Improv Club Owners." As you know, your August 5 letter enthusiastically
describes in very general terms various plans for the future of the Improv on the Internet.
These plans are repeated to some degree by a press release dated August 3, 2011. Both the
letter and press release make clear that PixoFactor Entertainment ("PixoFactor") has partnered
with Budd Freidman and Mark Lonow "build and expand the Improv brand across all the digital
platforms." PixoFactor is obviously under the impression that Improv West Associates ("IWA"),
and more specifically, its principals, Budd Friedman and Mark Lonow, are authorized to engage
or otherwise "partner" with PixoFactor in the representation of the Improv brand on the
Internet. Unfortunately, to the extent that such authorization has been communicated to you,
whether by IWA, its principals, or by anyone else for that matter, PixoFactor has been woefully
misled.

So that you are aware, on June 13, 1999, CCI, on the one hand, and IWA, on the other, entered
into a Trademark License Agreement ("Trademark License Agreement"). The Trademark
License Agreement is unmistakably broad and confers to CCI the *exclusive* license and right to
use the trademarks "Improv" or "Improvisation" in any manner that is "in connection with" the
operation of CCI's underlying business. Shortly after the parties entered into the Trademark
License Agreement, an amendment thereto was entered into effective as of October 19, 1999
("Trademark License Amendment"). The Trademark License Amendment further confirms and
expands upon the broad grant of rights in the in the Trademark License Agreement and
provides, in pertinent part:

11466.2:1262553.1


EXHIBIT X PAGE 86

ERVIN COHEN & JESSUP LLP

Sean Hurwitz
August 24, 2011
Page 2

> [IWA] will grant to [CCI] the exclusive rights and license to use, utilize, and/or license the trademarks, trade dress and content associated therewith for the purpose of the use on the Internet, including broadband or other Internet related media, and radio as deemed appropriate by [CCI]. Ownership in the marks will remain vested in [IWA] who agrees not to enter into any other usage without prior approval from Comedy Club, Inc. whose consent will not be unreasonably withheld provided any such use by [IWA]shall not impair the rights of [CCI]. . ..(Emphasis added)

Needless to say, it is CCI, not IWA, that currently maintains the exclusive right to control the exploitation of the "Improv" and "Improvisation" trademarks on the Internet. Based on the statements contained within your August 5 letter and August 3 press release, it appears that the newly formed partnership between Budd Friedman and Mark Lonow (presumably on behalf of IWA) and PixoFactor, and more specifically, PixoFactor's planned creation of an "Improv Network," is in direct competition with CCI's current and anticipated future use of the Improv.com website. Given the circumstances of the planned use, we cannot grant IWA and/or PixoFactor permission to use the "Improv" trademark in such a fashion.

To the extent that CCI has somehow misunderstood your intentions for the future of the Improv on the Internet, please do not hesitate to contact me to discuss the matter further. Otherwise, you may wish to confer directly with IWA about the future of your planned endeavors. Regardless, please be advised that now that PixoFactor has been put on notice of CCI's rights (all of which rights and remedies are hereby specifically reserved), any participation by PixoFactor in IWA's planned violation of those rights will necessarily implicate PixoFactor should litigation ultimately ensue.

Very truly yours,

Kelly O. Scott
ERVIN COHEN & JESSUP LLP

KOS:LJK

cc:     Dennis Ardi, Esq.
        Kenneth A. Luer, Esq.
        Lauren J. Katunich, Esq.

11466.2:1262553.1

EXHIBIT H PAGE 87

**ERVIN COHEN & JESSUP** LLP

Sean Hurwitz
August 24, 2011
Page 3

     bcc:   **Bryan White**
              **Ronald Wendel**

EXHIBIT H PAGE 88

1

## PROOF OF SERVICE

2

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

3
4

I am employed in the County of Los Angeles; I am over the age of eighteen years and not a party to the within entitled action; my business address is 1901 Avenue of the Stars, Suite 1600, Los Angeles, California 90067-6017.

5

On **January 19, 2012,** I served the following document(s) described as

6

**[Proposed] INTERVENOR COMEDY CLUB, INC,'S:**

7

**(1)  ANSWER TO COMPLAINT; AND**

8

**(2)  COUNTERCLAIM FOR DECLARATORY JUDGMENT.**

9

on the interested party(ies) in this action by placing true copies thereof enclosed in sealed envelopes and/or packages addressed as follows:

10
11
12
13
14
15

KENDALL BRILL & KLIEGER LLP          Attorneys for Plaintiff
Robert N. Klieger, Esq.                           IMPROV WEST ASSOCIATES
rklieger@kbkfirm.com
Randall L. Jackson, Esq.
rjackson@kbkfirm.com
10100 Santa Monica Boulevard
Suite 1725
Los Angeles, CA 90067
Telephone:  310-556-2700
Facsimile:  310-556-2705

16
17
18
19

DENNIS ARDI ATTORNEY AT LAW          Attorneys for Plaintiff
   PROFESSIONAL CORPORATION          IMPROV WEST ASSOCIATES
Dennis Ardi, Esq.
340 N. Camden Drive
Third Floor
Beverly Hills, CA 90210
Telephone:  310-271-6900
Facsimile:  310-271-6963

20
21
22

**BY MAIL:**  I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

23
24

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.  I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

25

Executed on **January 19, 2012,** at Los Angeles, California.

26

27

_Natalie Aronstein_
Natalie Aronstein

28

-1-